Danny C. Kelly (USBA 01788)
Catherine Parrish Lake (USBA 11454)
Jason W. Crowell (USBA 13019)
STOEL RIVES LLP
201 South Main Street, Suite 1100
Salt Lake City, UT  84111
Telephone:  (801) 578-6979
Facsimile:  (801) 578-6999
dckelly@stoel.com
cplake@stoel.com
jwcrowell@stoel.com

Christopher N. Weiss (WSBA 14826) admitted *pro hac vice*
Brian C. Park (WSBA 25584) admitted *pro hac vice*
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA  98101
Telephone:  (206) 386-7624
Facsimile:  (206) 386-7500
cnweiss@stoel.com
bcpark@stoel.com

Counsel for Playboy Enterprises International, Inc.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>PLAY BEVERAGES, LLC,<br><br>               Alleged Debtor. | Bankruptcy Case No. 11-26046<br><br>Chapter 7 (Involuntary)<br><br>Honorable Joel T. Marker<br><br>[Filed Electronically] |

### MEMORANDUM IN SUPPORT OF
### PLAYBOY ENTERPRISES INTERNATIONAL, INC.'S
### MOTION FOR AN ORDER (I) CONVERTING THE DEBTOR'S CASE TO A
### CHAPTER 7 CASE; OR (II) REQUIRING THE APPOINTMENT OF A TRUSTEE

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION .................................................................................................... 1

II.    JURISDICTION AND VENUE ............................................................................... 3

III.   FACTS ..................................................................................................................... 3

    A.     Most of the Debtor's Critical Financial Information Can Be Found Only in
the SEC Reports Filed by CirTran Corporation, a Related Company ................... 3

    B.     Playboy, the Debtor, and the Licensing Agreement ............................................. 4

    C.     The CBC Agreement and the Loan Agreement ..................................................... 7

        (1)     Under the CBC Agreement, the Debtor Effectively Transferred All
of Its Rights Under the Licensing Agreement to CBC ............................. 7

        (2)     The CBC Agreement Requires the Debtor to Pay Millions of
Dollars to CBC ......................................................................................... 8

        (3)     The Loan Agreement Burdens the Debtor with Debt but Provides It
No Money .................................................................................................. 9

        (4)     The Debtor's Post-Petition Reports Confirm that (a) the Debtor
Has Received No Money But (b) Its Liabilities and Losses Have
Increased Dramatically ........................................................................... 11

    D.     All Proceeds from the Sale of the Products Are Being Diverted to CirTran ....... 13

IV.    ARGUMENT .......................................................................................................... 15

    A.     The Debtor's Case Should Be Converted to a Chapter 7 Case ............................ 15

        (1)     Cause Exists to Convert this Case Because the Debtor Is
Experiencing Substantial and Continuing Loss and Lacks Any
Reasonable Likelihood of Rehabilitation ................................................ 16

        (2)     Cause Exists to Convert this Case Based on the Conflict of Interest
of the Debtor's Management ................................................................... 17

    B.     In the Alternative, the Court Should Order the Appointment of a Trustee .......... 20

        (1)     The Court Should Appoint a Trustee for "Cause" Because of the
Irreconcilable Conflict of Interest Between the Debtor and Its
Management ............................................................................................. 23

        (2)     The Appointment of a Trustee Is in the Best Interests of the
Debtor's Creditors .................................................................................. 25

V.     CONCLUSION ....................................................................................................... 27

Pursuant to Sections 1112 and 1104 of the U.S. Bankruptcy Code, Playboy Enterprises International, Inc. ("Playboy"), a creditor and party in interest in the above chapter 11 bankruptcy case of Play Beverages, LLC (the "Debtor" or sometimes "PlayBev"), moves the Court for an order (1) converting the Debtor's case to a chapter 7 case; or, alternatively, (2) appointing a chapter 11 trustee.

## I.    INTRODUCTION

The Debtor portrays itself as a worldwide business with a large distribution network in which it has invested millions of dollars, and from which it receives substantial returns.  But the reality is much different.  *The Debtor has no operations and no money*, *and never has*.  In fact, the Debtor has admitted that it never even had a bank account prior to becoming a debtor in possession.  These are extraordinary facts, and they are wholly inconsistent with the nature of a chapter 11 reorganization.

The Debtor's unusual situation is the direct result of two prepetition contracts between itself and another company, CirTran Beverage Corporation ("CBC"), both of which are controlled by the same person: Iehab Hawatmeh ("Hawatmeh").  As the sole officer and director of CBC, and the managing member of the Debtor, Hawatmeh caused the two companies to enter into (1) an exclusive manufacturing and distribution agreement (the "CBC Agreement"), and (2) a loan agreement (the "Loan Agreement") (sometime referred to collectively as the "Agreements").  The purpose of these two Agreements was to allow CBC to capture for itself the Debtor's business, and to keep the Debtor in perpetual indebtedness.  And they accomplished those purposes.  CBC continues (to this day) to control the Debtor's business and collect actual dollars from the sale of what was supposed to be Debtor's products.  At the same time, the Debtor takes on millions of dollars in liabilities to CBC (with borrowing fees and accruing

interest) without the prospect of receiving any cash.  This arrangement has made CBC the

Debtor's largest creditor, with a purported prepetition secured claim of over $14 million.

Because the Debtor has ever-expanding debt with no reasonable hope of reorganizing, the Court

should convert this case to a chapter 7 case.

If the Court were to determine that this case should continue as a chapter 11 case, this

Court should, at the very least, provide the Debtor with a chance to reorganize by appointing a

chapter 11 trustee.  The CBC and Loan Agreements are strangling the Debtor.  The Debtor's

bankruptcy estate (the "Estate") needs an independent fiduciary to thoroughly scrutinize the

Agreements and, as appropriate, take actions to reject or challenge them.

Without the appointment of a chapter 11 trustee, that independent review will not happen.

As the person controlling both parties to the Agreements, Hawatmeh is not independent and is in

no position to fairly evaluate the Agreements and the opportunities available to the Debtor and

the Estate (with or without CBC and Hawatmeh).  As the sole officer and director of CBC,

Hawatmeh has an inherent interest in protecting and improving the financial condition of CBC

and its corporate parent, which is at odds with the best interests of the Debtor and the Estate.

Given his control of both companies, there is a direct and irreconcilable conflict of interest.  And

as if to prove this point, Hawatmeh has already concluded that there is no dispute of the amounts

owing to CBC under the Loan Agreement even though the Loan Agreement does nothing more

than create debt for the Debtor.

If the status quo were allowed to continue, the Estate will continue to suffer.  The

Debtor's monthly financial reports show that the Debtor has not received a penny since the

commencement of this case, except for $250 that CBC's parent loaned the Debtor so it could

open a debtor in possession bank account – apparently the first *real* money that the Debtor has

received.  Over the same time period of time, the Debtor has incurred over a million dollars in debt and hundreds of thousands of dollars of "operating" losses, much of it to CBC.  The Debtor is already in a hole, and the hole will only get deeper.  If the Debtor has any prospects of rehabilitation and its creditors have any hope for recovery, they get dimmer every day the Agreements remain in place – which they will without a trustee.  The motion should be granted.

## II.   JURISDICTION AND VENUE

This Court has jurisdiction over the Motion under 28 U.S.C. § 1334 and Local Rule DUCivR 83-7.1 of the United States District Court for the District of Utah.  Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).

The basis for the relief requested by the Motion is Section 1112 and Section 1104 of the United States Bankruptcy Code (the "Bankruptcy Code"), and Federal Rules of Bankruptcy Procedure 1017, 2007.1, and 9014.

## III.   FACTS

**A.   Most of the Debtor's Critical Financial Information Can Be Found Only in the SEC Reports Filed by CirTran Corporation, a Related Company.**

1.      As a preliminary matter, it is important to understand that most of the Debtor's critical financial information is contained in the reports that CirTran Corporation, a publicly-held and related corporation ("CirTran"), is required to file with the Securities and Exchange Commission (the "SEC").  As set forth in the reports filed with the SEC, effective as of January 1, 2010, the Debtor's financial information became part of the consolidated financial statements that CirTran files with the SEC.  As of that date, CirTran determined that because the Debtor had no operations of its own and CirTran was the Debtor's "primary beneficiary," a new accounting rule permitted the financial consolidation.

2.      Thus, in order to discuss and assess the Debtor's true financial condition, it is necessary to refer to CirTran's SEC reports.  For ease of reference, CirTran's most recent reports are attached as exhibits hereto.  Specifically, attached as <u>Exhibit A</u> is the FY 2010 10-K of CirTran Corp., filed 4/15/2011 (the "2010 10-K"), attached as <u>Exhibit B</u> is the 10-Q of CirTran Corp., for Period Ending  6/30/11 filed on August 18, 2011 (the "June 2011 10-Q"), and CirTran's FY 2009 10-K (the "2009 10-K") is attached as <u>Exhibit C</u>.[1]

**B.      Playboy, the Debtor, and the Licensing Agreement**

3.      Playboy owns one of the most recognized and popular consumer brands in the world, which it markets through a wide range of media and licensing initiatives.  The power of Playboy's brand is the company's most valuable asset.

4.      Playboy licenses its trademarks for the worldwide manufacture, sale, and distribution of a wide variety of products.  In 2006, Playboy decided to expand into the energy-drink business.

5.      The Debtor was formed on August 24, 2006, by a group of investors involved in the beverage industry.  A short time later, the investors negotiated and obtained for the Debtor a Product Licensing Agreement (the "Licensing Agreement") with Playboy to allow the Debtor to

---

[1] Early on, the Court noted its concern about all the money that appeared to be unaccounted for.  Because this is such an important question, Playboy decided that it would try to find the answer.  The essence of what Playboy found is reflected in this memorandum.  In sum, there *is* in fact a lot of money moving around but, despite the impression that the Debtor has created and continues to perpetuate in order to take advantage of the power and protection afforded by the Bankruptcy Code and this Court, it appears that *the money is not the Debtor's money.*  Rather, as the direct result of Agreements, the money – derived from the Licensing Agreement – allegedly belongs to non-debtor CBC under *its* distribution and other agreements with third parties.  In reality, the Debtor over which this Court has jurisdiction has little to do with the operations through which the Products are actually manufactured, marketed, and distributed.

use Playboy's trademarks in connection with the manufacture and distribution of a non-alcoholic

drink known as Playboy® Energy Drink and branded water (the "Products").

6.      In 2007, however, the original investors sold all or the majority of their equity

interests in, and transferred control of, the Debtor to Hawatmeh or entities owned or controlled

by him.

7.      At the time, Hawatmeh was one of two directors and the sole officer of CirTran.

CirTran had been a manufacturer of circuit boards, but over time had become a distributor of

consumer products.[2]  But CirTran was not (and historically had not been) a profitable company,

and its financial prospects were only declining.  (Ex. B, June 2011 10-Q, at 26 ("We have a

history of substantial losses from operations, as well of [sic] history of using rather than

providing cash in operations.").)

8.      Thus, once he obtained control of the Debtor, Hawatmeh decided that the Debtor

itself would not manufacture, market and distribute the Products as contemplated under the

Licensing Agreement.[3]  Instead, on March 29, 2007, Hawatmeh caused CirTran to incorporate

CirTran Beverage Corporation to allow CirTran to take advantage of the Debtor's Licensing

Agreement with Playboy.

9.      Specifically, Hawatmeh effectively transferred the Debtor's contemplated

business (*i.e.*, the right to manufacture, market, and distribute the Products under the Licensing

Agreement) to CBC by causing the Debtor to enter into an Exclusive Manufacturing, Marketing

---

[2] CirTran, however, had no prior experience in the beverage industry.

[3] The Debtor is "wholly-owned or majority owned" by CirTran.  (Ex. A, 2010 10-K at 4 & "Exhibit 21" thereto.)   But the Debtor has no operations of its own.  (*Id.* at 31 "PlayBev has no operations").  As explained in the SEC reports, this is one of the facts that allowed CirTran to include the Debtor in is consolidated financial statements.

and Distribution Agreement with CBC on May 25, 2007, which was amended on August 21, 2007 (the "CBC Agreement").  (A copy of the CBC Agreement, as amended, is attached hereto as <u>Exhibit D</u>.)

10.    Hawatmeh then caused the Debtor to enter into the Loan Agreement.  Under this Agreement, CBC agreed to make a "loan" to the Debtor for the purported purpose of manufacturing, marketing, and distributing the Products.  (Copies of the Loan Agreement, its Amendment, and the related Security Agreement are attached hereto as <u>Exhibits E-1, E-2, and E-3</u>.)

11.    The Agreements have greatly benefited CBC and CirTran.  Indeed, the June 2011 10-Q disclosed that *97% of CirTran's sales* over the last three months came from its "beverage segment" (*i.e.*, CBC).  (Ex. B, at 23.)  All of CirTran's other enterprises (which include "media/online marketing services, electronic products, and contract and manufacturing of consumer products" (*see* Ex. A, 2010 10-K, at 6), now account for a merel 3% of its revenue.

12.    On the other hand, these Agreements have ruined the Debtor.  As set forth more fully below, the Debtor has (a) up-streamed millions of dollars to CBC and CirTran, (b) never received any of the substantial cash generated by the manufacturing and sales of the Products, and (c) been placed in a financial hole from which it will never emerge.

13.    In fact, Hawatmeh was so certain that the Debtor would stay penniless that he, as the Debtor's manager, never even bothered to open a bank account for it.  As Debtor's acting CFO testified at the § 341 meeting, the Debtor did not have a bank account "because there was [*sic*.] no proceeds to go to Play Beverages from the – from CirTran under its existing contract"

(*i.e.*, the CBC Agreement).  (Tr. of § 341 Meeting, 9/15/11 (the "Tr. § 341," attached as <u>Exhibit</u> <u>F</u>), at 45:1-17.)[4]

**C.      The CBC Agreement and the Loan Agreement**

   **(1)      Under the CBC Agreement, the Debtor Effectively Transferred All of Its Rights Under the Licensing Agreement to CBC.**

14.      The CBC Agreement provides that CBC shall be the *exclusive* master manufacturer for all Products for the Debtor.  (Ex. D, CBC Agreement ¶ 1(a).)  The Agreement also provides that CBC shall be the *exclusive* master distributor for the Debtor, and will market and sell the Products for the Debtor.  (*Id*. ¶ 2(a).)  In other words, CBC is to do everything that the Debtor was going to do.

15.      Because CBC performs these functions exclusively, the Debtor is prohibited from entering into any other agreements for the manufacture or distribution of the Products, or granting any other party the rights that the Debtor has under the Licensing Agreement, including the use of Playboy's trademarks.  (*Id*. ¶¶ 2(b) & 11(a).)  The Debtor is completely locked into doing business with CBC, and only CBC.

16.      The CBC Agreement provides that CBC can either manufacture, market, and distribute the Products itself, or subcontract with other parties ("Vendors" and "Distributors") to do the actual work.  If CBC chooses to subcontract the work (which it has in fact done), CBC has the right to negotiate the payment terms directly with the Vendors and Distributors.  (*Id*. ¶ 1(a) & (d).)

---

[4] This statement highlights one of the problems:  Despite the fact that the CBC Agreement does not provide for any payments to the Debtor, it purports to require the Debtor to "remain solely responsible for" certain payments to Playboy.  (Ex. D, CBC Agreement § 3.f.)

17.     Under the CBC Agreement, all proceeds generated from the sale of the Products are paid directly to CBC.  Specifically, paragraph 1(d) of the CBC Agreement states that "[a]s vendor of record, all payments for the Product will be made directly to CBC."  (*Id*. ¶ 1(d).)

18.      Moreover, the CBC Agreement cuts the Debtor out of royalties paid to CBC by its subcontractors.  For example, the Agreement states that CBC "shall engage directly with all distributors."  (*Id*. ¶ 1(d).)  CBC then negotiates *for itself* additional royalties from the distributors.

**(2)        The CBC Agreement Requires the Debtor to Pay Millions of Dollars to CBC.**

19.     The CBC Agreement provides that the Debtor must pay CBC significant sums for the "services" that CBC purportedly performs (or subcontracts out).  The fees charged for the services vary based on which services are being performed.  For example:

a.      For CBC's manufacturing "services" not only must the Debtor pay for the cost of the goods manufactured, the Debtor must pay CBC *an additional 20% of the cost of the goods*.  (Ex. D, CBC Agreement ¶ 3(a) & (b).)

b.      For CBC's distribution "services" the Debtor must pay the underlying costs and *an additional 6% of the gross sales of all Products.  (Id*. ¶ 3(c).)

c.      For its marketing services (*e.g*., placing "all advertising in print, web, television, radio and other promotional outlets") the Debtor must reimburse CBC for the costs of the marketing and pay *an additional 5% of those costs.  (Id*. ¶ 3(e).)

20.     These fees add up quickly.  According to CirTran's 2009 10-K, as of December 31, 2009, the Debtor owed CBC $6,955,817 for the services.  (Ex. C, 2009 10-K, at 24.)[5]

---

[5] The fees "paid" by the Debtor after FY 2009 are unknown due to the financial consolidation described above that became effective as of January 1, 2010.  Under the existing

(continued . . .)

Moreover, because the Debtor had to cash to pay for the services when they supposedly came

due, the amounts owing were left to accrue.  And because the Debtor was unable to "pay" for the

services on a current basis, CBC was able to charge interest on the amount owing and further

increase the Debtor's debt load.  According to the 2009 10-K, "Interest accrued on the PlayBev

accounts receivable balance totaled $518,600 for the year ended December 31, 2009."  *Id*.

<div style="margin-left:2em">

**(3)      The Loan Agreement Burdens the Debtor with Debt but Provides It No
Money.**

</div>

21.      As the "lender" under the Loan Agreement, CBC agreed to loan to the Debtor the

funds needed to perform the manufacturing, marketing and distribution of the Products.[6]

22.      However, the Loan Agreement provides that the Debtor does not receive actual

cash advances.  Instead, CBC agreed to pay third parties directly for the manufacture, marketing,

and distribution of the Products, at which time a "Loan" is deemed "made."  Specifically,

Section 2.1 of the Loan Agreement provides:

> Subject to the terms and conditions of this Loan Agreement,
> Lender agrees to make loans to Borrower on a revolving basis
> (collectively the "Loans" and individually each a "Loan") from time to
> time. . . .  *The Loans will be made to Borrower by Lender paying those
> designated agreed upon expenses in the Budget to third parties directly on
> behalf of the Borrower*.

(Ex. E, Amendment to Loan Agreement § 2.1 (emphasis added).)

---------------------------------

(. . . continued)
accounting system, such intercompany accounts were "eliminated" and, therefore, are not
disclosed, even in CirTran's SEC reports.  (Ex. A, 2010 10-K, at 25.)

[6]  The Loan Agreement is secured by a Security Agreement, which provides CBC with a
lien upon all of the Debtor's assets, including the Debtor's rights under trademark license
agreements.  (Ex. E, at Security Agreement § 2.k.v.)  CBC filed a financing statement in
Delaware on August 22, 2007.

23.     CBC then charges the Debtor a 5% "borrowing fee" on all amounts borrowed.

Specifically, Section 2.2 of the Loan Agreement provides:

> After Lender and Borrower agree on a Budget, Lender shall pay all
> agreed upon designated expenses in the Budget to third parties directly on
> behalf of Borrower. *In addition, Lender shall also charge Borrower a
> one-time borrowing fee (the "Borrowing Fee") of 5% of each of the
> expenses advanced by Lender constituting Loans under this Loan
> Agreement.* Such fee will be added to the principal amount of each Loan.

(*Id*. § 2.2 (emphasis added).)

24.     CBC also charges 7% interest on the amounts borrowed. Section 2.3 of the Loan

Agreement provides:

> Interest on the Loan shall accrue at the rate of 7% per annum from
> the date of disbursement of the principal amount or portion thereof until
> paid, both before and after judgment. . . . If a default occurs in the
> payment of any principal or interest when due, or if any Event of Default
> occurs, all outstanding principal and interest on the loans shall bear
> interest at a default rate from the date when due until paid, both before and
> after judgment, which default rate shall be an annual rate equal to the
> greater of (i) 12% per annum or (ii) 4% per annum above the prime rate of
> interest as described in the Western Edition of the *Wall Street Journal*, as
> such rate shall change from time to time.

(*Id*. § 2.3.)

25.     Moreover, although the CBC Agreement does not allow for the Debtor to receive

revenue directly from the sales of the Products, it leaves the Debtor directly responsible for some

of the costs. Specifically, paragraph 3(f) of the CBC Agreement provides that the Debtor

remains solely responsible to pay the "minimum royalties" (*i.e.*, the "Guaranteed Royalties")

owing to Playboy under the Licensing Agreement.[7]

---

[7] Under the Licensing Agreement, PlayBev is responsible for two different types of
royalties: the "Guaranteed Royalties" and the "Earned Royalties." (*See* Dock. No. 137,
Stipulated Facts, ¶¶ 6-7.) Under paragraph 3(f) of the CBC Agreement, CBC agreed to pay
(purportedly on "PlayBev's behalf") the royalties payable to Playboy under the Licensing
Agreement "calculated on the basis of a percentage of gross sales" (*i.e.*, the "Earned Royalties").

(continued . . .)

26.     But because CBC has never provided any cash to the Debtor, CBC had to make

the "Guaranteed Royalty" payments for the Debtor directly to Playboy.  Presumably, the

amounts of these royalty payments have been added to the principal balance due to CBC under

the Loan Agreement, once again subjecting the Debtor to the Loan Agreement's interest and

"borrowing fee" provisions and perpetuating the Debtor's indebtedness.[8]

**(4)     The Debtor's Post-Petition Reports Confirm that (a) the Debtor Has Received No Money But (b) Its Liabilities and Losses Have Increased Dramatically.**

27.     According to its monthly financial reports, the Debtor's postpetition financial

performance can be summed up as follows:

a.     The Debtor has received no *cash* revenue.  The reports show that the

Debtor received postpetition "revenues" of $691,373 in royalties under the CBC

Agreement from April 26, 2011 to August 31, 2011.[9]  But, of course, the Debtor has not

– and will not – receive the cash.  Rather, CBC offsets every nickel of the royalties

earned by the Debtor against the debts that CBC saddles the Debtor with under the Loan

Agreement.  (*See* Dock. No. 148, Monthly Operating Report for the Period August 13 to

---

(. . . continued)
But no Earned Royalties have ever been paid to Playboy since the Debtor has never met the minimum sales requirements of the Licensing Agreement.  CBC, rather than the Debtor, agreed to pay the royalties to Playboy because, as CBC knew, the Debtor would never have cash or a bank account.

[8] Theoretically, it is possible for the Debtor to receive funds from CBC other than royalties.  Under Section 3(g) of the CBC Agreement, if any receipts from Gross Sales are left after CBC pays (i) the Vendors, (ii) the royalties it pays to Playboy, and (iii) to itself the compensation that PlayBev owes to CBC for the "services" it provides, the surplus funds will be remitted to PlayBev.  To date, however, this has never occurred.

[9] This number is the difference between the amount of royalties noted as owing on April 26, 2011  from the Royalties noted as owing on August 31, 2011, shown on the Debtor's Balance Sheet contained in Ex. G, August 2011 Operating Report  at "5 of 16."

August 31, 2011 (the "August 2011 Operating Report," attached as <u>Exhibit G</u>) at page "5 of 16" at "*Notes.")

       b.     The Debtor's alleged debt to CBC under the Loan Agreement has increased by $1,039,669 ($781,198 in principal and $258,471 for interest), which results in a per diem accrual of $8,186.37.[10]

       c.     Not only is the Debtor's alleged debt to CBC increasing rapidly, the Debtor's "operating" losses are continuing.  Specifically, the Debtor has accumulated losses total $525,336 in four months.[11]  There is no indication, however, of how and why the Debtor is experiencing operating losses when it has no operations of its own.

---

[10] The $781,198 figure is the difference between "Accounts (notes)" payable to CBC as of April 26, 2011 ($12,762,020) and August 31, 2011 ($13,543,218).  (Ex. G, August 2011 Operating Report, at "5 of 16.")  The $258,471 figure is the difference between "Accrued interest payable" as of April 26, 2011 ($1,757,305) and August 31, 2011 ($2,015,776).  (*Id.*)

Apparently, CBC is (1) continuing to spend money in the operation of its business and charging it to the Debtor as "Loans"; (2) adding the "Borrowing Fee" of 5% to the principal; and/or (3) charging the Debtor 7% interest (or perhaps 12% if CBC is applying the default rate).  A good example of how this works is contained in the Debtor's August 2011 Operating Report, which discloses that the $25,000 that CBC paid Durham Jones & Pinegar to represent the Debtor in the gap period was charged to the Debtor as an advance under the Loan Agreement.  (*See* Ex. G, August 2011 Operating Report, at page "11 of 16.")

In most cases, the Court and the Debtor's creditors would know how and why postpetition debt is being incurred, but such information has not been disclosed in this case because the Debtor has been "operating" underneath the radar by virtue of CBC's control over its business.

[11] This numbers are derived by adding the deficits shown as "Net income (loss)" noted on the Statements of Operations contained in the Debtor's 3 Monthly Operating Reports covering April 26, 2011 to August 31, 2011.  (Dock. Nos. 146, 147, and 148.)

**D.     All Proceeds from the Sale of the Products Are Being Diverted to CirTran.**

28.     CBC's only source of funds is from the sale of the Products under the CBC

Agreement with the Debtor.  CBC it does not get revenue from anywhere else.  (Ex. F, Tr. § 341,

at 55:23-56:2.)   And the amount of those revenues is substantial.

29.     But these revenues are not going to the Debtor as originally contemplated.

Rather, all of the revenue generated from the sale of the Products is being captured by CirTran.

The June 2011 10-Q disclosed that 97% of CirTran's sales came from its "beverage segment."

(Ex. B, at 23.)

30.     Given CirTran's own desperate financial condition, maintaining this continuous

stream of revenue from CBC is critical.   Indeed, even with this revenue stream, CirTran is not

able to cash-flow its operations, evidenced by the fact that its loss from operations continues to

rise.  (Ex. B, June 2011 10-Q at 4-5 ("loss of operations" for the reporting period of $1,163,110

and "net loss" from 6 months' operating activities of $3,905,783); *see also id*. at 26 ("We have a

history of substantial losses from operations, as well of [sic] history of using rather than

providing cash in operations.").)  In addition, CirTran is "unlikely [to] be able to obtain

additional debt financing" for its operations.  (*Id*. at 26; *see* Ex. B, June 2011 10-Q, at 9 ("These

conditions raise substantial doubt about our ability to continue as a going concern.").   Thus,

without the revenue stream from the sale of the Products, CirTran's cash flow problems would

intensify.

31.     This stream of revenue is likely being used (or might be used) by CirTran to meet

its other obligations.  As a few examples:

        a.     In January of this year, CirTran and its subsidiaries – including CBC –

        signed a forbearance agreement with YA Global Investments, L.P. ("YA"), which

        required CirTran to confess to a judgment to authorize the replevin of its assets.  On

February 23, 2011, CirTran's confession of judgment in the amount of $3,987,212 was

filed in the Third District Court for the State of Utah.  During the first 6 months of 2011,

CirTran paid $430,000 to YA but CirTran's agreed-to monthly payments of $200,000 for

May through August of 2011 were still not paid.  Thus, YA instructed CirTran to

assemble its assets, and provided notice of a foreclosure sale to occur on August 30,

2011.  Somehow, CirTran was able to get YA to withdraw its foreclosure, at least for

now.  (Ex. B, June 2011 10-Q at 13-15, 17, 21, and 27.)

      b.     Advanced Beauty Solutions ("ABS") has held a judgment in the principal

amount of $1,811,667 against CirTran since September 11, 2009.  On March 3, 2011,

ABS moved the court in that case (the U.S. Bankruptcy Court for the Central District of

California) for an order of civil contempt against CirTran, CBC, Hawatmeh, and others

for failing to make payments on the judgment in violation of the court's orders.

Apparently, no contempt citation was issued initially, but the court subsequently "found

that a basis exists to hold [CirTran and some of its subsidiaries] and Mr. Hawatmeh in

contempt and set an evidentiary hearing for October 6, 2011."  (*Id*. at 32.)

      c.     At least four other judgment creditors have taken actions to collect on their

respective judgments.  Moreover, CirTran is in breach of several settlement agreements,

and additional litigation is still being filed.  (*Id*. at 32-34.)

      d.     Moreover, CirTran's SEC filings disclose that payments have been made

to insiders, including Hawatmeh's family members.  Specifically, during the first six

months of 2011, payments of $7,609 and $28,212 went to "a family member of the

Company president" (*i.e*., Hawatmeh) and on April 2, 2010 the "first payment" in an

undisclosed amount under CirTran's agreement to pay "Separation Pay" went to

Hawatmeh's brother, Shawher Hawatmeh.  (Ex. B, June 2011 10-Q, at 11-12.)[12]

32.     As of December 31, 2010, CirTran had an accumulated net deficit of $41,969,908, an increase of more than $2.8 million over its 2009 deficit.  (Ex. A, 2010 10-K, at F-3.)  CirTran's financial deterioration is accelerating.  In its June 2011 10-Q, CirTran disclosed that its deficit has ballooned to $44,740,760, an increase of more than $2.7 million in just the first six months of 2011.  (Ex. B, June 2011 10-Q, at 3.)[13]

## IV.     ARGUMENT

### A.     The Debtor's Case Should Be Converted to a Chapter 7 Case.

Conversion of a chapter 11 case "for cause" is governed by § 1112(b)(1) of the Bankruptcy Code, which provides:

> [O]n request of a party in interest and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

The party moving for conversion or dismissal bears the burden of proof, by a preponderance of the evidence.  *Vista Foods U.S.A., Inc. v. Official Unsecured Creditors' Comm. (In re Vista Foods U.S.A., Inc.)*, B.A.P. No. WO-96-37, 1997 Bankr. LEXIS 2401, at *13 (B.A.P. 10th Cir. Apr. 3, 1997).

Under Section 1112(b)(4) "cause" includes "substantial or continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation."  11 U.S.C.

---

[12] In the meantime, Hawatmeh is ignoring the Debtor and leaving its creditors unpaid, despite the fact that he is supposed to be acting as a fiduciary for them.

[13] These facts are also troubling because, as long as the CBC and Loan Agreements are in place, the Debtor remains entirely dependent on CBC and CirTran.

§ 1112(b)(4)(A).  In addition, courts recognize that a case may be converted "for cause" when a conflict of interest exists between the debtor (or its management) and those with whom the debtor is dealing.  *In re Graf Bros., Inc.*, 19 B.R. 269, 270 (Bankr. D. Me. 1982) (converting a chapter 11 where Debtor's principal was proposing sales to insiders); *In re BTS, Inc.*, 247 B.R. 301, 311 (Bankr. N.D. Okla. 2000) (converting a case to chapter 7 where management's willingness to pursue claims against itself was doubtful); *see generally Vista Foods,* 1997 Bankr. LEXIS 2401, at *11 (the enumerated grounds for "cause" are not exhaustive).

**(1)      Cause Exists to Convert this Case Because the Debtor Is Experiencing Substantial and Continuing Loss and Lacks Any Reasonable Likelihood of Rehabilitation.**

The Estate was created on April 26, 2011 with the filing of the involuntary petition. According to the Debtor's operating reports, the Debtor's liabilities exceeded its assets by more than $8,254,000 on the petition date.   By August 31, 2011, that figure had risen to $8,871,000, an erosion of approximately $617,927 in just four months.  The Debtor's ever-expanding liability includes an increase of approximately $781,000 under the Loan Agreement.  (Ex. G, August 2011 Operating Report, at page "5 of 16.")  In addition, the Debtor's liabilities include a four-month increase of approximately $258,471 in accrued interest payable (presumably under the Loan Agreement).  (*Id*.)  The Debtor's losses, many due to an insider affiliate company, are substantial and continuing.

Moreover, the Debtor lacks any prospects for a successful rehabilitation.  Section 1112(b)(4)(A) requires that the Debtor be rehabilitated, not reorganized.  "Rehabilitate" means to "put back in good condition; reestablish a firm, sound basis." *In re Great Am. Pyramid Joint Venture,* 144 B.R. 780, 790 (Bankr. W.D. Tenn. 1992) (internal quotation marks and citation omitted).  Accordingly, the Court must look to whether the Debtor's business prospects justify continuance of the reorganization effort.

Far from any hope of being "put back in good condition," the Debtor's extraordinary debts and losses are guaranteed to continue under the CBC Agreement and the Loan Agreement. Indeed, as Hawatmeh has confirmed "no proceeds [are] to go to Play Beverages . . . under its existing contract." (Ex. F, Tr. § 341, at 45:1-7.)  Instead, under the CBC Agreement and the Loan Agreement, the Debtor:

- Receives no cash from CBC;

- Is required to pay high premiums to CBC for the services allegedly provided by CBC;

- Is funded solely by continually receiving advances on loans from CBC at 7% interest *and* with an additional 5% "borrowing fee."

With the Agreements in place, Hawatmeh and CirTran have put the Debtor into a box: liabilities continue to accrue without any reasonable prospect of generating revenue.  And the Debtor's history bears this out.   The Debtor has no cash flow; has no operations; has never before had a bank account; and (as long as the CBC Agreement and the Loan Agreement are in place) remains dependent on CBC and CirTran, a financially troubled company itself.  The Debtor is so cash-strapped that it even had to borrow $250 from CirTran for the account it opened as part of this case.  (Ex. G, August 2011 Operating Report, at Form 2-B.)  Given the Debtor's substantial and continuing losses, and its lack of any reasonable prospect for rehabilitation, cause exists to convert this case to chapter 7.

    **(2)**       **Cause Exists to Convert this Case Based on the Conflict of Interest of the Debtor's Management.**

A debtor in possession is a statutory fiduciary for creditors and the estate.  *In re Interwest Bus. Equip., Inc. v. U.S. Trustee (In re Interwest Bus. Equip., Inc.*), 23 F.3d 311, 316 n.9 (10th Cir. 1994).  The officers and managers of a debtor in possession are bound by a duty of loyalty which encompasses an obligation to refrain from self-dealing, avoid conflicts of interest and the

appearance of impropriety, and treat all parties in the case fairly. 7 *Collier on Bankruptcy*

¶ 1108.09 (16th ed. 2011). Where management is subject to irresolvable conflicts of interest and

the debtor has no substantial operations to protect, conversion is appropriate.

Here, there are irresolvable conflicts between the Debtor and its management. Indeed,

Hawatmeh is an "insider" of both. *See* 11 U.S.C. § 101(31). On one hand, Hawatmeh is "the

managing member" of the Debtor. (Dock. No. 8, Decl. of Iehab Hawatmeh at ¶ 8.) At the same

time, Hawatmeh is CirTran's President, CEO, Chairman, and CFO. (Exhibit H, Deposition of

Iehab Hawatmeh ("Hawatmeh Dep.") at 8-9.) Hawatmeh is also the only officer and the only

director of CBC (*id*. at 9-10) – the Debtor's largest creditor (Dock. No. 111, at Schedule D.)

This conflict cannot be reconciled.[14] On one hand, the Estate needs to increase revenue

and decrease costs, and the Estate's fiduciaries are obligated to exercise their fiduciary duties to

benefit the Estate. On the other, CBC and CirTran are motivated to maximize the revenues and

leverage under the CBC and Loan Agreements, especially given CirTran's dismal economic

outlook. The problem, of course, is that Hawatmeh is in the middle. And from that position, he

cannot, and will not, act in the best interests of the Debtor.

In fact, history demonstrates exactly where Hawatmeh's loyalties lie: squarely on the side

of CirTran and CBC. As shown above, the terms of the CBC and Loan Agreement are one-

sided: they benefit only CBC and serve to load the Debtor up with a massive amount of

purportedly secured debt from which it cannot escape. And while CirTran has reported that 97%

---

[14] In fact, the "insider" and "affiliate" relationships that give rise to irreconcilable
conflicts in this case are myriad. For example, the Debtor is 54.9% owned by a company named
After Bev Group, LLC ("AfterBev"). (Dock. No. 92, List of Equity Security Holders.)
AfterBev, in turn, is a subsidiary of CirTran. (Ex. A, 2010 10-K, at 6.) And CBC has voting
control over AfterBev. (Ex. H, Hawatmeh Dep. at 15.) In other words, CBC has voting control
over the Debtor.

of its sales have come through its beverages segment, CBC has ensured that the Debtor has

received not *a dime* in cash.  Instead, the CBC Agreement requires the Debtor to bear all costs

(and pay a premium!) associated with the manufacturing, marketing, and distribution of the

Products, while allowing CBC to receive all revenues generated by the Licensing Agreement and

Products as its own property.

Given these conflicts, there are numerous analyses and decisions that the Debtor cannot

currently undertake objectively because they directly impact CBC, CirTran, and the Debtor's

management.  Two such key decisions are whether to reject or make an attempt to assume the

CBC Agreement and whether to challenge the Loan Agreement.  Given the importance of these

Agreements to the Estate, the Estate requires a fiduciary with unquestionable loyalty to

thoughtfully analyze them from the viewpoint of the Debtor and its creditors, untainted by

potential conflict.   Other such decisions include, but are not limited to:

- Whether royalties under the CBC Agreement have been computed correctly;

- Whether CBC "payment" of royalties to the Debtor as an "offset" is proper;

- Whether CBC's conduct has breached any of the terms of the Licensing Agreement or the CBC Agreement;

- Whether transfers of proceeds under the Loan Agreement were fraudulent transfers;

- Whether CBC has properly charged expenses to the Debtor making up CBC's nearly $15 million claim;[15] and

---

[15] Hawatmeh testified at the § 341 meeting that the Debtor has *already concluded* that there is no dispute between it and CirTran regarding the amounts owing between the two.  (Ex. F, Tr. § 341, at 28:17-29:20.)

- The extent, value, and priority of CBC's secured interest in the Debtor, and whether the Estate should seek equitable subordination of CBC's secured claim.

These are important issues that only a fiduciary can properly consider with the aid of detached, uninterested managers and professionals. Because of his many conflicts, Hawatmeh cannot do so. Accordingly, this case should be converted.[16]

**B.     In the Alternative, the Court Should Order the Appointment of a Trustee.**

If this Court were to conclude that this case should remain in chapter 11, the Court should appoint a trustee. Appointment of a trustee is warranted in a chapter 11 case if either (i) "cause" exists for the appointment or (ii) the appointment is in the interests of creditors and the estate. Section 1104(a) of the Bankruptcy Code states in pertinent part:

> At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee –
>
> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case . . . ;
>
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests or the estate . . . ; or
>
> (3) if grounds exist to convert or dismiss the case under section 1112, but the court determines that the appointment of a trustee or an examiner is in the best interests of creditors and the estate.

Generally, there is a presumption that the debtor is to continue in control and possession of its business unless a party in interest can prove that the appointment of a trustee is warranted.

---

[16] Conversion, rather than dismissal, is in the best interests of the creditors and the estate. Because of the numerous conflicts, a trustee will have the independent judgment to be able to evaluate the Debtor's contracts, financial history, and relationships with insiders, and evaluate and pursue any appropriate remedies.

*See Sims v. Sims (In re Sims)*, BAP No. NM-97-022, 1997 Bankr. LEXIS 2112, at *10 (B.A.P.

10th Cir. Dc. 30,1997).  Thus, the party moving for the appointment of a trustee has the burden

of proof. [17]  Nonetheless, once a bankruptcy court determines that "cause" exists for the

appointment of a trustee "'it has no discretion but must appoint a trustee.'" *Sims*, 1997 Bankr..

LEXIS 2112, at *10 (*quoting In re Okla. Ref. Co. v. Blaik (In re Okla. Ref. Co.)*, 838 F.2d 1133,

1136 (10th Cir. 1988)).

A debtor in possession must represent the estate, and has a fiduciary duty to exercise

business judgment for the benefit of that estate.  *In re Microwave Prods. of Am., Inc.*, 102 B.R.

666, 670 (Bankr. W.D. Tenn. 1989).  Among other things, a debtor in possession must act to

protect and to conserve the estate and must refrain from acting in a manner which could damage

the estate, or hinder a successful reorganization of the business. *Id.* at 671-73 (citing *In re*

---

[17] The Tenth Circuit has not determined whether the appropriate evidentiary standard for appointment of a trustee is "preponderance of the evidence" or "clear and convincing".  *See In re Celeritas Technologies, LLC*, 446 B.R. 514, 519 (Bankr. D. Kan. 2011) (noting that while a larger number of courts have adopted the "clear and convincing" standard, the opinions have little support in either the Bankruptcy Code or the legislative history).

The *Celeritas* court correctly notes that the U.S. Supreme Court has directed that the "preponderance of the evidence" standard is presumed to be applicable to all civil actions between private litigants, with few exceptions.  *See Grogan v. Garner,* 498 U.S. 279, 286 (1991) (applying that standard to dischargeability actions under Section 523); *see also*, *First Nat'l Bank of Gordon v. Serafini (In re Serafini),* 938 F.2d 1156,  1157 (10th Cir. 1991) (adopting the same standard to non-discharge actions under Section 727); *Vista Foods*, 1997 Bankr. LEXIS 2401, at *13 (adopting the same standard in conversion and dismissal actions).  Because the "preponderance of the evidence" standard is applicable in actions related to discharge, dischargeability, and dismissal or conversion, it is reasonable to conclude that the Tenth Circuit would apply that same standard for the appointment of a trustee.  *See In re Veblen West Dairy, LLP*, 434 B.R. 550, 555 (Bankr. S.D. 2010) (adopting the preponderance standard because a debtor's desire to remain in possession cannot be more important than a chapter 7 debtor's interest in a discharge).

In any event, Playboy submits that even if a higher standard were applicable, the evidence in this case supports the appointment of a trustee.

*Thurmond*, 41 B.R. 464 (Bankr. D. Or. 1983); *In re Sharon Steel Corp.*, 86 B.R. 455, 457 (Bank.

W.D. Pa. 1988)). Moreover, debtors in possession may propose a plan of reorganization, reject

or attempt to assume executory contracts, object to claims, and decide whether to pursue causes

of action of the estate. *See Microwave Prods.*, 102 B.R. at 671.

       If a debtor's ability to fairly and adequately perform these duties is called into question

by prepetition or postpetition conduct, or by the existence of or serious potential for conflicts of

interest, a chapter 11 trustee "must" be appointed, whether for "cause" or because such

appointment is in the best interests of creditors. *See*, *e.g.*, *Okla. Ref.*, 838 F.3d at 1136 (citing

numerous cases holding that "a history of transactions with companies affiliated with the debtor

company is sufficient cause for the appointment of a trustee"); *In re Embrace Sys. Corp.*, 178

B.R.112, 129 (Bankr. W.D. Mich. 1995) (management with ties to company attempting to obtain

debtor's assets "should not be permitted to continue to exercise the Debtor's fiduciary

obligations"); *In re Bellevue Place Assocs.*, 171 B.R. 615, 624 (Bankr. N.D. Ill. 1994) (debtor's

management agreement with related company sharing officers made it impossible for debtor to

evaluate whether to seek to recover any fees paid under the agreement, pursue possible claims

against the managing company, or assume or reject the agreement); *In re Euro-Am. Lodging

Corp.*, 365 B.R. 421, 430 (Bankr. S.D.N.Y. 2007) (management suffering from divided loyalties

cannot exercise independent judgment regarding debtor's relationship with affiliated company);

*In re McCorhill Publ'g, Inc.*, 73 B.R. 1013 (Bankr. S.D.N.Y. 1987) (director's interests in

affiliated debtors who shared convoluted accounting supported appointment of a trustee); *In re

Philadelphia Athletic Club, Inc.*, 15 B.R. 60, 62 (Bankr. E.D. Pa. 1981) (management's desire to

steer assets in a way benefiting his interests made him "incapable of dealing with the debtor as a

fiduciary"); *Smith v. Concord Coal Corp. (In re Concord Coal Corp.)*, 11 B.R. 552, 554 (Bankr.

S.D. W. Va. 1981) (appointment order due to substantial doubt regarding management's loyalty to debtor); *In re L.S. Good & Co.*, 8 B.R. 312, 315 (Bankr. N.D. W. Va. 1980) (serious potential conflicts of interest with parent company required appointment of a trustee).

      **(1)      The Court Should Appoint a Trustee for "Cause" Because of the Irreconcilable Conflict of Interest Between the Debtor and Its Management.**

      The definition of cause under Section 1104(a)(1) is not exclusive.  *Okla. Ref.*, 838 F.2d at 1136 ("[T]he court need not find any of the enumerated wrongs in order to find cause for appointing a trustee"); *see Bellevue Place*, 171 B.R. at 623 (appointing a trustee for "cause" even though no fraud, gross mismanagement, or incompetence was established).  Rather, where the debtor in possession lacks the ability to exercise its fiduciary duties, this "inability constitutes cause to order the appointment of a trustee."  *Bellevue Place*, 171 B.R. at 624.

      Under this flexible standard, there is "cause" to appoint a trustee if conflicts of interest exist that interfere with the debtor's ability to fulfill its fiduciary duties.  Indeed, courts hold that "a conflict of interest alone is sufficient justification under § 1104(a)(1) for the appointment of trustee."  *In re Funge Sys., Inc.*, Case No. 01-12219-RGM, 2002 Bankr. LEXIS 1937, at *17 (Bankr. E.D. Va.  Oct. 17, 2002); *see Veblen West Dairy*, 434 B.R. at 553.

      In *Bellevue Place*, the debtor owned a hotel and had entered into a management agreement with an operator of the business. When the debtor experienced financial difficulties, the operator forced it to enter into a second agreement essentially giving the operator full control of the debtor.  The bankruptcy court ordered the appointment of a trustee because, by virtue of its contract with the operator, the debtor could not independently evaluate whether to pursue recovery of management fees from the operator, assume or reject the contracts, or pursue any other causes of action against the operator.  *Id*. at 624.

Similarly, in *Embrace Systems*, 178 B.R. 112, the debtor owned certain technology and had entered into a licensing agreement for the technology with a company known as Eco. Debtor's president was a "consultant" to Eco and had helped arrange its formation. After the bankruptcy case was filed the debtor sought permission to transfer its technology to Eco. The bankruptcy court found that debtor's management was more concerned about Eco's future than the debtor's and was therefore not disinterested and held an interest adverse to the estate. The court therefore ordered the appointment of a trustee. *Id.* at 128-29.

Additionally, in *Veblen West Dairy*, 434 B.R. 550, the bankruptcy court found that the interrelationship between the debtor's management was acting in a way that would benefit the debtor's insiders and affiliates, rather than its creditors. Although the court made no finding as to whether the management had breached its fiduciary duties to the debtor, the court found sufficient cause to appoint a trustee as an independent entity to assess possible causes of action belonging to the debtor. *Id.* at 555.

In this case, the inherent conflicts of interest discussed above between the Debtor and its current management are as prevalent, if not more so, than the conflicts in the cases described above. Indeed, in this case, the Debtor is controlled by officers, directors, and major shareholders of CBC, which is the Debtor's only purported secured creditor and the party that is in control of the manufacturing, distribution, and promotion of the Products. As noted above, there are numerous questions going forward in which the interests of the Debtor and the interests of CirTran/CBC will directly collide, including the Estate's decisions regarding the CBC and Loan Agreements. Given his roles at CirTran and CBC, Hawatmeh will not be able to evaluate those questions and make decisions impartially. The Estate needs an independent chapter 11

trustee to evaluate these issues and make decisions with the best interests of the Estate and its

creditors in mind.

  **(2)**  **The Appointment of a Trustee Is in the Best Interests of the Debtor's Creditors.**

  The Court need not find cause to appoint a trustee; "[i]t is sufficient that the appointment

be in the interest of creditors." *Okla. Ref.*, 838 F.2d at 1136.  Accordingly, even where there is

insufficient evidence to establish "cause" for appointment of a trustee, the court will nonetheless

consider whether practical reality requires the appointment of a trustee.  *Euro-Am. Lodging

Corp.*, 365 B.R. at 427.  Among the factors the court will consider are the debtor's past and

present performance, its prospects for rehabilitation, the confidence (or lack thereof) in current

management, and the benefits to be derived from the appointment of a trustee.  *Id.* (citing *In re

Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990)); *see also In re V. Savino Oil

& Heating Co.,* 99 B.R. 518, 527 n.11 (Bankr. E.D.N.Y. 1989) ("factors constituting a basis for

appointing a trustee under § 1104(a)(2) are amorphous, diverse, and necessarily involve a great

deal of judicial discretion"); *In re Lowenschuss*, 202 B.R. 305, 316 (Bankr. D. Nev. 1996)

(granting motion for appointment of a chapter 11 trustee because "it is in the best interests of

creditors to have an independent, disinterested trustee to administer the estate and to pursue any

unauthorized transfers of estate property by any person, entity or individual").

  In *Euro-American Lodging*, 365 B.R. at 429, an involuntary petition had been filed

against the debtor, which owned a New York hotel.  The property was operated pursuant to an

agreement with a company called Macson.  Both the debtor and Macson were owned and

managed by the same individuals.  The debtor sought to convert the involuntary case to a chapter

11, and its lender sought appointment of a trustee.  The court noted that the operating agreement

with Macson was the debtor's principal contract and that *possible* disputes related to that

contract, including whether it should be rejected, required the appointment of a trustee. *Id.* at

430 (management suffered from "divided loyalties" and could not exercise independent

judgment on behalf of the estate).  In ordering the appointment of a trustee, the bankruptcy court

noted that the debtor was little more than a "holding company" and that appointment of a trustee

would not threaten day to day operations, as Macson had undertaken those tasks pursuant to the

operating agreement.  *Id.* at 431-32; *see In re Rivermeadows Assocs., Ltd.*, 185 B.R. 615, 618

(Bankr. D. Wyo. 1995) (grounds for the appointment of a trustee included the fact that the debtor

property owner had never had a bank account, and all receipts were funneled through a related

company and transferred to another company for disbursement, a practice which was "not

indicative of sound fiduciary practice"); *Concord Coal*, 11 B.R. at 554-55 (joint ownership of

debtor and related companies with inter-company transactions involving credit and asset swaps

required further scrutiny, which could not "reasonably be expected" with current management in

charge); *In re Microwave Prods.*, 102 B.R. at 676 (ordering the appointment of a trustee under

Section 1104(a)(2) because of continuing erosion of confidence in the debtor and its board of

directors to operate the company).

       Here, even if there were not sufficient grounds to appoint a trustee for cause – which

there are – there are grounds to appoint a trustee in the interest of the creditors.  The Debtor will

either end up liquidating or reorganizing.  Either way, a trustee is vital to the creditors' interests.

Indeed, as it stands, the Debtor is hemorrhaging with ever increasing debt, and has been turned

into nothing more than a holding company for the Licensing Agreement for the benefit of

CirTran.  A trustee would be able to shed light on the transactions and determine for itself

whether reorganization is warranted or whether the Debtor should be liquidated.  A trustee will

be able to take a hard look at, and make potentially difficult decisions regarding, the CBC

Agreement and the Loan Agreement independent from CirTran's conflicting interests.  A trustee will be able to independently evaluate CBC's secured claim and determine whether there are defenses to it.  And a trustee will be able to independently determine whether the best interests of the creditors justify rejecting the CBC Agreement.

The only chance the Debtor has at a successful outcome is to separate the Debtor from its secured creditor and the party who controls it.  By appointing an independent trustee, the Court will be opening up significant areas of inquiry that the Debtor's current management has the intent or the incentive to pursue.

### V.      CONCLUSION

Based on the foregoing, Playboy requests that the Court enter an Order:

1.      Converting the Debtor's chapter 11 case to a case under chapter 7 of the Bankruptcy Code; or, alternatively

2.      Requiring the U.S. Trustee to appoint a chapter 11 trustee; and

3.      Providing such further relief as may be appropriate.

DATED this 5th day of October 2011.

**STOEL RIVES LLP**

/s/Danny C. Kelly
Danny C. Kelly (USBA 1788)
Catherine Parrish Lake (USBA 11454)
Jason W. Crowell (USBA 13019)

Counsel for Playboy Enterprises International, Inc.