# EXHIBIT A

===============================================================================

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, DC 20549

FORM 10-K

(Mark One)

[X]     Annual report under section 13 or 15(d) of the Securities Exchange Act
        of 1934
        For the fiscal year ended December 31, 2010

[ ]     Transition report under section 13 or 15(d) of the Securities Exchange
        Act of 1934
        For the transition period from _____ to _____

Commission file number 000-49654

CIRTRAN CORPORATION
(Name of small business issuer in its charter)

| Nevada | 68-0121636 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 4125 South 6000 West, West Valley City, Utah | 84128 |
| (Address of principal executive offices) | (Zip Code) |

(801) 963-5112
--------------------------
(Issuer's telephone number)

Securities registered under Section 12(b) of the Exchange Act:  None

Securities registered under Section 12(g) of the Exchange Act: Common Stock, Par
Value $0.001

Indicate by check mark if the registrant is a well-known seasoned issuer, as
defined in Rule 405 of the Securities Act. Yes [ ] No [X]

Indicate by check mark if the registrant is not required to file reports
pursuant to Section 13 or 15(d) of the Exchange Act. [ ]

Indicate by check mark whether the registrant (1) has filed all reports required
to be filed by Section 13 or 15(d) of the Exchange Act during the past 12 months
(or for such shorter period that the registrant was required to file such
reports), and (2) has been subject to such filing requirements for the past 90
days. Yes [X] No [ ]

Indicate by check mark whether the registrant has submitted electronically and
posted on its corporate Web site, if any, every Interactive Data File required
to be submitted and posted pursuant to Rule 405 of Regulation S-T during the
preceding 12 months (or for such shorter period that the registrant was required
to submit and post such files). Yes [ ] No [ ]

Indicate by check mark if disclosure of delinquent filers in response to Item
405 of Regulation S-K is not contained herein, and will not be contained to the
best of registrant's knowledge, in definitive proxy or information statements
incorporated by reference in Part III of this Form 10-K or any amendment to this
Form 10-K. [ ]

Indicate by check mark whether the registrant is a large accelerated filer, an
accelerated filer, a non-accelerated filer, or a smaller reporting company. See
the definitions of "large accelerated filer," "accelerated filer," and "smaller
reporting company" in Rule 12b-2 of the Exchange Act. (Check one.)

Large Accelerated Filer [  ]                          Accelerated Filer [  ]
Non-accelerated Filer   [  ]           Smaller Reporting Company [X]

Indicate by check mark whether the registrant is a shell company (as defined in
Rule 12b-2 of the Exchange Act). Yes [ ] No [X]

The issuer's revenues for its most recent fiscal year: $ 9,044,902.

The aggregate market value of the voting and non-voting common equity held by
non-affiliates computed by reference to the price at which the common equity was
sold as of June 30, 2010, was $ 3,994,174.

As of April 15, 2011, the issuer had outstanding 1,498,972,293 shares of Common
Stock, par value $0.001.

Transitional Small Business Disclosure Format (check one) Yes [ ] No [X]

Documents incorporated by reference: None.

2

TABLE OF CONTENTS

ITEM NUMBER AND CAPTION                                                           Page

Part I

Item 1.      Business                                                              4

Item 2.      Properties                                                            17

Item 3.      Legal Proceedings                                                     17

Part II

Item 4.      Market for Common Equity, Related Stockholder Matters
             and Issuer Purchases of Equity Securities                            20

Item 5.      Selected Financial Data                                              22

Item 6.      Management's Discussion and Analysis and Results of
             Operations                                                           22

Item 6A      Quantitative and Qualitative Disclosures about Market Risk           35

Item 7.      Financial Statements and Supplementary Data                          35

Item 8.      Changes in and Disagreements with Accountants on Accounting
             and Financial Disclosure                                             35

Item 8A(T)   Controls and Procedures                                              35

Item 8B      Other Information                                                     37

Part III

Item 9.      Directors, Executive Officers, and Corporate Governance              37

Item 10.     Executive Compensation                                               39

Item 11.     Security Ownership of Certain Beneficial Owners and
             Management and Related Stockholder Matters                           47

Item 12.     Certain Relationships and Related Transactions, and
             Director Independence                                                47

Item 13.     Principal Accountant Fees and Services                               50

PART IV

Item 14.     Exhibits, Financial Statement Schedules                              51

             Signatures                                                           55

3

PART I

ITEM 1.  BUSINESS

This annual report on Form 10-K contains, in addition to historical information,
forward-looking statements that involve substantial risks and uncertainties. Our
actual results could differ materially from the results anticipated by CirTran
and discussed in the forward-looking statements. Factors that could cause or
contribute to such differences are discussed below in the section entitled
"forward-looking statements" and elsewhere in this Annual Report. We disclaim
any intention or obligation to update or revise any forward-looking statement,
whether as a result of new information, future events, or otherwise. The
following discussion should be read together with our financial statements and
related notes thereto included elsewhere in this Report.

CORPORATE BACKGROUND AND OVERVIEW

In 1987, Cirtran Corporation (the "Company" or "we") was incorporated in Nevada
under the name Vermillion Ventures, Inc., for the purpose of acquiring other
operating corporate entities. We were largely inactive until July 1, 2000, when
our wholly owned subsidiary, CirTran Corporation (Utah) acquired substantially
all of the assets and certain liabilities of Circuit Technology, Inc.
("Circuit").

Our predecessor business in Circuit was commenced in 1993 by our president,
Iehab Hawatmeh. In 2001, we effected a 15-for-1 shares forward split and stock
distribution which increased the number of our issued and outstanding shares of
common stock. We also increased our authorized capital from 500,000,000 to
750,000,000 shares. In 2007, our shareholders approved a 1.2 -for-1 shares
forward split and an amendment to our Articles of Incorporation that increased
the authorized capital of the Company to 1,500,000,000 shares of common stock.

Corporate Overview - We conduct our business principally through nine
wholly-owned or majority owned subsidiaries or divisions:

      o      CirTran Corporation ("CirTran USA");

      o      CirTran - Asia, Inc. ("CirTran Asia");

      o      CirTran Products Corp. ("CirTran Products");

      o      CirTran Media Corp. ("CirTran Media");

      o      CirTran Online Corp. ("CirTran Online");

      o      CirTran Beverage Corp. ("CirTran Beverage");

      o      Racore Technology Corporation ("Racore");

      o      Play Beverages, LLC. ("PlayBev") and

      o      After Bev Group, LLC

CirTran USA

We provide a mix of high and medium volume turnkey manufacturing services using
surface mount technology ("SMT"), ball-grid array assembly, pin-through-hole,
and custom injection molded cabling for leading electronics original equipment
manufacturers ("OEMs") in the communications, networking, peripherals, gaming,
law enforcement, consumer products, telecommunications, automotive, medical, and
semiconductor industries. Our services include pre-manufacturing, manufacturing
and post-manufacturing services. Our goal is to offer our customers the
significant competitive advantages that can be obtained from manufacture
outsourcing, such as access to advanced manufacturing technologies, shortened
product time-to-market, reduced cost of production, more effective asset
utilization, improved inventory management, and increased purchasing power.

As of December 31, 2010 and 2009, approximately 2 percent and 13 percent,
respectively, of our revenues were generated by low-volume electronics assembly
activities, which consist primarily of the placement and attachment of
electronic and mechanical components on printed circuit boards and flexible
(i.e., bendable) cables. We also assemble higher-level subsystems and systems
incorporating printed circuit boards and complex electromechanical components
that convert electrical energy to mechanical energy, in some cases manufacturing
and packaging products for shipment directly to our customers' distributors. In
addition, we provide other manufacturing services, including refurbishment and
remanufacturing. We manufacture on a turnkey basis, directly procuring any of
the components necessary for production where the OEM customer does not supply
all of the components that are required for assembly. We also provide design and
new product introduction services, just-in-time delivery on low-to medium-volume
turnkey and consignment projects and projects that require more value-added
services, and price-sensitive, high-volume production.

4

On March 5, 2010, the Company and Katana Electronics, LLC ("Katana") entered into certain agreements related to the Company's re-alignment of its legacy electronic manufacturing business. In so doing the Company transferred its rights and responsibilities to the Company's open and active purchase orders relating to its legacy electronics contract manufacturing business to Katana (which will lease equipment and manufacturing space), allowing the Company for the present time, to focus its resources on areas of growth and profitability. The Katana agreements are discussed in more detail below under the heading "Electronic Products (Cirtran USA, Racore).

CirTran Asia

Through CirTran Asia, we design, engineer, manufacture, and supply products in the international electronics, consumer products and general merchandise industries for various marketers, distributors, and retailers selling overseas. This subsidiary provides manufacturing services to the direct response and retail consumer markets. Our experience and expertise in manufacturing enables CirTran Asia to enter a project at various phases: engineering and design; product development and prototyping; tooling; and high-volume manufacturing. This presence with Asian suppliers helps us maintain an international contract manufacturer status for multiple products in a wide variety of industries, and has allowed us to target larger-scale contracts.

We intend to pursue manufacturing relationships beyond printed circuit board assemblies, cables, harnesses and injection molding systems by establishing complete "box-build" or "turn-key" relationships in the electronics, retail, and direct consumer markets.

The Company has developed several fitness and exercise products, and products in the household and kitchen appliance and health and beauty aids markets that are manufactured in China. Sales of these products comprised approximately 1 percent and 2 percent of revenues reported in 2010 and 2009, respectively. We anticipate that offshore contract manufacturing will play an increased role moving forward as resources will become available to the Company.

CirTran Products

CirTran Products pursues contract manufacturing relationships in the U.S. consumer products markets, including products in areas such as: home/garden, kitchen, health/beauty, toys, licensed merchandise, and apparel for film, television, sports, and other entertainment properties. Licensed merchandise and apparel is defined as any item that bears the image, likeness, or logo of a product, or a person such as a well-known celebrity, that is sold or advertised to the public. Licensed merchandise and apparel are sold and marketed in the entertainment and sports franchise industries. Sales of these products comprised less than 1 percent and 1 percent of total revenues in 2010 and 2009 respectively. We have concentrated our product development efforts into three areas, home and kitchen appliances, beauty products and licensed merchandise. We anticipate that these products will be introduced into the market either under one uniform brand name or under separate trademarked names owned by CirTran Products. We are preparing to launch various programs where CirTran Media will operate as the marketer, campaign manager and distributor in various product categories including beauty products, entertainment products, software products, and fitness and consumer products. The Company anticipates in increasing role in this market as resources become available for allocation to this division.

CirTran Media

In 2006, we formed Diverse Media Group, now known as CirTran Media, to provide end-to-end services to the direct response and entertainment industries. We are developing marketing production services, and preparing programs in which CirTran Media will operate as the marketer, campaign manager and/or distributor for beauty, entertainment, software, and fitness consumer products. In 2006, we entered into an agreement with Diverse Talent Group, Inc., a California corporation ("DT"), whereby DT agreed to provide outsourced talent agency services in exchange for growth financing. In March 2007, we mutually agreed with DT to terminate the agreement, and assigned to DT the name "Diverse Media Group." The Company had no revenues relating to this subsidiary in 2010 and 2009.

In 2006, CirTran Media leased a sales office in Bentonville, Arkansas, in close proximity to Wal-Mart's world headquarters. The office is located there to help create and manage an ongoing relationship with Wal-Mart and Sam's Club stores, and other retailers in order to facilitate the distribution of products through those channels. This division is playing an increasing role in setting up retail distribution for our beverage division.

CirTran Online

During the first quarter of 2007, we started CirTran Online to sell products via the internet; to offer training, software, marketing tools, web design and support, and other e-commerce related services to entrepreneurs; and to telemarket directly to customers. As part of CirTran Online's business plan, we entered into an agreement with Global Marketing Alliance ("GMA"), a Utah limited liability company specializing in providing services to eBay sellers, conducting internet marketing seminars, and developing and hosting web sites. Revenues derived from the arrangement with GMA comprised 12 percent and 26 percent of total revenue in 2010 and 2009, respectively.

CirTran Beverage

In May 2007, we incorporated CirTran Beverage to arrange for the manufacture, marketing and distribution of Playboy-licensed energy drinks, flavored water beverages, and related merchandise through various distribution channels. We also entered into an agreement with PlayBev, LLC ("PlayBev"), a related Delaware limited liability company and the licensee under a product licensing agreement with Playboy Enterprises International, Inc. ("Playboy"). Under the terms of the PlayBev agreement, we are to provide the initial development and promotional services to PlayBev, who will collect from us a royalty based on product sales and manufacturing costs once licensed product distribution commences. As part of efforts to finance the initial development and marketing of the Playboy energy drink, the Company, along with other investors, formed After Bev Group LLC ("AfterBev"), a majority-owned subsidiary organized in California.

Effective January 1, 2010, PlayBev was required to be consolidated into the financial statements of the Company as a variable interest entity. PlayBev holds a license agreement with Playboy Enterprises, Inc. ("Playboy") to market, manufacture and distribute energy drinks and beverages under their brand name.

Two versions of the Playboy energy drink, regular and sugar-free with 8.4 oz cans, have been developed. During 2007, PlayBev and the Company conducted focus group taste tests to determine the best flavor and ingredients; publicized the new drink via promotional bus tours, celebrity-attended activities, and magazine ads; and negotiated with production facilities and distribution groups. During 2008, the Company secured distribution contracts and the drink began selling in New England, Florida, Atlanta, Oklahoma, and California. We also developed 16 oz cans for the same two versions based on demand. Another promotional bus tour began in Las Vegas at the end of February 2008, and the following month continued into Florida. In 2009 and 2010, we expanded sales both domestically and internationally. We currently have sales and distribution networks in 65 countries, throughout Europe, Africa, Australia, the Pacific and the Middle East, and we anticipate continued growth in 2011. Energy drink sales in 2010 and 2009 accounted for 85 percent and 18 percent of total sales, respectively. In 2009, CirTran Beverage has billings to PlayBev for development and marketing services equal to 40 percent of total sales.

Racore Technology Corporation

Through our subsidiary, Racore Technology Corporation ("Racore"), we provide engineering design services to customers of some of our other subsidiaries.

PRIMARY PRODUCTS AND SERVICES

The Company has four primary product and service areas: beverages; media/online marketing services; electronic products; and contract and manufacturing of consumer products.

Beverages (CirTran Beverage)

During 2007, we developed two versions of the Playboy-labeled energy drink: regular and sugar-free. Other products considered under the PlayBev agreement are flavored water beverages and related merchandise. During 2007, we also initiated a promotional marketing program, whereby contacts were made with several celebrities who helped publicize the new energy drinks. Additionally, we ran a college-town bus tour throughout the Southwest United States, and the geographic area of the NCAA's Southeastern Conference. Ads were placed in college-oriented editions of magazines, and we developed collateral materials used to support the product in the college marketplace. A focus group taste test was conducted by Alder-Weiner Research, and the results proved favorable with regards to flavor and ingredients.

Promotional activities continued through 2009 and 2010 throughout the United States and international markets. During 2010, additional promotional activities were also put in place. Beverage segment revenues for the year ended December 31, 2010 and 2009 were $7.7 million and $1.8 million, respectively.

We continue to expand distribution nationally and internationally, having signed international distribution agreements to distribute our line of Playboy-branded energy drinks to 65 countries, including Australia, New Zealand, Albania, Greece, India, Lebanon, Mexico, Nigeria, Russia, South Africa, South Korea, Spain, Brazil, Paraguay, Argentina, Canada, Bulgaria, Croatia, the Czech Republic, Hungary, Poland, Romania, Serbia, Slovakia, Slovenia, and Turkey. During the year ended December 31, 2010, we recorded revenues totaling $7.7 million relating to Playboy-branded energy drink products sold and distributed throughout the world.

Media/Online Marketing Services (CirTran Media, CirTran Online)

In October 2005, we opened a satellite office in Los Angeles, with a two year lease, in accordance with a planned internal expansion program. In November 2007, a new office space was leased (3 year term) in Los Angeles to house personnel involving CirTran Asia-related product transportation, along with activities connected with our beverage business. As of the date of this Report, we had moved out of the office location described above, and were looking for a new location. We anticipate that the Los Angeles office will be used almost exclusively for our beverage business.

In early 2007, we signed a three-year, Assignment and Exclusive Services Agreement with GMA, founded by Mr. Sovatphone Ouk, and its affiliate companies, Online Profit Academy, LLC, and Online 2 Income, LLC, including Webprostore.com and Myitseasy.com. Based in the Salt Lake area, these companies offer a wide range of services for e-commerce, including eBay sellers. We plan to work closely with the GMA companies to sell products via the internet, and to offer training, software, marketing tools, web design and support, as well as other e-commerce related services to internet entrepreneurs. Through the GMA companies, we also intend to telemarket directly to buyers of our products and services. We also signed a three-year employment agreement with Mr. Ouk to serve as Senior Vice President of our new CirTran Online subsidiary. GMA and its affiliate companies offer a range of complementary capabilities and products for e-commerce, including seminars on how to buy and sell on the World Wide Web. GMA is experienced in building e-commerce websites, and currently hosts sites for internet entrepreneurs. The agreements are to continue on a month to month basis upon completion of the original term. Both agreements remained in effect during 2009 and 2010.

Electronics Products (CirTran USA, Racore)

Since 1993, we have devoted resources to our traditional electronics business and product lines. We manufacture all of our electronics products through CirTran USA, and provide some engineering services through Racore.

As previously disclosed in a Current Report on Form 8-K, filed March 11, 2010, on March 5, 2010, the Company and Katana Electronics, LLC, a Utah limited liability company ("Katana") entered into certain agreements related to the Company's re-alignment of its legacy electronic manufacturing business (the "Agreements"). In so doing the Company transferred its rights and responsibilities to the Company's open and active purchase orders relating to its legacy electronics contract manufacturing business to Katana (which will lease equipment and manufacturing space), allowing the Company for the present time, to focus its resources on areas of growth and profitability. The Agreements included an Assignment and Assumption Agreement, Sublease Agreement and Equipment Lease.

An overview and summary of the Agreements follows. The summaries of the terms
and conditions of the Agreements do not purport to be complete, and are
qualified in their entirety by reference to the full text of the agreements.

### Assignment and Assumption Agreement

The Assignment and Assumption Agreement, dated March 5, 2010, between the
Company and Katana (the "Assignment Agreement") sets forth the terms and
conditions of the Company's transfer of its right, title, interest, obligations
and duties in, under and to all of the Company's open and active purchase orders
relating to its legacy electronics manufacturing business existing as of March
5, 2010 (the "Purchase Orders"). In exchange for the assignment of the minimal
Purchase Orders, Katana agreed to assume all obligations under and service the
Purchase Orders and indemnify the Company from any losses or claims arising from
or under the Purchase Orders as of the date of the Assignment Agreement.

The Company made standard representations regarding the ownership and status of
the Purchase Orders in connection with the assignment.

### Sublease Agreement

In connection with the assignment of the Purchase Orders pursuant to the
Assignment Agreement, the Company entered into a Sublease Agreement with KATANA
(the "Sublease"). The Company leases from Don L. Buehner the real property and
its improvements located at 4125 South 6000 West, West Valley, Utah, 84128 (the
"Premises"). Pursuant to the terms of the Sublease, the Company will sublease a
certain portion of the Premises to Katana consisting of the warehouse,
electronics product manufacturing and assembly area, and office space used as of
the close of business on March 4, 2010, for the legacy electronics manufacturing
business of the Company.

The term of the Sublease is for two (2) months with automatic renewal periods of
one month each. The base rent under the Sublease is $8,500 per month. The
Sublease contains normal and customary use restrictions, indemnification rights
and obligations, default provisions and termination rights.

### Equipment Lease

In connection with the assignment of the Purchase Orders pursuant to the
Assignment Agreement, the Company entered into an Equipment Lease with KATANA
(the "Equipment Lease") for the lease of certain machinery and equipment related
to the Company's legacy electronics manufacturing business.

The term of the Equipment Lease is two (2) months with automatic renewal periods
of one month each. The base rent under the Equipment Lease is $1,000 per month.
The Equipment Lease contains normal and customary use restrictions,
indemnification rights and obligations, default provisions and termination
rights.

In June 2010, subsequent to the entry into the agreements with Katana, YA Global
Investments, LP ("YA") brought suit against the Company and Katana, claiming
that the Company had improperly assigned assets to Katana. On January 24, 2011,
the Company entered into an Amended and Restated Forbearance Agreement with YA,
including a confession of judgment in favor of YA. On February 23, 2011, the
court entered judgment based on the confession of judgment against the Company
in the amount of $3,161,354 in principal, plus $825,858 in interest. (The
Amended and Restated Forbearance Agreement is discussed below under the heading
"Entry into Forbearance Agreement and Amendment.")

Contract and Manufacturing of Consumer Products

Fitness and Exercise Products (CirTran Asia)

The Company began manufacturing fitness products in 2004. To date, we have manufactured numerous fitness products and sold over 12 different fitness products. We manufacture all of our fitness products through our CirTran Asia subsidiary, originally via an exclusive, three-year manufacturing agreement with certain developers and their affiliates that expired by its terms during mid-2007, but which continues on a month-to-month basis. The Company continues to offer contract manufacturing services moving forward.

> Household and Kitchen Appliances, and Health and Beauty Aids
> (CirTranMedia, CirTranProducts, CirtranAsia)

We began manufacturing household and kitchen appliance products in January 2005. To date, we have manufactured and sold various household and kitchen appliance products. These products are sold through Cirtran Media and Cirtran Products. We manufacture the majority of our household and kitchen appliance products through our CirTran Asia operation.

In 2005, we signed an exclusive manufacturing agreement with Advanced Beauty Solutions L.L.C. ("ABS"), regarding the True Ceramic Pro(TM) ("TCP") flat iron hair product. Later in 2005, we were notified that ABS had defaulted on certain obligations to a financing company. We stopped shipping under credit, and exercised rights permitted by the agreement. Following efforts to resolve disputes, we filed a lawsuit against ABS, citing various claims, and sought damages. By then, we had shipped approximately $4.7 million worth of TCP units, and were owed approximately $4.0 million. We repossessed from ABS approximately $2.3 million worth of TCP units, and have since been selling TCP units directly to ABS customers as permitted under the bankruptcy proceedings, which also required us to pay royalties to various ABS creditors (see "Legal Proceedings" for more information regarding ABS-related litigation).

In November 2006, we entered into an exclusive agreement with Beautiful Eyes(R), Inc. for a new "hot lashes" product to be sold via infomercials and through retailers. Through the end of 2007, we worked with the customer, developing the product and submitting samples for approval. The infomercial for the product was completed during 2008. We anticipate initiating market tests in the near future.

In February 2007, we announced completion of an infomercial featuring former heavyweight boxing champion Evander Holyfield and The Real Deal Grill(TM), an indoor/outdoor cooking appliance. Media testing took place in the fall of 2007. Sales of approximately $10,000 resulted, and certain changes were made to the infomercial. We have contracted with another media company for infomercial airings and distribution, and during early 2008 decided to make additional changes to the infomercial to determine if a roll-out was justified. During 2008 we also completed retail packaging design for this product and presented the product to major retailers. We continue sell the product with online retailers and we continue to work with other leading retailers to order to bring the Real Deal Grill to their shelves in the near future.

INDUSTRY BACKGROUND

New Age Beverages. The Playboy energy drink and other products we are developing are part of a growing market segment of the beverage industry known as the "new age" or alternative beverage industry. The alternative beverage category combines non-carbonated ready-to-drink iced teas, lemonades, juice cocktails, single serve juices and fruit beverages, ready-to-drink dairy and coffee drinks, energy drinks, sports drinks, and single-serve still water (flavored, unflavored and enhanced) with "new age" beverages, including sodas that are considered natural, sparkling juices and flavored sparkling beverages. The alternative beverage category is the fastest growing segment of the beverage marketplace, according to Beverage Marketing Corporation.

As we continue to launch our Playboy energy drink and other licensed products, we will compete with other beverage companies not only for consumer acceptance but also for shelf space in retail outlets and for marketing focus by our distributors, all of whom also distribute other beverage brands. Our energy drink products compete with all non-alcoholic beverages; most of the competing products are marketed by companies with substantially greater financial resources than ours. We also compete with regional beverage producers and "private label" soft drink suppliers. We believe that our leading energy drink competitors are Red Bull and Monster.

Contract Manufacturing. The contract manufacturing industry specializes in
providing the program management, technical and administrative support and
manufacturing expertise required to take products from the early design and
prototype stages through volume production and distribution. The goal is to
provide the customer with a quality product, delivered on time and at the lowest
cost. This full range of services gives the customer an opportunity to avoid
large capital investments in plant, inventory, equipment and staffing, and to
concentrate instead on innovation, design and marketing. By using our contract
manufacturing services, customers have the ability to improve the return on
their investment with greater flexibility in responding to market demands and
exploiting new market opportunities.

In previous years we identified an important trend in the manufacturing
industry. We found that customers increasingly required contract manufacturers
to provide complete turnkey manufacturing and material handling services, rather
than working on a consignment basis where the customer supplies all materials
and the contract manufacturer supplies only labor. Turnkey contracts involve
design, manufacturing and engineering support, the procurement of all materials,
and sophisticated in-circuit and functional testing and distribution. The
manufacturing partnership between customers and contract manufacturers involves
an increased use of "just-in-time" inventory management techniques that minimize
the customer's investment in component inventories, personnel and related
facilities, thereby reducing their costs.

MARKET AND BUSINESS STRATEGY

We maintain capabilities domestically and internationally through multiple
channels in product manufacturing, marketing, and distribution. More
specifically, we can provide solutions in areas such as campaign management,
direct-response media, retail and wholesale distribution, web-based marketing,
along with print/catalog and live shopping marketing channels.

We have concentrated our focus on promoting four operating business segments.
These segments include Beverage Distribution, Marketing and Media, Contract
Manufacturing and Electronics Assembly.

Beverage Distribution

We feel that our beverage business will continue to have a substantial impact on
our business. The New Age Beverage industry is still on the move. According to
Beverage Digest, a trade publication covering the non-alcoholic beverages
industry, caffeinated energy drinks have become the fastest-growing sector of
the $93 billion domestic beverage industry. Sales of energy drinks grew 700
percent over the past five years, and continue to grow at a double digit rate,
according to beverage industry consultants. This industry is growing due to
current attention to new brands, non-coffee drinkers, and people interested in
health and fitness. By directing products to specific groups such as extreme
sports enthusiasts, energy drinks target consumer groups made up primarily of
male teenagers and young people in the 20's age bracket.

Marketing and Media

We currently provide product marketing services to the direct response and
retail markets for both proprietary and non-proprietary products. This segment
provides campaign management and marketing services for both the Direct
Response, Retail and Beverage Distribution markets. We provide marketing and
media services to support our own product efforts, and offer to customers
marketing service in channels involving television, radio, print media, and the
internet.

Contract Manufacturing

Based on the trends observed in the contract manufacturing industry, one of our
goals is to benefit from the increased market acceptance of, and reliance upon,
the use of manufacturing specialists by many OEMs, marketing firms,
distributors, and national retailers. We believe the trend towards outsourcing
manufacturing will continue. OEMs utilize manufacturing specialists for many
reasons, including reducing the time it takes to bring new products to market,
reducing the initial investment required and to access leading manufacturing
technology, gaining the ability to better focus resources in other value-added
areas, and improving inventory management and purchasing power. An important
element of our strategy is to establish partnerships with major and emerging OEM
leaders in diverse segments across the electronics industry. Due to the costs
inherent in supporting customer relationships, we focus our efforts on customers
with which the opportunity exists to develop long-term business partnerships.
Our goal is to provide our customers with total manufacturing solutions for both
new and more mature products, as well as across product generations – an idea we
call "Concept to Consumer."

10

PlayBev Agreement

The consolidated financial statements of the Company also include the accounts
of PlayBev LLC ("PlayBev") a newly consolidated variable interest entity.
PlayBev holds a license agreement with Playboy International, Inc. ("Playboy")
to manufacture and distribute energy drinks and water under the PlayBoy name. In
prior years, PlayBev was not required to be consolidated due to lack of control
over significant decisions by the Company or its affiliates. Effective January
1, 2010, the Company determined that it was the primary beneficiary of PlayBev
and began to consolidate into its financial statements the accounts of PlayBev.

In May 2007, the Company entered into an exclusive, three-year manufacturing,
marketing, and distribution agreement (the "PlayBev Agreement") with PlayBev. In
August 2007, the Company extended the agreement's term to ten years. PlayBev is
the licensee under a product licensing agreement with Playboy. The PlayBev
Agreement allows the Company to arrange for the manufacture, marketing and
distribution of Playboy-licensed energy drinks, flavored water beverages, and
related merchandise through various distribution channels. Under the terms of
this agreement, the Company is to provide the initial development and
promotional services to PlayBev.

PlayBev had no operations, so under the terms of the PlayBev Agreement, the
Company was appointed the master manufacturer and distributor of the beverages
and other products that PlayBev licensed from Playboy. As a result, we have
assumed all the risk of collecting amounts owed from customers, and contracting
with vendors for manufacturing and marketing activities.

The Company also agreed to provide services to PlayBev for initial development,
marketing, and promotion of the new beverage.

Entry into Forbearance Agreement and Amendment

On January 24, 2011, the Company, certain of its subsidiaries listed below, and
YA Global Investments (formerly known as Cornell Capital Partners, LP) ("YA")
finalized an amended and restated forbearance agreement (the "A&R Forbearance
Agreement") and related agreements, which related to certain financing
arrangements and agreements between the Company and YA and its predecessors. The
A&R Forbearance Agreement was dated as of January 7, 2011, but the final
conditions for closing were met on January 24, 2011.

A&R Forbearance Agreement

An overview and summary of the A&R Forbearance Agreement between the Company and
YA, together with other agreements entered into in connection with the A&R
Forbearance Agreement, follows. The summaries of the terms and conditions of the
A&R Forbearance Agreement and the other agreements do not purport to be
complete, and are qualified in their entirety by reference to the full text of
the agreements which were filed as exhibits to a Current Report on Form 8-K
filed on January 28, 2011.

The A&R Forbearance Agreement related specifically to three debentures issued by
the Company to YA or its predecessor entities: a May 26, 2005, debenture in the
principal amount of $3,750,000 (the "May Debenture"), a December 30, 2005,
debenture in the principal amount of $1,500,000 (the "December Debenture"), and
an August 23, 2006, debenture in the principal amount of $1,500,000 (the "August
Debenture," and collectively with the May Debenture and the December Debentures,
the "Debentures"), together with certain other agreements entered into in
connection with the issuance of the Debentures (collectively, the "Financing
Documents").

The parties to the A&R Forbearance Agreement are the Company; YA; and the
following subsidiaries of the Company: Racore Network, Inc. (hereinafter,
"Racore"); Cirtran - Asia, Inc. (hereinafter, "Asia"); Cirtran Beverage Corp.
(hereinafter, "Beverage"); Cirtran Media Corp. (hereinafter, "Media"); Cirtran
Online Corp. (hereinafter, "Online"); Cirtran Products Corp. (hereinafter,
"Products"); and Cirtran Corporation (Utah) (hereinafter, "Cirtran Sub," and
together with Racore, Asia, Beverage, Media, Online and Products, collectively,
jointly and severally, the "Guarantors"). The A&R Forbearance Agreement
references certain events of default under the Financing Documents, and notes
that the Company and the Guarantors (collectively, the "Obligors") had requested
that YA forbear from enforcing its rights and remedies under the Financing
Documents, and sets for the agreement between the Obligors and YA with respect
to such forbearance.

ITEM 2.  DESCRIPTION OF PROPERTY

On May 4, 2007, we entered into a ten-year lease agreement for our existing 40,000 square-foot headquarters and manufacturing facility, located at 4125 South 6000 West in West Valley City, Utah (the "Premises"). Monthly payments are $10,000, adjusted annually in accordance with the Consumer Price Index. The Premises workspace includes 10,000 square feet of office space to support administration, sales, and engineering staff. The 30,000 square feet of manufacturing space includes a secured inventory area, shipping and receiving areas, and manufacturing and assembly space.

In 2010, in connection with the Agreement between the Company and Katana (described above), the Company entered into a Sublease Agreement with Katana (the "Sublease"). Pursuant to the terms of the Sublease, the Company will sublease a certain portion of the premises to Katana consisting of the warehouse, electronics product manufacturing and assembly area, and office space used as of the close of business on March 4, 2010, for the legacy electronics manufacturing business of the Company.

The term of the Sublease is for two (2) months with automatic renewal periods of one month each. The base rent under the Sublease is $8,500 per month. The Sublease contains normal and customary use restrictions, indemnification rights and obligations, default provisions and termination rights.

Century City, California

In November 2007, we began occupying approximately 1,260 square feet of commercial space in the Century City district of Los Angeles. The three-year lease calls for payments of $3,525 per month. The Company closed this office and discontinued this lease during 2010 but intends to relocate to another location in 2011.

Bentonville, Arkansas

In November 2006, we signed a two-year lease on a 1,150 square-foot facility in Bentonville, Arkansas, in close proximity to Wal-Mart's world headquarters. Lease payments during the two-year lease term have been $1,470 per month. We entered into a new lease agreement, beginning in November 2008 for a 600 square-foot facility at a new location in Bentonville. Lease payments for the two year lease are $715 per month. As the contract period has expired on this lease, it is on a month-to-month basis.

We believe that the facilities and equipment described above are generally in good condition, are well maintained, and are generally suitable and adequate for our current and projected operating needs.

ITEM 3.  LEGAL PROCEEDINGS

Advanced Beauty Solutions, LLC, v. CirTran Corporation, Case No.1:08-ap-01363-GM. In connection with prior litigation between Advanced Beauty Solutions ("ABS") and the Company, ABS claimed non-performance by the Company and filed an adversary proceeding in ABS's bankruptcy case proceeding in the United States Bankruptcy Court, Central District of California, and San Fernando Valley Division. On March 17, 2009, the Bankruptcy Court entered judgment in favor of ABS and against the Company in the amount of $1,811,667 plus interest. On September 11, 2009, the Bankruptcy Court denied the Company's motion to set aside the judgment. As of the date of this report, ABS is pursuing collection efforts on this judgment.

On September 8, 2010, the Company executed an Assignment of Copyrights, thereby assigning the Company's Copyright Registration No. TX-6-064-955, Copyright Registration No. TX-6-064-956, and Copyright to the True Ceramic Pro - Live Ops (TCPS) infomercial and related master tapes (collectively the "Copyrights") to ABS. The Company assigned and transferred the Copyrights without reservation or exclusion, making ABS the owner of the Copyrights. On February 23, 2011, the Company filed a Motion to Declare Judgment Fully Satisfied or Alternatively to Recoup Mutual Debts, requesting that the Court determine that the Company's assignment of the Copyrights resulted in full satisfaction of the ABS judgment. On March 3, 2011, ABS brought a Motion for Order to Show Cause re Civil Contempt by the Company and CirTran Beverage Corp., CirTran Products Corp., CirTran Media Corp., and Iehab Hawatmeh, alleging that the Company had failed to make payments on ABS's judgment in violation of the Court's orders.

17

On April 6, 2011, the Court held a hearing on (1) the Company's Motion to Declare Judgment Fully Satisfied or Alternatively to Recoup Mutual Debts; and (2) ABS's Motion for an Order to Show Cause re Civil Contempt. The Court denied the Company's Motion to declare the judgment fully satisfied, but did not hold the Company in civil contempt. As of the date of this Report, the Company was reviewing its options with respect to how to proceed.

Apex Maritime Co. (LAX), Inc. v. CirTran Corporation, CirTran Asia, Inc., et al., California Superior Court, Los Angeles County, SC098148. Plaintiff Apex Maritime Co. (LAX), Inc. ("Apex") filed a complaint on May 8, 2008, against the Company and CirTran Asia, the Company's subsidiary, claiming breach of contract, nonpayment on open book account, non-payment of an account stated, and non-payment for services, seeking approximately $62,000 against the Company and $121,000 against CirTran Asia. The Company and CirTran Asia answered on June 9, 2008. The parties subsequently entered into a Release and Settlement Agreement pursuant to which the Company and CirTran Asia agreed to pay an aggregate of $195,000 in monthly payments. In the event of default under the Release and Settlement Agreement, the Plaintiffs could file a Stipulation for Entry of Judgment in the amount of $195,000, minus any amounts paid under the Release and Settlement Agreement. On February 26, 2009, the Stipulation of Judgment was filed, granting the California court jurisdiction to enforce the Release and Settlement Agreement. On March 3, 2009, the court entered its judgment pursuant to the Release and Settlement Agreement. On April 23, 2009, a Judgment Enforcing Settlement was entered against CirTran Corporation and CirTran Asia, Inc., jointly and severally in the principal amount of $173,000, plus fees of $1,800 and costs of $40. On October 28, 2009, the Third Judicial District Court, District of Utah, West Jordan Department, entered an Order in Supplemental Proceedings, with which the Company complied. The parties have previously engaged in settlement negotiations. The Company has accrued $173,000,as a liability, related to this claim.

Fortune Resources LLC v. CirTran Beverage Corp, Civil No. 090401259, Third Judicial District Court, Salt Lake County, State of Utah. On February 5, 2009, the plaintiff filed a complaint against CirTran Asia, claiming non-payment for goods in the amount of $121,135. On CirTran Beverage filed its answer on March10, 2009, denying the allegations in the Complaint. CirTran Beverage and Fortune Resources engaged in settlement negotiations, and on May 3, 2010, pursuant to which Fortune Resources agreed to dismiss the suit upon receipt from CirTran of $50,000 pursuant to a payment schedule. As of August 22, 2010, the Company has made its scheduled payments timely. The Plaintiff has filed a request for entry of judgment against CirTran, claiming that CirTran failed to make the required payments. These amounts have been accrued in full as a liability. An Order for Supplementary Proceedings was entered on January 12, 2011. The proceedings have been continued without date.

Global Freight Forwarders v. CirTran Asia, Civil No. 080925731, Third Judicial District Court, Salt Lake County, State of Utah. On December 18, 2008, the plaintiff filed a complaint against CirTran Asia, claiming breach of contract, breach of the duty of good faith and fair dealing, and unjust enrichment, seeking approximately $260,000. The Complaint was served on CirTran Asia on January 5, 2009. On February 12, 2009, CirTran Asia filed its answer. Thereafter, CirTran Asia filed an amended answer and counterclaim. Discovery is complete, and the plaintiff filed a certificate of readiness for trial with the Court. The Parties have engaged in settlement negotiations, and have reached a tentative agreement, but a final written settlement agreement had not been executed as of the date of this Report. The Company has accrued $91,460, as a liability, related to this claim.

Dr. Najib Bouz v. CirTran Beverage Corp, Iehab Hawatmeh and Does 1-20, Superior Court for the State of California, County of Los Angeles, Civil No. KC053818. On September 12, 2008, the plaintiff filed a complaint, seeking a judgment for $52,500 plus attorneys' fees and certain costs, against CirTran Beverage, Iehab Hawatmeh and unnamed others, claiming breach of contract and fraud in connection with a certain promissory note. CirTran Beverage and Mr. Hawatmeh answered, denying liability. On August 11, 2009, the parties entered into a settlement agreement whereby the claims against Mr. Hawatmeh were dismissed with prejudice, and the Company agreed to pay Dr. Bouz $63,000 over a twelve month period. The Company has made 9 monthly payments but is in default of the $5,250 monthly payments that were due on May 28, 2010, June 28, 2010, and July 28, 2010 These amounts have been accrued in full as a liability.

Dr. Paul Bouz v. CirTran Beverage Corp, Iehab Hawatmeh and Does 1-20, Superior Court for the State of California, County of Los Angeles, Civil No. KC053819. On September 12, 2008, the plaintiff filed a complaint, seeking a judgment for $52,500 plus attorneys' fees and certain costs, against CirTran Beverage, Iehab Hawatmeh and unnamed others, claiming breach of contract and fraud in connection with a certain promissory note. CirTran Beverage and Mr. Hawatmeh answered, denying liability. On August 11, 2009, the parties entered into a settlement agreement whereby the claims against Mr. Hawatmeh were dismissed with prejudice, and the Company agreed to pay Dr. Bouz $63,000 over a twelve month period. The Company has made 10 monthly payments but is in default of the $5,250 monthly payments that were due on June 28, 2010, and July 28, 2010. These amounts have been accrued in full as a liability.

NA CL&D Graphics v. CirTran Beverage Corp., Case No. 09V01154, Circuit Ct, Waukesha County, Wisconsin. On or about March 23, 2009, CL&D filed an action in the above court, alleging claims for breach of contract, unjust enrichment, promissory estoppel, and seeking damages of at least $25,488 along with attorneys' fees and costs. CirTran Beverage Corp is reviewing the matter and intends to defend vigorously against the allegations in the complaint. These amounts have been accrued in full as a liability.

Old Dominion Freight Line v. CirTran Corporation, Civil No. 090426290, Third Judicial District Court, Salt Lake County, State of Utah. On May 5, 2010, the Court entered an Order in Supplemental Proceedings in connection with a judgment in favor of Old Dominion and against CirTran in the amount of $33,187. The parties agreed to resolve this matter under terms requiring CirTran to pay $20,000 over time. To date, the required payments have not been made. These amounts have been accrued in full as a liability.

YA Global Investments, LP v. CirTran Corporation, Third Judicial District Court of Salt Lake County, State of Utah, case no. 100911400. On January 24, 2011, the Company entered into a Forbearance Agreement with YA Global Investments, LP ("YA"), including a confession of judgment in favor of YA. On February 23, 2011, the court entered judgment based on the confession of judgment against the Company in the amount of $3,161,354 in principal, plus $825,858.17 in interest. These amounts have been accrued in full as a liability.

LIB-MP Beverage, LLC v. PlayBeverages, LLC, CirTran Beverage Corporation, CirTran Corporation, Iehab Hawatmeh, and Fadi Nora, United States District Court, Central District of California, Case No. CV10-2814. On March 25, 2010, LIB-MP Beverages, LLC, filed a complaint asserting claims for fraud, specific performance, breach of contract, breach of the implied covenant of good faith and fair dealing, declaratory relief and accounting (the "California Litigation"). The amount of damages claimed in the California Litigation was not specified. On April 29, 2010, the Company filed claims against LIB-MP Beverage, LLC, American Sales & Merchandising, LLC, Warner Depuy, Michael Liberty and Jeffrey Pollack in the Third Judicial District Court, Salt Lake County, State of Utah, seeking a declaratory judgment on the claims asserted in the California litigation, and further asserting claims for tortious interference with contractual relations, breaches of fiduciary duties, fraud and negligent misrepresentations. On June 21, 2010, the complaint filed in the California Litigation was dismissed without prejudice for lack of jurisdiction.

Jimmy Esebag v. CirTran Corporation and Fadi Nora, Superior Court of the State of California, Los Angeles County, Case No. BC296162. On July 15, 2010, the court entered judgment against the Company in the amount of $68,270 based upon the Company's failure to make payments when due under a settlement with Mr. Esebag. The Company has accrued $59,769, as a liability related to this claim.

Desiree Liston v. CirTran Media Corp. d/b/a Diverse Media Group Corp., Circuit Court of Benton County, Arkansas, Case No. CV2010-2448-6. On July 28, 2010, Desiree Liston filed a complaint seeking an unspecified amount in excess of $75,000 based on allegations of breach of an Employment Agreement. The Company has filed its answer. The Company believes that this claim has no merit and intends to defend it vigorously.

Gordon Jensen, d/b/a Gordon Jensen Trucking v. CirTran Corp., Third Judicial District Court of Salt Lake County, State of Utah, case no. 108900934. On May 28, 2010, plaintiff brought an action seeking $7,145 for nonpayment of services. Judgment was entered against CirTran on October 7, 2010, for $6,703. The Company has accrued $2,745, as a liability, related to this claim.

General Distributors, Inc., v. Iehab Hawatmeh and CirTran Beverage Corp., dba
Play Beverages LLC dba Playboy Beverages, in the Circuit Court of the State of
Oregon, for the County of Clackamas, Case No. CV 10110087. On November 8, 2010,
General Distributors, Inc., filed a complaint asserting claims for breach of
contract, liability under the Uniform Commercial Code, quasi contract - unjust
enrichment, goods sold and delivered, account state, and attorneys fees. The
complaint seeks judgment in the amount of $49,999 plus interest and attorneys
fees. The Company and the other defendants have answered the complaint and deny
liability.

Playtime Distributing of Oklahoma LLC v. CirTran Corporation, CirTran Beverage
Corporation, and PlayBeverages LLC, in the District Court of Oklahoma County,
State of Oklahoma, Case No. CJ-2010-1058. On December 30, 2010, Playtime
Distributing of Oklahoma LLC filed suit asserting claims for breach of a
distribution agreement, bad faith breach of a distribution agreement, rescission
of the distribution agreement, accounting, breach of an independent sales
agreement, bad faith breach of an independent sales agreement, and punitive
damages. The petition seeks judgment in an unspecified amount in excess of
$75,000, plus interest and attorneys fees. The Company and the other defendants
have answered and deny liability.

USS Cal Builders, Inc. v, CirTran Beverage Corp., Iehab Hawatmeh, and Fadi Nora,
in the Superior Court of the State of California, County of Orange, Case No.
00425093. On November 16, 2010, USS Cal Builders, Inc., filed a complaint
asserting various claims which were challenged by the Company. On February 8,
2011, USS Cal Builders, Inc., replaced its original complaint with an amended
complaint, in which it asserts claims for breach of promissory note, breach of
oral contract, common count money had and received, and common count money lent.
The amended complaint seeks damages in the sum of at least $100,000 plus
interest, costs, and attorneys fees. The Company and the individual defendants
deny liability and intend to defend the claims.

RDS Touring and Promotions, Inc. v. CirTran Beverage Corp., CirTran Corp., and
CirTran Media Corp., in the Superior Court of the State of California, County of
Los Angeles, Case No. BC454112. On January 31, 2011, RDS Touring and Promotions,
Inc., filed a complaint asserting claims for breach of settlement agreement,
fraud in the inducement, and fraud and deceit (false promise). The Company has
filed a motion to dismiss the fraud claims and the contract claim against all
defendants other than the Company. The Company disputes the allegations of
fraud. The Company does not deny that it is currently in breach of the
settlement agreement.

American Express Travel Related Services Company, Inc., v. CirTran Corporation,
dba Diverse Media Group and Iehab Hawatmeh, in the Third District Court, State
of Utah, Salt Lake County. In this action, American Express asserts a claim for
$108,029.38 in principal and $24,269.62 in interest due on a credit card
account. The Company denies liability and intends to defend the claim.

Ayad Jaber, Ramzy Fakhoury, Haya Enterprises, LLC. V. CirTran Beverage
Corporation, Play Beverages LLC, Iehab Hawatmeh, and Fadi Nora, in the Superior
Court of the State of California, County of Orange, Case No. 0443807. On January
24, 2011, these plaintiffs filed a complaint asserting claims based on alleged
breaches of various written and oral promises, seeking damages of $700,000 in
principal from the Company, plus $1,219,520 in principal from all defendants,
plus $200,000 from Fadi Nora, plus other unspecified amounts. Company intends to
deny claims and file counter claims.

PART II

ITEM 4.   MARKET FOR COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER
          PURCHASES OF EQUITY SECURITIES

Our common stock is traded in the over-the-counter market. The following table
sets forth for the respective periods indicated the prices of the common stock
in the over-the-counter market, as reported and summarized by the OTC Bulletin
Board. Such prices are based on inter-dealer bid and asked prices, without
markup, markdown, commissions, or adjustments and may not represent actual
transactions. In May 2007, we effected a 1.2-for-1 forward split in the issued
and outstanding common stock. Prices below reflect retroactively the forward
split.

| Calendar Quarter Ended | High Bid | Low Bid |
|---|---|---|
| March 31, 2009 | $ 0.003 | $ 0.001 |
| June 30, 2009 | $ 0.006 | $ 0.001 |
| September 30, 2009 | $ 0.018 | $ 0.003 |
| December 31, 2009 | $ 0.013 | $ 0.006 |
| March 31, 2010 | $ 0.008 | $ 0.004 |
| June 30, 2010 | $ 0.005 | $ 0.002 |
| September 30, 2010 | $ 0.004 | $ 0.002 |
| December 31, 2010 | $ 0.003 | $ 0.001 |

Also, on July 14, 2009, we entered into a Stock Purchase Agreement with our
president to purchase 50,000,000 shares of our common stock at a purchase price
of $.003 per share, for a total amount of $150,000, payable through the
conversion of outstanding loans made by our president to us. Mr. Hawatmeh and we
acknowledged in the purchase agreement that we did not have sufficient shares to
satisfy the issuances, and agreed that the shares would be issued once we have
sufficient shares to do so. As of December 31, 2010, we showed the balance of
$150,000 as an accrued liability on the balance sheet.

Penny Stock Rules

Our shares of common stock are subject to the "penny stock" rules of the
Securities Exchange Act of 1934 and various rules under this Act. In general
terms, "penny stock" is defined as any equity security that has a market price
less than $5.00 per share, subject to certain exceptions. The rules provide that
any equity security is considered to be a penny stock unless that security is
registered and traded on a national securities exchange meeting specified
criteria set by the SEC, authorized for quotation from the NASDAQ stock market,
issued by a registered investment Company, and excluded from the definition on
the basis of price (at least $5.00 per share), or based on the issuer's net
tangible assets or revenues. In the last case, the issuer's net tangible assets
must exceed $3,000,000 if in continuous operation for at least three years,
$5,000,000 if in operation for less than three years, or the issuer's average
revenues for each of the past three years must exceed $6,000,000.

Trading in shares of penny stock is subject to additional sales practice
requirements for broker-dealers who sell penny stocks to persons other than
established customers and accredited investors. Accredited investors, in
general, include individuals with assets in excess of $1,000,000 or annual
income exceeding $200,000 (or $300,000 together with their spouse), and certain
institutional investors. For transactions covered by these rules, broker-dealers
must make a special suitability determination for the purchase of the security
and must have received the purchaser's written consent to the transaction prior
to the purchase. Additionally, for any transaction involving a penny stock, the
rules require the delivery, prior to the first transaction, of a risk disclosure
document relating to the penny stock. A broker-dealer also must disclose the
commissions payable to both the broker-dealer and the registered representative,
and current quotations for the security. Finally, monthly statements must be
sent disclosing recent price information for the penny stocks. These rules may
restrict the ability of broker-dealers to trade or maintain a market in our
common stock, to the extent it is penny stock, and may affect the ability of
shareholders to sell their shares.

ITEM 5.   SELECTED FINANCIAL DATA

Not required.

ITEM 6.   MANAGEMENT'S DISCUSSION AND ANALYSIS OR PLAN OF OPERATION

OVERVIEW

In our U.S. operations, we provide a mix of high and medium size volume turnkey
manufacturing services and products using various high-tech applications for
leading electronics OEMs in the communications, networking, peripherals, gaming,
law enforcement, consumer products, telecommunications, automotive, medical, and
semiconductor industries. Our services include pre-manufacturing, manufacturing
and post-manufacturing services. Our goal is to offer customers the significant
competitive advantages that can be obtained from manufacture outsourcing. We
also market an energy drink under the Playboy brand pursuant to a license
agreement with Playboy Enterprises, Inc. ("Playboy").

We conduct business through multiple subsidiaries and divisions: CirTran USA,
Racore Technology, CirTran Asia, CirTran Products, CirTran Media Group, CirTran
Online, and CirTran Beverage.

CirTran USA accounted for 2 percent and 13 percent of our total revenues during
2010 and 2009, respectively, generated by low-volume electronics assembly
activities consisting primarily of the placement and attachment of electronic
and mechanical components on printed circuit boards and flexible (i.e.,
bendable) cables. On March 5, 2010, the Company and Katana Electronics, LLC, a
Utah limited liability company ("Katana") entered into certain agreements
related to the Company's re-alignment of its legacy electronic manufacturing
business (the "Agreements"). (See Note 18)

CirTran Asia manufactures and distributes electronics, consumer products and general merchandise to companies with international markets. Such sales were 1 percent and 2 percent of our total revenues during 2010 and 2009, respectively.

CirTran Products pursues contract manufacturing relationships in the U.S. consumer products markets, including licensed merchandise sold in the sports and entertainment markets. These sales comprised less than 1 percent and 1 percent of total sales respectively for each of the years ended December 31, 2010 and 2009.

CirTran Media provides end-to-end services to the direct response and entertainment industries. The Company had no revenues relating to this subsidiary in 2010 or 2009.

CirTran Online sells products via the internet, and provides services and support to internet retailers. In conjunction with partner GMA, revenues from this division were 12 percent and 26 percent of total revenues in 2010 and 2009, respectively.

CirTran Beverage was organized, in May 2007, to arrange for the manufacture, marketing and distribution of Playboy-licensed energy drinks, flavored water beverages, and related merchandise. The Company also entered into an agreement with PlayBev, a newly consolidated entity, which holds the Playboy license. The Company provides development and promotional services to PlayBev. The Company also sold energy drink beverages during 2010 and 2009, which amounted to 85 percent and 18 percent of total sales. Playbev billings for development and marketing services accounted for 40 percent of total sales for 2009.

RESULTS OF OPERATIONS - COMPARISON OF YEARS ENDED DECEMBER 31, 2010 AND 2009

Sales and Cost of Sales

Net sales for the year ended December 31, 2010, totaled $9,044,902, as compared to $9,732,855 for the year ended December 31, 2009. If PlayBev had been accounted for on a consolidated basis as of December 31, 2009, then sales would have been $5,956,754 for that year, resulting in a 52 percent increase from 2009 to 2010. The increase is primarily attributable to revenue from international beverage sales. Net sales in the Contract Manufacturing segment fell $267,882 in year ended December 31, 2010, as compared to the same period in 2009. Net sales in the Marketing and Media segment fell by $5,255,624 in 2010 as compared to 2009. Beverage Distribution revenue increased to $7,712,492 for the year ended December 31, 2010, as compared to $1,784,028 for the year ended December 31, 2009. The increase continues to be driven by strong interest internationally for the Playboy branded energy drinks,

Cost of sales, as a percentage of sales, decreased to 65 percent for the year ended December 31, 2010, as compared to 98 percent for the prior year ended December 31, 2009. Consequently, the gross profit margin increased to 35 percent from 2 percent, respectively, over the same time period. The increase in gross profit margin is attributable to the continued sales mix shift into the CirTran Beverage products and services along with the consolidation of PlayBev. The primary CirTran Online products and services are governed by the arrangement we have with GMA. Pursuant to our Assignment and Exclusive Services Agreement, we recognize the revenue collected under the GMA contracts, and remit back to GMA a management fee approximating their actual costs. This management fee is included in our cost of revenue.

The following charts present (i) comparisons of sales, cost of sales and gross profits generated by our four operating segments, i.e., Contract Manufacturing, Electronics Assembly, Marketing and Media, and Beverage Distribution during 2010 and 2009; and (ii) comparisons during these two years for each segment between sales generated by pre-existing customers and sales generated by new customers.

23

| SEGMENT | YEAR | SALES | COST OF SALES | ROYALTY EXPENSE | GROSS LOSS / MARGIN |
|---|---|---|---|---|---|
| Electronics Assembly | 2010 | $ 170,444 | $ 255,940 | $ - | $ (85,496) |
| | 2009 | 1,263,335 | 1,693,245 | - | (429,910) |
| Contract Manufacturing | 2010 | 66,880 | - | - | 66,880 |
| | 2009 | 334,762 | 129,755 | - | 205,007 |
| Marketing / Media | 2010 | 1,095,086 | 1,037,563 | - | 57,523 |
| | 2009 | 6,350,710 | 6,021,175 | - | 329,535 |
| Beverage Distribution | 2010 | 7,712,492 | 2,352,840 | 2,257,582 | 3,102,070 |
| | 2009 | 1,784,028 | 975,820 | 745,121 | 63,087 |

Selling, General and Administrative Expenses

During the year ended December 31, 2010, selling, general and administrative
expenses increased by 30 percent as compared to the year ended December 31,
2009. The increase of $1,326,463 in selling, general and administrative expenses
was driven primarily by increased media and promotional expenses, higher labor
related expenses, and an increase in shipping and travel costs.

Non-cash compensation expense

Non-cash compensation expense, resulting from the obligation to grant options to
employees and outside attorneys to purchase common stock, increased to $374,783
during the year ended December 31, 2010, compared to $98,281 during the year
ended December 31, 2009. No stock options were granted to employees during the
year ended December 31, 2009 or 2010. The increase in non-cash compensation
expense relates to the vesting of previous granted options and the measurement
of stock options required to be granted per their employment contracts.

Other income and expense

Interest expense for the year ended December 31, 2010, was $1,177,761 as
compared to $1,221,004 for the year ended December 31, 2009, a decrease of 4
percent. The interest expense recorded in the consolidated statements of
operations combines both accretion expense and interest expense. The decrease in
interest expense was driven by a $210,255 reduction in accretion expense
recorded for the year ending December 31, 2010, as compared to the year ending
December 31, 2009. Derivative accounting treatment of convertible debentures
with embedded derivative features requires accretion of the carrying value of
the convertible debenture until the carrying value equals the face value of the
instrument. During the year ending December 31, 2008, the carrying value of two
of the convertible debenture equaled the face value of the instrument, and as a
result, the accretion treatment ceased prior to 2008 (see Note 15 of the
consolidated financial statements). Interest expense increased to $944,201 for
the year ended December 31, 2010, as compared to the interest expense of
$777,187 for the year ending December 31, 2009.

Interest income for the year ending December 31, 2010, decreased to $0 as
compared to interest income of $518,600 for the year ended December 31, 2009.
The change is due to the consolidation of PlayBev in the 2010 financials. The
interest income balance has been eliminated in consolidation.

During the year ended December 31, 2009, we recorded impairment on our
investment in Diverse Media Group (DTG) of $452,000. As of December 31, 2009 and
2010 the carrying value of the investment DTG stock was $0.

We recorded a loss of $889,297 on our derivative valuation for the year ending
December 31, 2010, as compared to a gain of $100,295 recorded for the year
ending December 31, 2009. The unfavorable swing in the derivative valuation is
primarily the result of factors relating to the differing debt levels of the
underlying convertible securities, together with the varying market values of
our common stock.

As a result of these factors, our overall net loss from operations decreased to
$4,954,638 for the year ended December 31, 2010, as compared to a net loss of
$5,814,653 for the year ended December 31, 2009. The net loss attributable to
the Company was $2,617,653 for 2010, and a net loss of $2,336,985 was
attributable to a non-controlling equity interest in PlayBev.

24

LIQUIDITY AND CAPITAL RESOURCES

We have had a history of losses from operations, as our expenses have been
greater than our revenues. Our accumulated deficit was $41,969,908 at December
31, 2010, and $39,140,068 at December 31, 2009. Net loss for the year ended
December 31, 2010, was $4,954,638 as compared to $5,814,653 for the year ended
December 31, 2009. Our current liabilities exceeded our current assets by
$21,140,941 as of December 31, 2010, and by $14,864,374 as of December 31, 2009.
For the years ended December 31, 2010 and 2009, we experienced negative cash
flows from operating activities of $688,240 and $485,406, respectively.

Cash

The amount of cash used in operating activities during the year ended December
31, 2010, increased by $202,834, as compared to the year ended December 31,
2009, driven primarily by the reduction of PlayBev-related marketing
expenditures and an increase in prepaid customer deposits relating to
international beverage shipments

Accounts Receivable

Trade accounts receivable, net of allowance for doubtful accounts, increased
$156,883 during the year ended December 31, 2010. We continue to monitor
individual customer accounts and are working to improve collections on trade
accounts receivable. As of December 31, 2009, the Company had $6,955,817 in
related party receivables due from PlayBev. These receivables have been
eliminated with the consolidation for accounting purposes of PlayBev as of
December 31, 2010.

Accounts payable, accrued liabilities and short-term debt.

During the year ended December 31, 2010, accounts payable, accrued liabilities
and short-term debt increased by more than $4.3 million to a combined balance of
$14.3 million as of December 31, 2010. The increase was driven by an increase of
$1.8 million in accrued liabilities, $865,000 increase in short term debt and
$700,000 increase in accounts payable. The increase in accounts payable activity
is a result of continued PlayBev-related services performed during the year for
beverage development, distribution and marketing services. At December 31, 2010,
we owed $3,827,538 to various investors from whom we had borrowed funds in the
form of either unsecured or short-term advances.

Liquidity and financing arrangements

We have a history of substantial losses from operations, as well of history of
using rather than providing cash in operations. We had an accumulated deficit of
$41,969,908, along with a total stockholders' deficit of $19,111,797, at
December 31, 2010. In addition, we have used, rather than provided, cash in our
operations for the years ended December 31, 2010 and 2009, of $688,240 and
$485,406, respectively. During the year ended December 31, 2010, our monthly
operating costs and interest expense averaged approximately $608,000 per month.

In conjunction with our efforts to improve our results of operations we are also
actively seeking infusions of capital from investors, and are seeking sources to
repay our existing convertible debentures. In our current financial condition,
it is unlikely that we will be able to obtain additional debt financing. Even if
we did acquire additional debt, we would be required to devote additional cash
flow to servicing the debt and securing the debt with assets. Accordingly, we
are looking to obtain equity financing to meet our anticipated capital needs.
There can be no assurances that we will be successful in obtaining such capital.
If we issue additional shares for debt and/or equity, this will dilute the value
of our common stock and existing shareholders' positions.

There can be no assurance that we will be successful in obtaining more debt
and/or equity financing in the future or that our results of operations will
materially improve in either the short or the long term. If we fail to obtain
such financing and improve our results of operations, we will be unable to meet
our obligations as they become due. That would raise substantial doubt about our
ability to continue as a going concern.

Ratification and Joinder to Collateral Agreements

The Company, CirTran Sub, and the other Obligors also entered into a
Ratification and Joinder to Collateral Agreements, pursuant to which CirTran Sub
agreed to be bound by the terms and conditions of, and to be a party to, the
Global Security Agreement (entered into in connection with the Prior Forbearance
Agreement) and the Global Guaranty Agreement (entered into in connection with
the Prior Forbearance Agreement). (The terms of the Global Guaranty Agreement
and the Global Security Agreement were described in, and attached as exhibits
to, the Company's Current Report on Form 8-K, filed with the SEC on August 17,
2009. For a more complete description of these agreements, please see that
filing.)

Other Convertible Instruments

We currently have issued and outstanding options, warrants, convertible notes
and other instruments for the acquisition of our common stock in excess of the
available authorized but unissued shares of common stock provided for under our
Articles of Incorporation, as amended. As a consequence, in the event that the
holders of such instruments requiring the issuance, in the aggregate, of a
number of shares of common stock that would, when combined with the previously
issued and outstanding common stock of the Company exceed the authorized capital
of the Company, seek to exercise their rights to acquire shares under those
instruments, we will be required to increase the number of authorized shares or
effect a reverse split of the outstanding shares in order to provide sufficient
shares for issuance under those instruments.

RELATED PARTY TRANSACTIONS

Play Beverages, LLC

Effective January 1, 2010, the Company began to consolidate into its financial
statements the accounts of PlayBev Corporation, formerly an unconsolidated
related party. PlayBev Corporation holds the Playboy license and is
majority-owned by the Company and its related parties. In prior years, PlayBev
was not required to be consolidated due to lack of control over significant
decisions by the Company or its affiliates. However, in the fourth quarter of
2010, the Company reevaluated its relationship with PlayBev and concluded that
it was required to consider whether it had a variable interest in PlayBev.
Management concluded that PlayBev's level of equity was not sufficient to permit
PlayBev to operate on its own without additional subordinated support and that
the Company was the primary beneficiary for accounting purposes.

During 2006, Playboy Enterprises International, Inc. ("Playboy") entered into a
licensing agreement with Play Beverages, LLC ("PlayBev"), then an unrelated
Delaware limited liability company, whereby PlayBev agreed to internationally
market and distribute a new energy drink carrying the Playboy name and "Rabbit
Head" logo symbol. In May 2007, PlayBev entered into an exclusive agreement with
the Company to arrange for the manufacture, marketing and distribution of the
energy drinks, other Playboy-licensed beverages, and related merchandise through
various distribution channels throughout the world.

In an effort to finance the initial development and marketing of the new drink,
the Company with other investors formed After Bev Group LLC ("AfterBev"), a
California limited liability company and partially owned, consolidated
subsidiary of the Company. The Company contributed its expertise in exchange for
an initial 84 percent membership interest in AfterBev. The other initial
AfterBev members contributed $500,000 in exchange for the remaining 16 percent.
The Company borrowed an additional $250,000 from an individual, and contributed
the total $750,000 to PlayBev in exchange for a 51 percent interest in PlayBev's
cash distributions. The Company previously recorded this $750,000 amount as an
investment in PlayBev, accounted for under the cost method. PlayBev then
remitted these funds to Playboy as part of a guaranteed royalty prepayment.
Along with the membership interest granted the Company, PlayBev agreed to
appoint the Company's president and one of the Company's directors to two of
PlayBev's three executive management positions. Additionally, an unrelated
executive manager of PlayBev resigned, leaving the remaining two executive
management positions occupied by the Company president and one of the Company's
directors. On August 23, 2008, PlayBev's members agreed to amend its operating
agreement to change the required membership vote on major managerial and
organizational decisions from 75 percent to 95 percent. Since 2007, the two
affiliates personally purchased membership interests from PlayBev directly and
from other PlayBev members constituting an additional 23.1 percent, which

aggregated 34.35 percent. Despite the combined 90.5 percent interest owned by
these affiliates and the Company, the Company cannot unilaterally control
significant operating decisions of PlayBev, as the amended operating agreement
requires that various major operating and organizational decisions be agreed to
by at least 95 percent of all members. The other members of PlayBev are not
affiliated with the Company. In previous years, management concluded that while
PlayBev is a related party, the Company did not have the ability to unilaterally
control significant operating decisions of PlayBev, and therefore had not
accounted for PlayBev's operations as if it was a consolidated subsidiary.
However, on January 1, 2010, the Company adopted ASU 2009-17 (ASC Topic 810,
Consolidation), Improvements to Financial Reporting by Enterprises Involved with
Variable Interest Entities. ASU 2009-17 amends the consolidation guidance
applicable to variable interest entities ("VIEs") and requires additional
disclosures concerning an enterprise's continuing involvement with VIEs. The
Company evaluated the impact of this guidance and determined that the adoption
resulted in the December 31, 2010, consolidation of PlayBev.

PlayBev has no operations, so under the terms of the exclusive manufacturing and
distribution agreement, we were appointed as the master manufacturer and
distributor of the beverages and other products that PlayBev licensed from
Playboy. In so doing, we assumed all the risk of collecting amounts owed from
customers, and contracting with vendors for manufacturing and marketing
activities. In addition, PlayBev is owed a royalty from the Company equal to our
gross profits from collected beverage sales, less 20 percent of our related cost
of goods sold, and 6 percent our collected gross sales. We incurred $745,121 in
royalty expenses due to PlayBev during the year ended December 31, 2009. The
intercompany royalty and expense items have been eliminated in the consolidated
financial statements as of and for the year ended December 31, 2010.

We also agreed to provide services to PlayBev for initial development,
marketing, and promotion of the new beverage. These services are to be billed to
PlayBev and recorded as an account receivable from PlayBev. We initially agreed
to carry up to a maximum of $1,000,000 as a receivable due from PlayBev in
connection with these billed services. On March 19, 2008 we agreed to increase
the maximum amount it would carry as a receivable due from PlayBev, in
connection with these billed services, from $1,000,000 to $3,000,000. As of
March 19, 2008 we also began charging interest on the outstanding amounts owing
at a rate of 7 percent per annum. PlayBev has agreed to repay the receivable and
accrued interest out of the royalties due PlayBev. PlayBev has agreed to repay
the receivable and accrued interest out of the royalties due PlayBev. We have
billed PlayBev for marketing and development services totaling $3,776,101 for
the year ended December 31, 2009, which has been included in revenues for our
marketing and media segment during 2009. As of December 31, 2009, the interest
accrued on the balance owing from PlayBev totaled $735,831. The net amount due
us from PlayBev for marketing and development services, after netting the
royalty owed to PlayBev, totaled $6,955,817 at December 31, 2009. All these
intercompany balances have been eliminated in the consolidated financial
statements as of December 31, 2010.

AfterBev Group, LLC

Following AfterBev's organization in May 2007, we entered into consulting
agreements with two individuals, one of whom had loaned us $250,000 when we
invested in PlayBev, and the other one was one of our directors. The agreements
provided that we assign to each individual approximately one-third of our share
in future AfterBev cash distributions, in exchange for their assistance in the
initial AfterBev organization and planning, along with their continued
assistance in subsequent beverage development and distribution activities. The
agreements also provided that as we sold a portion of its membership interest in
AfterBev, the individuals would each be owed their proportional assigned share
distributions in the proceeds of such a sale. The actual payment of the
distributions depended on what we did with the sale proceeds. If we used the
proceeds to help finance beverage development and marketing activities, the
payment of distributions would be deferred, pending collections from customers
once beverage product sales eventually commenced. Otherwise, the proportional
assigned share distributions would be due to the two individuals.

Throughout the balance of 2007, as energy drink development and marketing
activities progressed, we raised additional funds by selling portions of its
membership interest in AfterBev to other investors, some of whom were our
stockholders. In some cases, we sold a portion of its membership interest,
including voting rights. In other cases, we sold merely a portion of its share
of future AfterBev profits and losses. By the end of 2007, after taking into
account the two interests that had assigned, we had retained a net 14 percent
interest in AfterBev's profits and losses, but had retained 52 percent of all
voting rights in AfterBev. We recorded the receipt of these net funds as
increases to its existing minority interest in AfterBev, and the rest as amounts
owing as distributable proceeds payable to the two individuals with assigned
interests of our original share of AfterBev.

31

At the end of 2007, we agreed to convert the amount owing to one of the
individuals into a promissory note. In exchange, the individual agreed to
relinquish his approximately one-third portion of our remaining share of
AfterBev's profits and losses. Instead, the individual received a membership
interest in AfterBev. In January 2008, the other assignee, which is one our
directors, similarly agreed to relinquish the distributable proceeds owed to
him, in exchange for an interest in AfterBev's profits and losses. Accordingly,
he purchased a 24 percent interest in AfterBev's profits and losses in exchange
for foregoing $863,973 in amounts due to him. Of this 24 percent, by the end of
December 31, 2008, the director had sold or transferred 23 percent to unrelated
investors and retained the remaining 1 percent interest in AfterBev's profits
and losses. In turn, the director loaned $834,393 to us in the form of unsecured
advances. Of the amounts loaned, $600,000 was used to purchase interest in
PlayBev directly which resulted in a reduction of $600,000 of amounts owed by
PlayBev to us. During the year ended December 31, 2009, the director advanced an
additional $500,000 to us for his purchase of an additional 3 percent interest
in PlayBev, which resulted in a reduction of $500,000 of amounts owed by PlayBev
to us. As of December 31, 2010 we still owed the director $686,999 in the form
of unsecured advance. In addition, during the year ended December 31, 2009 one
of our directors and our president purchased 6 percent and 5 percent of AfterBev
shares, respectively, in private sales from existing shareholders of Afterbev.

Global Marketing Alliance

We entered into an agreement with GMA, and hired GMA's owner as the Vice
President of CirTran Online (CTO), one of our subsidiaries. Under the terms of
the agreement, we outsource to GMA the online marketing and sales activities
associated with our CTO products. In return, we provide bookkeeping and
management consulting services to GMA, and pay GMA a fee equal to five percent
of CTO's online net sales. In addition, GMA assigned to us all of its
web-hosting and training contracts effective as of January 1, 2007, along with
the revenue earned thereon, and we also assumed the related contractual
performance obligations. We recognize the revenue collected under the GMA
contracts, and remit back to GMA a management fee approximating their actual
costs. We recognized gross revenues from GMA related products and services in
the amount of $1,095,086 and $2,572,955 for the years ended December 31, 2010
and 2009, respectively.

Transactions involving Officers, Directors, and Stockholders

Don L. Buehner was appointed to our Board of Directors as of October 1, 2007.
For services to be rendered in 2008, we granted Mr. Buehner an option during
2007 to purchase 2,400,000 shares of our common stock. Prior to his appointment
as a director, Mr. Buehner bought the building housing our principal executive
offices in Salt Lake City in a sale/leaseback transaction. The term of the lease
is for 10 years, with an option to extend the lease for up to three additional
five-year terms. We pay Mr. Buehner a monthly lease payment of $10,000, which is
subject to annual adjustments in relation to the Consumer Price Index. We
believe that the amount charged and payable to Mr. Buehner under the lease is
reasonable and in line with local market conditions. Mr. Buehner retired from
our Board of Directors in June 2008.

In connection with the assignment of the Purchase Orders pursuant to the
Assignment Agreement, we entered into a Sublease Agreement with Katana (the
"Sublease"). We lease from Don L. Buehner the real property and its improvements
located at 4125 South 6000 West, West Valley, Utah, 84128 (the "Premises").
Pursuant to the terms of the Sublease, we will sublease a certain portion of the
Premises to Katana consisting of the warehouse, electronics product
manufacturing and assembly area, and office space used as of the close of
business on March 4, 2010, for our legacy electronics manufacturing business.
The term of the Sublease is for two (2) months with automatic renewal periods of
one month each. The base rent under the Sublease is $8,500 per month.

In 2007, we appointed Fadi Nora to our Board of Directors. In addition to
compensation we normally pay to non-employee members of the Board, Mr. Nora is
entitled to a quarterly bonus equal to 0.5 percent of any gross sales earned by
us directly through Mr. Nora's efforts. As of December 31, 2010, we owed $45,826
under this arrangement. Mr. Nora also is entitled to a bonus equal to five
percent of the amount of any investment proceeds received by us that are
directly generated and arranged by him if the following conditions are
satisfied: (i) his sole involvement in the process of obtaining the investment
proceeds is the introduction of the Company to the potential investor, but that
he does not participate in the recommendation, structuring, negotiation,
documentation, or selling of the investment, (ii) neither the Company nor the
investor are otherwise obligated to pay any commissions, finders fees, or
similar compensation to any agent, broker, dealer, underwriter, or finder in
connection with the investment, and (iii) the Board in its sole discretion
determines that the investment qualifies for this bonus, and that the bonus may
be paid with respect to the investment. During 2009 and 2010, Mr. Nora has
received no compensation under this arrangement, and at December 31, 2010, we
did not owe him under the arrangement.

Changes in Internal Control over Financial Reporting

During the twelve months ended December 31, 2010, there were no changes in our internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

Limitations on Effectiveness of Controls

A system of controls, however well designed and operated, can provide only reasonable, and not absolute, assurance that the system will meet its objectives. The design of a control system is based, in part, upon the benefits of the control system relative to its costs. Control systems can be circumvented by the individual acts of some persons, by collusion of two or more people, or by management override of the control. In addition, over time, controls may become inadequate because of changes in conditions, or the degree of compliance with the policies or procedures may deteriorate. In addition, the design of any control system is based in part upon assumptions about the likelihood of future events.

Management's Report on Internal Control over Financial Reporting

Management of the Company is responsible for establishing and maintaining adequate internal control of over financial reporting as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934. We have assessed the effectiveness of those internal controls as of December 31, 2010, using the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") Internal Control - Integrated Framework as a basis for our assessment.

Because of inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies and procedures may deteriorate. All internal control systems, no matter how well designed, have inherent limitations. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs.

A material weakness in internal controls is a deficiency in internal control, or combination of control deficiencies, that adversely affects the Company's ability to initiate, authorize, record, processor report external financial data reliably in accordance with accounting principles generally accepted in the United States of America such that there is more than a remote likelihood that a material misstatement of the Company's annual or interim financial statements that is more than inconsequential will not be prevented or detected.

Based on our evaluation of internal control over financial reporting, our management concluded that our internal control over financial reporting was not effective as of December 31, 2010.

As of December 31, 2010, management identified the following material weaknesses:

- o   Control Environment - We did not maintain an effective control environment for internal control over financial reporting. Specifically, we concluded that we did not have appropriate controls in the following areas:

    - o   Segregation of Duties - As a result of limited resources and staff, we did not maintain proper segregation of incompatible duties. The effect of the lack of segregation of duties potentially affects multiple processes and procedures.

    - o   Entity Level Controls - We failed to maintain certain entity-level controls as defined by the framework issued by COSO. Specifically, our lack of staff does not allow us to effectively maintain a sufficient number of adequately trained personnel necessary to anticipate and identify risks critical to financial reporting. There is a risk that a material misstatement of the financial statements could be caused, or at least not be detected in a timely manner, due to lack of adequate staff with such expertise.

36

o    Financial Reporting Process - We did not maintain an effective
     financial reporting process to prepare financial statements in
     accordance with generally accepted accounting principles.
     Specifically, we initially failed to appropriately account for and
     disclose the effects of the consolidation of PlayBev LLC as a
     variable interest entity, allowances for bad debt, impairment of
     long lived assets, calculation and recognition of energy drink
     royalties, proper accounting for embedded derivative liabilities,
     and proper recognition of year end accrued liabilities. However,
     management believes that these issues have been addressed and
     appropriately reflected within this annual report and the included
     consolidated financial statements.

o    Inventory - We failed to maintain effective internal controls over
     the tracking of inventory and adjusting its' corresponding cost to
     reflect lower of cost or market.

o    Access to Cash - Our Company President has debit cards for most of
     the Company's bank accounts and ability to transfer from his
     personal bank account and the Company's bank accounts.

These weaknesses are continuing. Management and the Board of Directors are aware
of these weaknesses that result because of limited resources and staff.
Management has begun the process of formally documenting the key processes of
the Company as a starting point for improved internal control over financial
reporting. Efforts to fully implement the processes we have designed have been
put on hold due to limited resources, but we anticipate a renewed focus on this
effort in the near future. Due to our limited financial and managerial
resources, we cannot assure when we will be able to implement effective internal
controls over financial reporting.

This annual report does not include an attestation report of the Company's
registered public accounting firm regarding internal control over financial
reporting. Management's report was not subject to attestation by the Company's
registered public accounting firm pursuant to temporary rules of the Securities
and Exchange Commission that permit the Company to provide only management's
report in this annual report.

ITEM 8B. OTHER INFORMATION

The Company has previously reported all information required to be disclosed
under this Item 8B during the fourth quarter of 2009 in a report on Form 8-K.

PART III

ITEM 9.   DIRECTORS, EXECUTIVE OFFICERS, PROMOTERS CONTROL PERSONS AND CORPORATE
          GOVERNANCE; COMPLIANCE WITH SECTION 16(A) OF THE EXCHANGE ACT

Directors and Executive Officers

The following table sets forth certain information concerning the executive
officers and directors of CirTran as of April 15, 2011:

| Name | Age | Position |
|------|-----|----------|
| Iehab J. Hawatmeh | 44 | President, Chief Executive Officer, Director, Chairman of the Board, Chief Financial Officer |
| Fadi Nora | 50 | Director |

Iehab J. Hawatmeh founded our predecessor company in 1993 and has been our Chairman, President and CEO since July 2000. Mr. Hawatmeh oversees all daily operation including technical, operational and sales functions for the Company. Mr. Hawatmeh is currently functioning in a dual role as Chief Financial Officer. Prior to his involvement with the Company, Mr. Hawatmeh was the Processing Engineering Manager for Tandy Corporation overseeing that company's contract manufacturing printed circuit board assembly division. In addition, he was responsible for developing and implementing Tandy's facility Quality Control and Processing Plan model. Mr. Hawatmeh received a Master's of Business Administration from University of Phoenix and a Bachelor's of Science in Electrical and Computer Engineering from Brigham Young University. Since the company was founded in 1993, we have employed a traditional board leadership model, with our chief executive officer also serving as chairman of our board of directors. We believe this traditional leadership structure benefits our company. A combined chairman/CEO role helps provide strong, unified leadership for our management team and board of directors. Our customers, suppliers and other business partners have always viewed the chairman/CEO of Company as a visionary leader in our industry, and we believe that having a single leader for the company is good for our business. Accordingly, we believe a combined chairman/CEO position is the best governance model for our company and our shareholders.

Fadi Nora is a self-employed investment consultant. He was formerly a director of ANAHOP, Inc., a private financing company, and was a consultant for several projects and investment opportunities, including CirTran Corporation, NFE records, Focus Media Group, and other projects. He has been a member of our Board since February 2007. Prior to his affiliation with ANAHOP, Mr. Nora worked with Prudential Insurance services and its affiliated securities brokerage firm Pru-Bach, as District Sales Manager. Mr. Nora received a B.S. in Business Administration from St. Joseph University, Beirut, Lebanon, in 1982, and an MBA – Masters of Management from the Azusa Pacific University School of Business in 1997. He also received a degree in financial planning from the University of California at Los Angeles.

The Company believes Mr. Nora continues to be a strong contributor to the management and growth of the Company, both domestically and internationally. Mr. Nora has a strong finance background and his experience has helped us with strong investor relationships. He has also be a leader in obtaining the necessary financing required to grow our business in the beverage industry.

Shaher Hawatmeh, Chief Operating Officer, joined our predecessor company in 1993 as its Controller shortly after its founding. He has served in his present capacity since June 2004. Mr. Hawatmeh directly oversees all daily manufacturing production, customer service, budgeting and forecasting for the Company. Following the Company's acquisition of Pro Cable Manufacturing in 1996, Mr. Hawatmeh directly managed the entire Company, supervising all operations for approximately two years and overseeing the integration of this new division into the Company. Prior to joining CirTran, Mr. Hawatmeh worked for the Utah State Tax Commission. Mr. Hawatmeh earned a Master's of Business Administration with an emphasis in Finance from the University of Phoenix and a Bachelor's of Science in Business Administration and a Minor in Accounting. Shaher Hawatmeh is the brother of our President, CEO and Chairman, Iehab Hawatmeh. As noted above, Mr. Shaher Hawatmeh resigned from the position of Chief Operating Officer of the Company on March 5, 2010.

Board of Directors

The Board is elected by and is accountable to the shareholders of the Company. The Board establishes policy and provides strategic direction, oversight, and control of the Company. The Board met one time during 2009 and 4 times during 2010. All directors attended all of the meetings.

Committees of the Board of Directors

As of the date of this Report, the Company did not have separately-designated Audit, Compensation, Governance or Nominating Committees. The Company's full Board acts in these capacities. The Board has determined that the Company does not have at present an audit committee financial expert as defined under Securities and Exchange Commission rules.

As of the date of this Report, there have been no changes to the procedures by which security holders may recommend nominees to our Board of Directors.

Summary Compensation Table

| Name and Principal Position (a) | Year (b) | Salary $ (c) | Bonus $ (d) | Stock Awards $ (e) | Option Awards $ (f) | Non-Equity Incentive Plan Compensation $ (g) | Change in Pension Value and Nonqualified Deferred Compensation Earnings $ (h) | All Other Compensation $ (1) (i) | Total $ (j) |
|---|---|---|---|---|---|---|---|---|---|
| Iehab J. Hawatmeh, President and Chief Executive Officer (3) | 2009 | 314,231 | - | - | 10,538 | - | - | 23,789 | 348,558 |
| | 2010 | 465,000 | 194,035 | - | 42,581 | - | - | 28,773 | 730,389 |
| Shaher Hawatmeh, Chief Operating Officer (2) | 2009 | 210,000 | - | - | - | - | - | 21,456 | 231,456 |
| | 2010 | 210,000 | - | - | - | - | - | 7,266 | 217,266 |

(1)  Amounts for Mr. Iehab Hawatmeh and Shaher Hawatmeh include $12,250 and $9,000 for car allowance, respectively, and $13,539 each for payments of medical insurance premiums.

(2)  As noted above, Mr. Shaher Hawatmeh resigned from the Company on March 5, 2010.

(3)  Mr. Iehab Hawatmeh, has not received cash payments for salary during the year. His salary expense has been accrued.

Employment Agreements

On August 1, 2009, we entered into an Employment Agreement with Mr. Hawatmeh, our President, which amends and restates in their entirety (i) the Employment Agreement between us and Mr. Hawatmeh dated July 1, 2004, and the Amendment to Employment Agreement dated January 4, 2007. The term of the employment agreement continues until August 31, 2014, and automatically extends for successive one year periods, with an annual base salary of $345,000. The Employment Agreement also grants to Mr. Hawatmeh options to purchase a minimum of 6,000,000 shares of the Company's stock each year, with the exercise price of the options being the market price of the Company's common stock as of the grant date. The Employment Agreement also provides for health insurance coverage, cell phone, car allowance, life insurance, and director and officer liability insurance, as well as any other bonus approved by the Board. The Employment Agreement includes additional incentive compensation as follows: a quarterly bonus equal to 5 percent of the Company's earnings before interest, taxes, depreciation and amortization for the applicable quarter; bonus(es) equal to 1.0 percent of the net purchase price of any acquisitions completed by the Company that are directly generated and arranged by Mr. Hawatmeh; and an annual bonus (payable quarterly) equal to 1 percent of the gross sales, net of returns and allowances of all beverage products of the Company and its affiliates for the most recent fiscal year. Pursuant to the Employment Agreement, Mr. Hawatmeh's employment may be terminated for cause, or upon death or disability, in which event the Company is required to pay Mr. Hawatmeh any unpaid base salary and unpaid earned bonuses. In the event that Mr. Hawatmeh is terminated without cause, the Company is required to pay to Mr. Hawatmeh (i) within thirty (30) days following such termination, any benefit, incentive or equity plan, program or practice (the "Accrued Obligations") paid when the bonus would have been paid Employee if employed; (ii) within thirty (30) days following such termination (or on the earliest later date as may be required by Internal Revenue Code Section 409A to the extent applicable), a lump sum equal to thirty (30) month's annual base salary, (iii) bonus(es) owing under the Employment Agreement for the two year

42

period after the date of termination (net of an bonus amounts paid as Accrued
Obligations) based on actual results for the applicable quarters and fiscal
years; and (iv) within twelve (12) months following such termination (or on the
earliest later date as may be required by Internal Revenue Code Section 409A to
the extent applicable), a lump sum equal to thirty (30) month's Annual Base
Salary; provided that if Employee is terminated without cause in contemplation
of, or within one (1) year, after a change in control, then two (2) times such
annual base salary and bonus payment amounts.

On July 1, 2004, we entered into an employment agreement with our President and
CEO, Iehab Hawatmeh, with an effective date of June 26, 2004 for a term of five
years, automatic renewal on a year-to-year basis, base salary of $225,000, bonus
of 5% of earnings before interest, taxes, depreciation, and amortization,
payable quarterly, as well as any other bonus approved by the Board, and health
insurance coverage, cell phone, car allowance, life insurance, and director and
officer liability insurance. Mr. Hawatmeh's employment could be terminated for
cause, or upon death or disability; a severance penalty applied in the event of
termination without cause, in an amount equal to five full years of the
then-current annual base compensation, half upon termination and half one year
later, together with a continuation of insurance benefits for a period of five
years. On January 1, 2007, an amendment to the employment agreement became
effective. The amended agreement is for a term of five years and renews
automatically on a year-to year basis, provides for base salary of $295,000,
plus a quarterly bonus of 5% of earnings before interest, taxes, depreciation,
and amortization, as well as an annual bonus payable as soon as practicable
after completion of the audit of the Company's annual financial statements equal
to 0.5% of gross sales for the most recent fiscal prior year which exceed 120%
of gross sales for the previous fiscal year, plus an additional bonus of 1% of
the net purchase price of any acquisitions that are generated by the executive,
and any other bonus approved by the Board. The amended agreement also provides
for a grant of options to purchase 5,000,000 shares of the Company's common
stock in accordance with the terms of the Company's Stock Option Plan, with
terms and an exercise price at the fair market value of the Company's common
stock on the date of grant. The amended agreement provides for benefits
including health insurance coverage, car allowance, and life insurance.

On March 5, 2010 we entered into a Separation Agreement ("Agreement") with Mr.
Shaher Hawatmeh. As of the date of the "Agreement" Mr. Hawatmeh's employment
with us terminated and he no longer has any further employment obligations with
us. In consideration of his execution of this "Agreement" we will pay Mr.
Hawatmeh's "Separation Pay" of $210,000 in twenty-six bi-weekly payments. The
first payment of the Separation Pay was to begin on March 19, 2010. We have made
the first payment to Mr. Hawatmeh. Additional terms of the separation agreement
include payment of all amounts necessary to cover health and medial premiums on
behalf of Mr. Hawatmeh, his spouse and dependents through April 20, 2010, all
outstanding car allowances and expense ($750) due and owing as of February 28,
2010, satisfaction and payment by us (with a complete release of Mr. Hawatmeh)
of all outstanding amounts due and owing on our Corporate American Express Card
(issued in the name of Shaher) and the issuance and delivery to Mr. Hawatmeh of
ten million (10,000,000) share of our common stock within a reasonable time
following authorization by our shareholders of sufficient shares to cover such
issuance.

On August 1, 2009, we entered into an Employment Agreement with Mr. Hawatmeh,
our President, which amends and restates in their entirety (i) the Employment
Agreement between us and Mr. Hawatmeh dated July 1, 2004, and the Amendment to
Employment Agreement dated January 4, 2007. The term of the employment agreement
continues until August 31, 2014, and automatically extends for successive one
year periods, with an annual base salary of $345,000. The Employment Agreement
also grants to Mr. Hawatmeh options to purchase a minimum of 6,000,000 shares of
the Company's stock each year, with the exercise price of the options being the
market price of the Company's common stock as of the grant date. The Employment
Agreement also provides for health insurance coverage, cell phone, car
allowance, life insurance, and director and officer liability insurance, as well
as any other bonus approved by the Board, . The Employment Agreement includes
additional incentive compensation as follows: a quarterly bonus equal to 5
percent of the Company's earnings before interest, taxes, depreciation and
amortization for the applicable quarter; bonus(es) equal to 1.0 percent of the
net purchase price of any acquisitions completed by the Company that are
directly generated and arranged by Mr. Hawatmeh; and an annual bonus (payable
quarterly) equal to 1 percent of the gross sales, net of returns and allowances
of all beverage products of the Company and its affiliates for the most recent
fiscal year.

43

Pursuant to the Employment Agreement, Mr. Hawatmeh's employment may be terminated for cause, or upon death or disability, in which event the Company is required to pay Mr. Hawatmeh any unpaid base salary and unpaid earned bonuses. In the event that Mr. Hawatmeh is terminated without cause, the Company is required to pay to Mr. Hawatmeh (i) within thirty (30) days following such termination, any benefit, incentive or equity plan, program or practice (the "Accrued Obligations") paid when the bonus would have been paid Employee if employed; (ii) within thirty (30) days following such termination (or on the earliest later date as may be required by Internal Revenue Code Section 409A to the extent applicable), a lump sum equal to thirty (30) month's annual base salary, (iii) bonus(es) owing under the Employment Agreement for the two year period after the date of termination (net of an bonus amounts paid as Accrued Obligations) based on actual results for the applicable quarters and fiscal years; and (iv) within twelve (12) months following such termination (or on the earliest later date as may be required by Internal Revenue Code Section 409A to the extent applicable), a lump sum equal to thirty (30) month's Annual Base Salary; provided that if Employee is terminated without cause in contemplation of, or within one (1) year, after a change in control, then two (2) times such annual base salary and bonus payment amounts.

On May 1, 2009, PlayBev, a newly consolidated entity, entered into compensation agreements with its managers, Mr. Hawatmeh and Mr. Nora. The agreed compensation consists of a monthly fee of $10,000 for each manager, reimbursement of reasonable expenses on behalf of the Company, a car allowance for Mr. Nora of $1,000 per month to cover the cost of use, fuel and repairs. The Company has accrued $420,000 in compensation, which is included in related party payables as of December 31, 2010.

DIRECTOR COMPENSATION

The table below summarizes the compensation paid by the Company to Directors for the fiscal year ended December 31, 2010.

| Name (a) | Fees Earned or Paid in Cash ($) (b) | Stock Awards ($) (c) | Option Awards ($) (2) (d) | Non-Equity Incentive Plan Compensation ($) (e) | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($) (f) | All Other Compensation ($) (g) | Total ($) (h) |
|---|---|---|---|---|---|---|---|
| Iehab Hawatmeh (1) | – | – | – | – | – | – | – |
| Fadi Nora (2) | 20,000 | – | 53,703 | – | – | 27,261 | 100,964 |

    (1)   Iehab Hawatmeh also served as an executive officer of the Company during 2010. He received compensation for his services as an executive officer, set forth above in the Summary Compensation Table. He did not receive any additional compensation for his services as director of the Company.

    (2)   The amounts in this column reflect the dollar amount recognized for financial statement reporting purposes, excluding the effect of estimated forfeitures, for the fiscal year ended December 31, 2010, in accordance with accounting principles. Assumptions used in the calculation of these amounts are included in Note 21 to the Company's audited financial statements for the year ended December 31, 2010, included in this Annual Report on Form 10-K.

46

ITEM 11. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND
        RELATED STOCKHOLDER MATTERS

The following table sets forth information regarding the ownership of the
Company's common stock by each person who, to the knowledge of the Company, is
the beneficial owner of more than 5% of the outstanding shares of common stock,
or who is (i) each person who is currently a director, (ii) each Named Executive
Officer, (iii) all current directors and Named Executive Officers as a group as
of April 15, 2011.

| (1) Title of class | (2) Name of beneficial owner | Amount and nature of beneficial ownership | Percent of class |
|---|---|---|---|
| Common Stock | Iehab J. Hawatmeh (1) | 145,060,960 | 9.6% |
| | Fadi Nora (2) | 88,494,199 | 5.8% |
| | All Officers and Directors as a Group (2 persons) | 232,780,320 | 15.3% |

    (1)   Includes options to purchase up to 12,000,000 shares that can be
exercised anytime at exercise prices ranging between $0.012 and
$0.013 per share. Excludes shares underlying a Stock Purchase
Agreement to purchase 50,000,000 shares.

    (2)   Includes 2,599,500 shares beneficially owned by Mr. Nora's spouse.
Also includes options to purchase up to 4,800,000 shares that can be
exercised anytime at exercise prices ranging between $0.012 and
$0.013 per share. Includes 12,000,000 shares received from Mrs.
Sawabini, on behalf of her husband Mr. Fakhouri. Excludes shares
underlying a Stock Purchase Agreement to purchase 75,000,000 shares.

The persons named in the table have sole or shared voting and dispositive power
with respect to all shares beneficially owned, subject to community property
laws where applicable. Beneficial ownership is determined according to the rules
of the Securities and Exchange Commission, and generally means that person has
beneficial ownership of a security if he or she possesses sole or shared voting
or investment power over that security. Each director, officer, or 5% or more
shareholder, as the case may be, has furnished us information with respect to
beneficial ownership. Except as otherwise indicated, we believe that the
beneficial owners of the common stock listed above, based on the information
each of them has given to us, have sole or shared investment and voting power
with respect to their shares, except where community property laws may apply.

ITEM 12. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR
        INDEPENDENCE

Play Beverages, LLC

Effective January 1, 2010, the Company began to consolidate into its financial
statements the accounts of PlayBev Corporation, formerly an unconsolidated
related party. PlayBev Corporation holds the Playboy license and is
majority-owned by the Company and its related parties. In prior years, PlayBev
was not required to be consolidated due to lack of control over significant
decisions by the Company or its affiliates. However, in the fourth quarter of
2010, the Company reevaluated its relationship with PlayBev and concluded that
it was required to consider whether it had a variable interest in PlayBev.
Management concluded that PlayBev's level of equity was not sufficient to permit
PlayBev to operate on its own without additional subordinated support and that
the Company was the primary beneficiary for accounting purposes.

During 2006, Playboy Enterprises International, Inc. ("Playboy") entered into a licensing agreement with Play Beverages, LLC ("PlayBev"), an unrelated Delaware limited liability company, whereby PlayBev agreed to internationally market and distribute a new energy drink carrying the Playboy name and "Rabbit Head" logo symbol. In May 2007, PlayBev entered into an exclusive agreement with the Company to arrange for the manufacture, marketing and distribution of the energy drinks, other Playboy-licensed beverages, and related merchandise through various distribution channels throughout the world.

In an effort to finance the initial development and marketing of the new drink, the Company with other investors formed After Bev Group LLC ("AfterBev"), a California limited liability company and partially owned, consolidated subsidiary of the Company. The Company contributed its expertise in exchange for an initial 84 percent membership interest in AfterBev. The other initial AfterBev members contributed $500,000 in exchange for the remaining 16 percent. The Company borrowed an additional $250,000 from an individual, and contributed the total $750,000 to PlayBev in exchange for a 51 percent interest in PlayBev's cash distributions. The Company previously recorded this $750,000 amount as an investment in PlayBev, accounted for under the cost method. PlayBev then remitted these funds to Playboy as part of a guaranteed royalty prepayment. Along with the membership interest granted the Company, PlayBev agreed to appoint the Company's president and one of the Company's directors to two of PlayBev's three executive management positions. Additionally, an unrelated executive manager of PlayBev resigned, leaving the remaining two executive management positions occupied by the Company president and one of the Company's directors. On August 23, 2008, PlayBev's members agreed to amend its operating agreement to change the required membership vote on major managerial and organizational decisions from 75 percent to 95 percent. Since 2007, the two affiliates personally purchased membership interests from PlayBev directly and from other PlayBev members constituting an additional 23.1 percent, which aggregated 34.35 percent. Despite the combined 90.5 percent interest owned by these affiliates and the Company, the Company cannot unilaterally control significant operating decisions of PlayBev, as the amended operating agreement requires that various major operating and organizational decisions be agreed to by at least 95 percent of all members. The other members of PlayBev are not affiliated with the Company. In previous years, management concluded that while PlayBev is a related party, the Company did not have the ability to unilaterally control significant operating decisions of PlayBev, and therefore had not accounted for PlayBev's operations as if it was a consolidated subsidiary. However, on January 1, 2010, the Company adopted ASU 2009-17 (ASC Topic 810, Consolidation), Improvements to Financial Reporting by Enterprises Involved with Variable Interest Entities. ASU 2009-17 amends the consolidation guidance applicable to variable interest entities ("VIEs") and requires additional disclosures concerning an enterprise's continuing involvement with VIEs. The Company evaluated the impact of this guidance and determined that the adoption resulted in the December 31, 2010, consolidation of PlayBev

PlayBev has no operations, so under the terms of the exclusive manufacturing and distribution agreement, we were appointed as the master manufacturer and distributor of the beverages and other products that PlayBev licensed from Playboy. In so doing, we assumed all the risk of collecting amounts owed from customers, and contracting with vendors for manufacturing and marketing activities. In addition, PlayBev is owed a royalty from the Company equal to our gross profits from collected beverage sales, less 20 percent of our related cost of goods sold, and 6 percent our collected gross sales. We incurred $745,121 in royalty expenses due to PlayBev during the year ended December 31, 2009. The intercompany royalty and expense items have been eliminated in the consolidated financial statements as of and for the year ended December 31, 2010.

We also agreed to provide services to PlayBev for initial development, marketing, and promotion of the new beverage. These services are to be billed to PlayBev and recorded as an account receivable from PlayBev. We initially agreed to carry up to a maximum of $1,000,000 as a receivable due from PlayBev in connection with these billed services. On March 19, 2008 we agreed to increase the maximum amount it would carry as a receivable due from PlayBev, in connection with these billed services, from $1,000,000 to $3,000,000. As of March 19, 2008 we also began charging interest on the outstanding amounts owing at a rate of 7 percent per annum. PlayBev has agreed to repay the receivable and accrued interest out of the royalties due PlayBev. PlayBev has agreed to repay the receivable and accrued interest out of the royalties due PlayBev. We have billed PlayBev for marketing and development services totaling $3,776,101 for the year ended December 31, 2009, which has been included in revenues for our marketing and media segment during 2009. As of December 31, 2009, the interest accrued on the balance owing from PlayBev totaled $735,831. The net amount due us from PlayBev for marketing and development services, after netting the royalty owed to PlayBev, totaled $6,955,817 at December 31, 2009. All these intercompany balances have been eliminated in the consolidated financial statements as of December 31, 2010.

48

AfterBev Group, LLC

Following AfterBev's organization in May 2007, we entered into consulting
agreements with two individuals, one of whom had loaned us $250,000 when we
invested in PlayBev, and the other one was one of our directors. The agreements
provided that we assign to each individual approximately one-third of our share
in future AfterBev cash distributions, in exchange for their assistance in the
initial AfterBev organization and planning, along with their continued
assistance in subsequent beverage development and distribution activities. The
agreements also provided that as we sold a portion of its membership interest in
AfterBev, the individuals would each be owed their proportional assigned share
distributions in the proceeds of such a sale. The actual payment of the
distributions depended on what we did with the sale proceeds. If we used the
proceeds to help finance beverage development and marketing activities, the
payment of distributions would be deferred, pending collections from customers
once beverage product sales eventually commenced. Otherwise, the proportional
assigned share distributions would be due to the two individuals.

Throughout the balance of 2007, as energy drink development and marketing
activities progressed, we raised additional funds by selling portions of its
membership interest in AfterBev to other investors, some of whom were our
stockholders. In some cases, we sold a portion of its membership interest,
including voting rights. In other cases, we sold merely a portion of its share
of future AfterBev profits and losses. By the end of 2007, after taking into
account the two interests it had assigned, we had retained a net 14 percent
interest in AfterBev's profits and losses, but had retained 52 percent of all
voting rights in AfterBev. We recorded the receipt of these net funds as
increases to its existing minority interest in AfterBev, and the rest as amounts
owing as distributable proceeds payable to the two individuals with assigned
interests of our original share of AfterBev.

At the end of 2007, we agreed to convert the amount owing to one of the
individuals into a promissory note. In exchange, the individual agreed to
relinquish his approximately one-third portion of our remaining share of
AfterBev's profits and losses. Instead, the individual received a membership
interest in AfterBev. In January 2008, the other assignee, which is one our
directors, similarly agreed to relinquish the distributable proceeds owed to
him, in exchange for an interest in AfterBev's profits and losses. Accordingly,
he purchased a 24 percent interest in AfterBev's profits and losses in exchange
for foregoing $863,973 in amounts due to him. Of this 24 percent, by the end of
December 31, 2008, the director had sold or transferred 23 percent to unrelated
investors and retained the remaining 1 percent interest in AfterBev's profits
and losses. In turn, the director loaned $834,393 to us in the form of unsecured
advances. Of the amounts loaned, $600,000 was used to purchase interest in
PlayBev directly which resulted in a reduction of $600,000 of amounts owed by
PlayBev to us. During the year ended December 31, 2009, the director advanced an
additional $500,000 to us for his purchase of an additional 3 percent interest
in PlayBev, which resulted in a reduction of $500,000 of amounts owed by PlayBev
to us. As of December 31, 2010 we still owed the director $686,999 in the form
of unsecured advance. In addition, during the year ended December 31, 2009 one
of our directors and our president purchased 6 percent and 5 percent of AfterBev
shares, respectively, in private sales from existing shareholders of Afterbev.

Global Marketing Alliance

We entered into an agreement with GMA, and hired GMA's owner as the Vice
President of CirTran Online (CTO), one of our subsidiaries. Under the terms of
the agreement, we outsource to GMA the online marketing and sales activities
associated with our CTO products. In return, we provide bookkeeping and
management consulting services to GMA, and pay GMA a fee equal to five percent
of CTO's online net sales. In addition, GMA assigned to us all of its
web-hosting and training contracts effective as of January 1, 2007, along with
the revenue earned thereon, and we also assumed the related contractual
performance obligations. We recognize the revenue collected under the GMA
contracts, and remit back to GMA a management fee approximating their actual
costs. We recognized net revenues from GMA related products and services in the
amount of $1,095,086 and $2,572,955 for the years ended December 31, 2010 and
2009, respectively.

Transactions involving ANAHOP, Inc.

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM


To the Board of Directors and the Shareholders
CirTran Corporation


We have audited the accompanying consolidated balance sheets of CirTran
Corporation and subsidiaries as of December 31, 2010 and 2009, and the related
consolidated statements of operations, stockholders' deficit, and cash flows for
each of the years then ended. These financial statements are the responsibility
of the Company's management. Our responsibility is to express an opinion on
these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company
Accounting Oversight Board (United States). Those standards require that we plan
and perform the audit to obtain reasonable assurance about whether the financial
statements are free of material misstatement. The Company is not required to
have, nor were we engaged to perform an audit of its internal control over
financial reporting. Our audit included consideration of internal control over
financial reporting as a basis for designing audit procedures that are
appropriate in the circumstances, but not for the purpose of expressing an
opinion on the effectiveness of the Company's internal control over financial
reporting. Accordingly, we express no such opinion. An audit also includes
examining, on a test basis, evidence supporting the amounts and disclosures in
the financial statements, assessing the accounting principles used and
significant estimates made by management, as well as evaluating the overall
financial statements presentation. We believe that our audits provide a
reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present
fairly, in all material respects, the financial position of CirTran Corporation
and subsidiaries as of December 31, 2010 and 2009, and the results of their
operations and their cash flows for each of the years then ended in conformity
with accounting principles generally accepted in the United States of America.

The accompanying consolidated financial statements have been prepared assuming
that the Company will continue as a going concern. As discussed in Note 3 to the
consolidated financial statements, the Company has an accumulated deficit, has
suffered losses from operations and has negative working capital that raise
substantial doubt about its ability to continue as a going concern. Management's
plans in regards to these matters are also described in Note 3. The consolidated
financial statements do not include any adjustments that might result from the
outcome of this uncertainty.


                              /s/  HANSEN, BARNETT & MAXWELL, P.C.


Salt Lake City, Utah
April 15, 2011

                                  F-2

CIRTRAN CORPORATION AND SUBSIDIARIES
CONDENSED CONSOLIDATED BALANCE SHEETS

|  | December 31, 2010 | December 31, 2009 |
|---|---|---|
| **ASSETS** | | |
| **Current assets** | | |
| Cash and cash equivalents | $    4,767 | $     8,588 |
| Trade accounts receivable, net of allowance for doubtful accounts of $455,253 and $290,806, respectively | 629,830 | 472,947 |
| Receivable due from related party | - | 670,266 |
| Inventory, net of reserve of $2,065,558 and $2,045,052, respectively | 542,356 | 873,650 |
| Prepaid royalty | 500,000 | - |
| Prepaid deposits | 109,874 | 82,011 |
| Other | 379,929 | 720,712 |
| Total current assets | 2,166,756 | 2,828,174 |
| Investment in securities, at cost | 300,000 | 300,000 |
| Investment in related party | - | 750,000 |
| Long-term receivable due from related party | - | 6,285,551 |
| Long-term receivable, net of allowance of $367,024 and $0, respectively | 1,215,871 | 1,647,895 |
| Property and equipment, net | 335,547 | 544,705 |
| Intellectual property, net | 169,459 | 1,270,358 |
| Other assets, net | 8,267 | 14,538 |
| Total assets | $   4,195,900 | $  13,641,221 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| **Current liabilities** | | |
| Checks written in excess of bank balance | $    203,460 | $    217,361 |
| Accounts payable | 3,331,092 | 3,047,592 |
| Related party payable | 420,000 | - |
| Short term advances payable | 3,827,538 | 2,962,339 |
| Accrued liabilities | 4,761,611 | 2,941,876 |
| Accrued interest | 1,930,355 | 947,536 |
| Deferred revenue | 1,882,191 | 2,275,967 |
| Derivative liability | 1,412,646 | 523,349 |
| Convertible debenture | 3,161,355 | 3,161,355 |
| Current portion of refundable customer deposits | 1,117,387 | 828,933 |
| Current maturities of notes payable | 850,620 | 578,226 |
| Note payable to stockholders | 409,442 | 208,014 |
| Total current liabilities | 23,307,697 | 17,692,548 |
| Refundable customer deposits, net of current portion | - | 1,719,000 |
| Notes payable, less current maturities | - | 196,614 |
| Total liabilities | 23,307,697 | 19,608,162 |
| **Stockholders' deficit** | | |
| CirTran Corporation stockholders' deficit: | | |
| Common stock, par value $0.001; authorized 1,500,000,000 shares; issued and outstanding shares: 1,498,972,923 and 1,498,972,923, respectively | 1,498,968 | 1,498,968 |
| Additional paid-in capital | 29,128,672 | 29,117,928 |
| Subscription receivable | (17,000) | (17,000) |
| Accumulated deficit | (41,969,908) | (39,140,068) |
| Total CirTran Corporation stockholders' deficit | (11,359,268) | (8,540,172) |
| Noncontrolling interest | (7,752,529) | 2,573,231 |
| Total stockholders' deficit | (19,111,797) | (5,966,941) |
| Total liabilities and stockholders' deficit | $   4,195,900 | $  13,641,221 |

The accompanying notes are an integral part
of these consolidated financial statements.

CIRTRAN CORPORATION AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF OPERATIONS

| For the Years Ended December 31, | | 2010 | | 2009 |
|---|---|---|---|---|
| Net sales | $ | 9,044,902 | $ | 9,732,855 |
| Cost of sales | | (3,646,343) | | (8,819,995) |
| Royalty Expense | | (2,257,582) | | (745,121) |
| Gross profit | | 3,140,977 | | 167,739 |
| Operating expenses | | | | |
| Selling, general and administrative expenses | | 5,738,682 | | 4,412,219 |
| Non-cash compensation expense | | 374,783 | | 98,281 |
| Total operating expenses | | 6,113,465 | | 4,510,500 |
| Loss from operations | | (2,972,488) | | (4,342,761) |
| Other income (expense) | | | | |
| Interest expense | | (1,177,761) | | (1,221,004) |
| Interest income | | – | | 518,600 |
| Settlement of litigation | | – | | (490,000) |
| Gain on settlement of litigation | | – | | 58,704 |
| Gain on sale/leaseback | | 81,074 | | 81,074 |
| Loss on settlement of debt | | (81,666) | | 88,779 |
| Impairment of intellectual properties | | – | | (156,340) |
| Impairment of investments in securities | | – | | (452,000) |
| Other income | | 85,500 | | – |
| Gain (loss) on derivative valuation | | (889,297) | | 100,295 |
| Total other expense, net | | (1,982,150) | | (1,471,892) |
| Net loss | $ | (4,954,638) | $ | (5,814,653) |
| Net loss attributable to noncontrolling interest | | 2,336,985 | | – |
| Net loss attributable to CirTran | $ | (2,617,653) | $ | (5,814,653) |
| Basic and diluted loss per common share | $ | (0.00) | $ | (0.00) |
| Basic and diluted weighted-average common shares outstanding | | 1,498,972,923 | | 1,490,580,788 |

The accompanying notes are an integral part
of these consolidated financial statements.

F-4

CIRTRAN CORPORATION AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF STOCKHOLDERS' DEFICIT
FOR THE YEARS ENDED DECEMBER 31, 2009 AND 2010

| | Common Stock | | Additional paid-in capital | Subscription receivable | Accumulated deficit | Non-Controlling Interest | Total |
|---|---|---|---|---|---|---|---|
| | Number of shares | Amount | | | | | |
| Balances at December 31, 2008 | 1,426,262,586 | $ 1,426,257 | $ 28,970,335 | $ (17,000) | $ (33,325,415) | $ 2,573,231 | $ (372,592) |
| Shares issued for partial conversion of debentures, including effect of derivative conversion | 72,710,337 | 72,711 | 126,744 | - | - | - | 199,455 |
| Options granted to employees, consultants and attorneys | - | - | 5,530 | - | - | - | 5,530 |
| Warrants granted to consultants and attorneys | - | - | 15,319 | - | - | - | 15,319 |
| Net loss | - | - | - | - | (5,814,653) | - | (5,814,653) |
| Balances at December 31, 2009 | 1,498,972,923 | 1,498,968 | 29,117,928 | (17,000) | (39,140,068) | 2,573,231 | (5,966,941) |
| Cumulative Effect Adjustment | - | - | - | | (212,187) | (7,988,775) | (8,200,962) |
| Options granted to employees, consultants and attorneys | - | - | 3,986 | - | - | - | 3,986 |
| Warrants granted to consultants and attorneys | - | - | 6,758 | - | - | - | 6,758 |
| Net loss | - | - | - | - | (2,617,653) | (2,336,965) | (4,954,638) |
| Balances at December 31, 2010 | 1,498,972,923 | $ 1,498,968 | $ 29,128,672 | $ (17,000) | $ (41,969,908) | $ (7,752,529) | (19,111,797) |

The accompanying notes are an integral part
of these consolidated financial statements.

F-5

CIRTRAN CORPORATION AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CASH FLOWS

| For the Years Ended December 31, | 2010 | 2009 |
|---|---|---|
| **Cash flows from operating activities** | | |
| Net loss | $ (4,954,638) | $ (5,814,653) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 653,615 | 660,940 |
| Accretion expense | 233,560 | 443,816 |
| Provision for doubtful accounts | 204,653 | 182,644 |
| Provision for obsolete inventory | 20,100 | 1,016,502 |
| Loss on assignment of intangibles | 205,462 | – |
| Gain on sale – leaseback | (81,074) | (81,074) |
| Impairment of intangibles | – | 156,340 |
| Impairment of long term receivable | 367,024 | – |
| Impairment of investment in securities | – | 452,000 |
| Non-cash compensation expense | 374,783 | 98,281 |
| Loan costs and interest withheld from loan proceeds | – | 15,662 |
| Litigation settled through note payable | – | 100,000 |
| Litigation settled through accrued liability | – | 390,000 |
| Options issued to attorneys for services | 6,758 | 20,849 |
| Change in valuation of derivative | 889,297 | (100,295) |
| Changes in assets and liabilities: | | |
| Trade accounts receivable | (361,536) | (164,630) |
| Related party receivable | – | (3,236,974) |
| Inventories | 311,194 | (438,877) |
| Prepaid expenses and other current assets | (43,326) | (328,643) |
| Accounts payable | 283,501 | 844,821 |
| Related party payable | 420,000 | – |
| Accrued liabilities | 2,606,709 | 2,749,117 |
| Deferred revenue | (393,776) | 1,688,915 |
| Customer deposits | (1,430,546) | 859,853 |
| Net cash used in operating activities | (688,240) | (485,406) |
| **Cash flows from investing activities** | – | – |
| **Cash flows from financing activities** | | |
| Proceeds from notes payable to related party | – | 4,611 |
| Payments on notes payable to related party | (48,571) | (22,434) |
| Principal payments on long-term debt | (54,169) | (106,854) |
| Checks written in excess of bank balance | (13,901) | 83,970 |
| Proceeds from short-term advances | 1,895,410 | 1,885,300 |
| Payments on short-term advances | (1,094,350) | (1,359,300) |
| Net cash provided by financing activities | 684,419 | 485,293 |
| Net decrease in cash and cash equivalents | (3,821) | (113) |
| Cash and cash equivalents at beginning of year | 8,588 | 8,701 |
| Cash and cash equivalents at end of year | $ 4,767 | $ 8,588 |

The accompanying notes are an integral part
of these consolidated financial statements.

CIRTRAN CORPORATION AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CASH FLOWS (CONTINUED)

| For the Years Ended December 31, | 2010 | 2009 |
|---|---|---|
| Supplemental disclosure of cash flow information: | | |
| Cash paid during the period for interest | $ 74,686 | $ 651,203 |
| Noncash investing and financing activities: | | |
| Net assets assumed in consolidation of PlayBev | 8,650,962 | |
| Debt settled in exchange for intangible assets | 2,600,747 | |
| Related party liability settled through | | |
| reduction of related party receivable | – | 1,000,000 |
| Accounts receivable settled through offset in | | |
| short-term liability | – | 100,480 |
| Accrued liabilities settled on behalf of the | | |
| Company for issuance of short-term advance | – | 1,949,490 |
| Debt settled on behalf of Company for  issuance | | |
| of short term advances | 114,139 | 1,315,000 |
| Stock issued in payment of notes payable and | | |
| accrued interest | – | 199,455 |
| Return of property and equipment | – | 12,400 |

The accompanying notes are an integral part
of these consolidated financial statements.

F-7

Reclassifications - Certain reclassifications have been made to the financial statements to conform to the current year presentation.

Recent Accounting Pronouncements

In January 2009, the Securities and Exchange Commission ("SEC") issued Release No. 33-9002, "Interactive Data to Improve Financial Reporting." The final rule requires companies to provide their financial statements and financial statement schedules to the SEC and on their corporate websites in interactive data format using the eXtensible Business Reporting Language ("XBRL"). The rule was adopted by the SEC to improve the ability of financial statement users to access and analyze financial data. The SEC adopted a phase-in schedule indicating when registrants must furnish interactive data. Under this schedule, the Company will be required to submit filings with financial statement information using XBRL commencing with its June 30, 2011, quarterly report on Form 10-Q. The Company is currently evaluating the impact of XBRL reporting on its financial reporting process.

In January 2010, the Financial Accounting Standards Board ("FASB") issued guidance which clarifies and provides additional disclosure requirements related to recurring and non-recurring fair value measurements. The Company's adoption of the new standard, during the first quarter of fiscal 2010, did not have a material impact on its consolidated statements.

In March 2010, the FASB issued guidance to clarify the scope exception for certain embedded derivative features on debt instruments. The guidance is effective for the first fiscal quarter after June 15, 2010, with early adoption permitted. The Company adoption of the new standard, on July 1, 2010, did not have a material impact on its consolidated statements.

In April 2010, the FASB issued guidance to clarify classification of an employee stock-based payment award when the exercise price is denominated in the currency of a market in which the underlying equity security trades. The guidance is effective for fiscal years and interim periods beginning after December 15, 2010, with early adoption permitted. The Company is currently evaluating the impact of this new guidance on its financial statements.

On January 1, 2010, the Company adopted ASU 2009-17 (ASC Topic 810, Consolidation), Improvements to Financial Reporting by Enterprises Involved with Variable Interest Entities. ASU 2009-17 amends the consolidation guidance applicable to variable interest entities ("VIEs") and requires additional disclosures concerning an enterprise's continuing involvement with VIEs. The Company evaluated the impact of this guidance and determined that the adoption resulted in the December 31, 2010, consolidation of PlayBev. See Note 4 for further details.

NOTE 3 - REALIZATION OF ASSETS

The accompanying consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America, which contemplate continuation of the Company as a going concern. However, the Company sustained losses of $4,954,638 and $5,814,653 for the years ended December 31, 2010 and 2009, respectively. As of December 31, 2010 and 2009, the Company had an accumulated deficit of $41,969,908 and $39,140,068, respectively. In addition, the Company used, rather than provided, cash in its operations in the amounts of $688,240 and $485,406 for the years ended December 31, 2010 and 2009, respectively. These conditions raise substantial doubt about the Company's ability to continue as a going concern.

In view of the matters described in the preceding paragraph, recoverability of a major portion of the recorded asset amounts shown in the accompanying consolidated balance sheets is dependent upon continued operations of the Company, which in turn is dependent upon the Company's ability to meet its financing requirements on a continuing basis, to maintain or replace present financing, to acquire additional capital from investors, and to succeed in its future operations. The financial statements do not include any adjustments relating to the recoverability and classification of recorded asset amounts or amounts and classification of liabilities that might be necessary should the Company be unable to continue in existence.

F-12

The Company feels that its beverage business has the potential to have a substantial impact on its business. The Company plans to focus on the beverage business and the contract manufacturing business. For the beverage business, the Company plans to sell existing products and develop new products under the license agreement with Playboy to a globally expanding market. With regard to contract manufacturing, the Company goal is to provide customers with manufacturing solutions for both new and more mature products, as well as across product generations.

The Company currently provides product marketing services to the direct response and retail markets for both proprietary and non-proprietary products. This segment provides campaign management and marketing services for both the Direct Response, Retail and Beverage Distribution markets. The Company intends to continue to provide marketing and media services to support its own product efforts, and offer to customers marketing service in channels involving television, radio, print media, and the internet.

With respect to electronics assembly and manufacturing, the Company intends to continue to serve these industries, although it anticipates that its focus will shift more to providing services on a sub-contract basis.

NOTE 4 - VARIABLE INTEREST ENTITY

Consolidation of PlayBev - During the year ended December 31, 2007 the Company, through AfterBev a 51% voting and 4% economic interest consolidated subsidiary, purchased a 50% ownership in PlayBev for $750,000. As condition of the purchase, AfterBev was to develop an acceptable operating plan for PlayBev, procure a credit facility with a third party at prevailing market rates sufficient to fund PlayBev's working capital needs, and provide a third party vendor to develop, manufacture, and distribute the energy drink product. Upon satisfactory completion of these events, AfterBev was granted an additional 1% ownership interest in PlayBev bringing its total investment to 51%. Certain participating rights held by the minority interest holders of PlayBev prevented it being consolidated with the Company under the majority ownership accounting guidance. The Company was selected to develop, manufacture, and distribute the energy drinks as well as provide the credit facility to support the working capital needs of PlayBev.

The Company has evaluated its involvement with PlayBev to determine whether it should be consolidated as a variable interest entity. Upon the initial involvement with PlayBev, it was determined that PlayBev did not have sufficient equity investment at risk and was determined to be a variable interest entity based on the following factors:

   o    The investment was contingent on procuring of a subordinated credit
        facility to finance the operations of PlayBev.

   o    PlayBev was under the obligation to make product license royalty
        payments. The licence agreement was for a period of five years. Only
        the first year of the royalty was able to be paid upon the original
        investment.

At inception, the Company determined that it was not the primary beneficiary of PlayBev based on the following factors:

   o    CirTran could not receive access on its own to the Playboy name and
        logo intangible assets and only had its initial equity investment at
        risk. The credit facility established was to be easily repaid based
        upon the projections of management for the sales of the beverage
        drinks.

   o    PlayBev's original owners were under obligation to make the required
        royalty payments to Playboy and were under the greatest risk of
        absorbing the expected losses (including but not limited to the loss
        of the right of the asset).

F-13

==============================================================================

EXHIBIT 21

SUBSIDIARIES

1.      CirTran Corporation, a Utah corporation.

2.      Racore Network, Inc., a Utah corporation.

3.      CirTran - Asia, Inc., a Utah corporation.

4.      CirTran Products Corp., a Utah corporation.

5.      CirTran Media Corp., a Utah corporation.

6.      CirTran Online Corp., a Utah corporation.

7.      CirTran Beverage Corp., a Utah corporation.

8.      After Bev Group, LLC, a California limited liability company.

9.      Play Beverages, LLC, a Delaware limited liability company

--------------------------------------------------------------------------------