# EXHIBIT B

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# FORM 10-Q

(Mark One

### [X] QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended June 30, 2011

OR

### [ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

*Commission file number 000-49654*

# CIRTRAN CORPORATION
(Exact name of registrant as specified in its charter)

```
        Nevada                                    68-0121636
--------------------------------         --------------------
(State or other jurisdiction of             (I.R.S. Employer
incorporation or organization)             Identification No.)

4125 South 6000 West, West Valley City, Utah        84128
--------------------------------------------        -----
  (Address of principal executive offices)        (Zip Code)

                 (801) 963-5112
                 --------------
    (Registrant's telephone number, including area code)
```

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes [X] No [ ]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

```
(Check one):
        Large accelerated filer [   ]        Accelerated filer [   ]
```

# CIRTRAN CORPORATION

## FORM 10-Q

**For the Quarterly Period Ended June 30, 2011**

### INDEX

Page

PART I - FINANCIAL INFORMATION

Item 1    Financial Statements (unaudited)
          Condensed Consolidated Balance Sheets...................... 3
          Condensed Consolidated Statements of Operations........... 4
          Condensed Consolidated Statements of Cash Flows........... 5
          Notes to Condensed Consolidated Financial Statements....... 7

Item 2    Management's Discussion and Analysis of Financial
          Condition and Results of Operations....................... 23

Item 3    Quantitative and Qualitative Disclosures About Market Risk.... 31

Item 4    Controls and Procedures................................... 31


                    PART II - OTHER INFORMATION

Item 1    Legal Proceedings......................................... 32

Item 2    Unregistered Sales of Equity Securities and Use of Proceeds... 36

Item 3    Defaults Upon Senior Securities........................... 36

Item 4    (Removed and Reserved..................................... 36

Item 5    Other Information......................................... 37

Item 6    Exhibits................................................. 37

Signatures................................................. 40

2

CIRTRAN CORPORATION AND SUBSIDIARIES
CONDENSED CONSOLIDATED BALANCE SHEETS (UNAUDITED)

| | June 30, 2011 | December 31, 2010 |
|---|---|---|
| **ASSETS** | | |
| Current assets | | |
| Cash and cash equivalents | $ 1,907 | $ 4,767 |
| Trade accounts receivable, net of allowance for doubtful accounts of $445,253 and $445,253, respectively | 994,300 | 629,830 |
| Inventory, net of reserve of $2,065,558 and $2,065,558, respectively | 792,393 | 542,356 |
| Prepaid royalty | – | 500,000 |
| Prepaid deposits | 81,086 | 109,874 |
| Other | 380,723 | 379,929 |
| Total current assets | 2,250,409 | 2,166,756 |
| Investment in securities, at cost | 300,000 | 300,000 |
| Long-term receivable | 1,215,871 | 1,215,871 |
| Property and equipment, net | 240,050 | 335,547 |
| Intellectual property, net | 156,189 | 169,459 |
| Other assets, net | 8,267 | 8,267 |
| Total assets | $ 4,170,786 | $ 4,195,900 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current liabilities | | |
| Checks written in excess of bank balance | $ 256,819 | $ 203,460 |
| Accounts payable | 3,091,612 | 3,331,092 |
| Related party payable | 546,000 | 420,000 |
| Short term advances payable | 4,416,543 | 3,827,538 |
| Accrued liabilities | 5,431,810 | 4,761,611 |
| Accrued interest | 1,961,642 | 1,930,355 |
| Deferred revenue | 2,580,220 | 1,882,191 |
| Derivative liability | 3,336,882 | 1,412,646 |
| Convertible debenture | 3,161,355 | 3,161,355 |
| Refundable customer deposits | 1,117,387 | 1,117,387 |
| Current maturities of long-term debt | 886,265 | 850,620 |
| Note payable to stockholders and members | 401,833 | 409,442 |
| Total current liabilities | 27,188,368 | 23,307,697 |
| Total liabilities | 27,188,368 | 23,307,697 |
| Stockholders' deficit | | |
| CirTran Corporation stockholders' deficit: | | |
| Common stock, par value $0.001; authorized 4,500,000,000 shares; issued and outstanding shares: 1,498,972,923 | 1,498,968 | 1,498,968 |
| Additional paid-in capital | 29,128,672 | 29,128,672 |
| Subscription receivable | (17,000) | (17,000) |
| Accumulated deficit | (44,740,760) | (41,969,908) |
| Total CirTran Corporation stockholders' deficit | (14,130,120) | (11,359,268) |
| Noncontrolling interest | (8,887,462) | (7,752,529) |
| Total stockholders' deficit | (23,017,582) | (19,111,797) |
| Total liabilities and stockholders' deficit | $ 4,170,786 | $ 4,195,900 |

The accompanying notes are an integral part of
these consolidated financial statements.

3

CIRTRAN CORPORATION AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS (UNAUDITED)

| | Three months ended June 30, | | Six months ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2011 | 2010 | 2011 | 201 |
| | | (As Adjusted) | | (As Adju |
| Net sales | $ 685,625 | $ 2,313,843 | $ 2,080,825 | $ 4,09 |
| Cost of sales | (133,130) | (1,011,742) | (328,417) | (2,15 |
| Royalty Expense | (534,296) | (579,784) | (1,078,361) | (1,10 |
| Gross profit | 18,199 | 722,317 | 674,047 | 83 |
| Operating expenses | | | | |
| Selling, general and administrative expenses | 1,175,606 | 1,260,982 | 2,247,754 | 2,43 |
| Non-cash compensation expense | 5,703 | – | 104,462 | 4 |
| Total operating expenses | 1,181,309 | 1,260,982 | 2,352,216 | 2,47 |
| Loss from operations | (1,163,110) | (538,665) | (1,678,169) | (1,64 |
| Other income (expense) | | | | |
| Interest expense | (232,722) | (323,052) | (504,512) | (58 |
| Gain on sale/leaseback | 20,269 | 20,269 | 40,537 | 4 |
| Separation expense – related party | – | – | – | (26 |
| Other income | 28,500 | – | 57,000 | |
| Gain on settlement of litigation / debt | 45,187 | (1,156) | 45,187 | 6 |
| Gain (loss) on derivative valuation | 6,005,885 | 120,652 | (1,865,826) | 36 |
| Total other income (expense), net | 5,867,119 | (183,287) | (2,227,614) | (44 |
| Net income (loss) | 4,704,009 | (721,952) | (3,905,783) | (2,08 |
| Net loss attributable to noncontrolling interest | 559,097 | 603,778 | 1,134,933 | 1,13 |
| Net income (loss) attributable to CirTran | $ 5,263,106 | $ (118,174) | $ (2,770,850) | $ (95 |
| Basic and diluted loss per common share | $ 0.00 | $ (0.00) | $ (0.00) | $ |
| Basic and diluted weighted-average common shares outstanding | 1,498,972,923 | 1,498,972,923 | 1,498,972,923 | 1,498,9 |

The accompanying notes are an integral part of these consolidated financial statements.

4

## CIRTRAN CORPORATION AND SUBSIDIARIES
## CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS (UNAUDITED)

| For the Six Months Ended June 30, | 2011 | 2010 |
|---|---|---|
| | | (As Adjusted) |
| **Cash flows from operating activities** | | |
| Net loss | $ (3,905,783) | $ (2,085,320) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 108,765 | 327,719 |
| Accretion expense | 35,865 | 115,719 |
| Recovery of doubtful accounts | – | (22,877) |
| Provision for obsolete inventory | – | (44,407) |
| Gain on sale – leaseback | (40,537) | 40,537 |
| Non-cash compensation expense | 46,053 | 43,577 |
| Issuance of warrants for settlement | 58,410 | – |
| Options issued to attorneys for services | – | 6,758 |
| Change in valuation of derivative | 1,865,826 | (368,010) |
| Changes in assets and liabilities: | | |
| Trade accounts receivable | (364,470) | (1,151,817) |
| Inventories | (250,037) | 327,494 |
| Prepaid expenses and other current assets | 527,994 | (1,249,159) |
| Accounts payable | (239,482) | 1,780,577 |
| Related party payable | 126,000 | – |
| Accrued liabilities | 808,322 | 1,344,013 |
| Deferred revenue | 698,029 | 864,607 |
| Customer deposits | – | 34,646 |
| **Net cash used in operating activities** | (525,045) | (35,943) |
| **Cash flows from financing activities** | | |
| Payments on notes payable to related party | – | (22,951) |
| Principal payments on long-term debt | – | (64,437) |
| Checks written in excess of bank balance | 53,359 | 27,838 |
| Proceeds from short-term advances | 916,190 | 103,900 |
| Payments on short-term advances | (447,364) | – |
| **Net cash provided by financing activities** | 522,185 | 44,350 |
| **Net increase (decrease) in cash and cash equivalents** | (2,860) | 8,407 |
| Cash and cash equivalents at beginning of year | 4,767 | 8,588 |
| Cash and cash equivalents at end of year | $ 1,907 | $ 16,995 |

The accompanying notes are an integral part of these consolidated financial statements.

5

**CIRTRAN CORPORATION AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS (UNAUDITED) - CONTINUED**

| For the Six Months Ended June 30, | | 2011 | | 2010 |
|---|---|---|---|---|
| | | | | (As Adjusted) |
| Supplemental disclosure of cash flow information: | | | | |
| Cash paid during the period for interest | $ | 499,934 | $ | 55,262 |
| | | | | |
| Noncash investing and financing activities: | | | | |
| Accounts payable settled on behalf of the | | | | |
| Company for issuance of short term advances | | 119,960 | | 51,220 |
| Net assets assumed in consolidation of PlayBev | | – | | 8,651,323 |

The accompanying notes are an integral part of these consolidated financial statements.

6

Case 11-02599   Doc 12-2   Filed 10/06/11   Entered 10/06/11 00:18:49   Desc Exhibit
CIRTRAN CORP - 10-Q - 20110818 - FORM Exhibit B   Page 9 of 39

Page 9 of 52

## CIRTRAN CORPORATION AND SUBSIDIARIES

## NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)

## NOTE 1 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Basis of Presentation - CirTran Corporation and its subsidiaries (collectively, the "Company" or "CirTran") consolidates all of its majority-owned subsidiaries and companies over which the Company exercises control through majority voting rights and companies in which it has a variable interest and the Company is the primary beneficiary. The Company accounts for its investments in common stock of other companies that the Company does not control but over which the Company can exert significant influence using the cost method.

Condensed Financial Statements - The accompanying unaudited condensed consolidated financial statements include the accounts of CirTran Corporation and its subsidiaries. These financial statements have been prepared in accordance with Article 10 of Regulation S-X promulgated by the Securities and Exchange Commission ("SEC" or "Commission"). Certain information and footnote disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted in the United States of America have been condensed or omitted pursuant to such rules and regulations. These statements should be read in conjunction with the Company's annual financial statements included in the Company's Annual Report on Form 10-K for the year ended December 31, 2010. In particular, the Company's significant accounting policies were presented as Note 2 to the consolidated financial statements in that Annual Report. In the opinion of management, all adjustments necessary for a fair presentation have been included in the accompanying condensed consolidated financial statements and consist of only normal recurring adjustments. The results of operations presented in the accompanying condensed consolidated financial statements for the six months ended June 30, 2011, are not necessarily indicative of the results that may be expected for the twelve months ending December 31, 2011.

Principles of Consolidation - The consolidated financial statements include the accounts of CirTran Corporation, and its wholly owned subsidiaries Racore Technology Corporation, CirTran - Asia, Inc., CirTran Products Corp., CirTran Media Corp., CirTran Online Corp., and CirTran Beverage Corp.

The consolidated financial statements also include the accounts of After Beverage Group LLC, a majority controlled entity, and Play Beverages LLC ("PlayBev"), a consolidated variable interest entity. PlayBev holds a licence agreement with Playboy Enterprises International, Inc. ("Playboy"), to manufacture and distribute energy drinks and water under the Playboy name. Effective January 1, 2010, the Company determined that it was the primary beneficiary of PlayBev and began to consolidate into its financial statements the accounts of PlayBev.

Inventories - Inventories are stated at the lower of average cost or market value. Cost on manufactured inventories includes labor, material and overhead. Overhead cost is based on indirect costs allocated to cost of sales, work-in-process inventory, and finished goods inventory. Indirect overhead costs have been charged to cost of sales or capitalized as inventory, based on management's estimate of the benefit of indirect manufacturing costs to the manufacturing process.

When there is evidence that the inventory's value is less than original cost, the inventory is reduced to market value. The Company determines market value on current resale amounts and whether technological obsolescence exists. The Company has agreements with most of its manufacturing customers that require the customer to purchase inventory items related to their contracts in the event that the contracts are cancelled.

Impairment of Long-Lived Assets - The Company reviews its long-lived assets, including intangibles, for impairment when events or changes in circumstances indicate that the carrying value of an asset may not be recoverable. At each balance sheet date, the Company evaluates whether events and circumstances have occurred that indicate possible impairment. The Company uses an estimate of future undiscounted net cash flows from the related asset or group of assets over their remaining life in measuring whether the assets are recoverable.

Long-lived asset costs are amortized over the estimated useful life of the asset, which are typically five to seven years. Amortization expense was $6,636 and $111,113 for the three months ended June 30, 2011 and 2010, respectively, and was $13,271 and $222,227 for the six months ended June 30, 2011 and 2010, respectively.

7

Financial Instruments with Derivative Features - The Company does not hold or issue derivative instruments for trading purposes. However, the Company has financial instruments that are considered derivatives, or contain embedded features subject to derivative accounting. Embedded derivatives are valued separate from the host instrument and are recognized as derivative liabilities in the Company's balance sheet. The Company measures these instruments at their estimated fair value, and recognizes changes in their estimated fair value in results of operations during the period of change. The Company has estimated the fair value of these embedded derivatives using the Black-Scholes model. The fair value of the derivative instruments is re-measured each quarter (see Note 10).

Revenue Recognition - Revenue is recognized when products are shipped. Title passes to the customer or independent sales representative at the time of shipment. Returns for defective items are either repaired and sent back to the customer, or returned for credit or replacement product. Historically, expenses associated with returns have not been significant and have been recognized as incurred.

Loss Per Share - Basic loss per share is calculated by dividing net loss available to common shareholders by the weighted-average number of common shares outstanding during each period. Diluted loss per share is similarly calculated, except that the weighted-average number of common shares outstanding would include common shares that may be issued subject to existing rights with dilutive potential when applicable. The Company had 2,236,035,552 and 1,269,804,223 in potentially issuable common shares at June 30, 2011 and 2010, respectively. These potentially issuable common shares were excluded from the calculation of diluted loss per share because the effects were anti-dilutive.

Use of Estimates - In preparing the Company's financial statements in accordance with accounting principles generally accepted in the United States of America, management is required to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reported periods. Actual results could differ from those estimates.

Reclassifications - Certain reclassifications have been made to the financial statements to conform to the current year presentation.

Consolidation of PlayBev - At December 31, 2010, the Company determined that it was the primary beneficiary of PlayBev, and that the assets, liabilities and operations of PlayBev should be consolidated into its financial statements beginning January 1, 2010. The Company has adjusted the previously reported, June 30, 2010, consolidated statements of operations and cash flows for the effects of the newly consolidated entity. The following table shows the effects of the change.

| | | Three months ended June 30, | | | Six months ended June 30, | | |
|---|---|---|---|---|---|---|---|
| | 2010 | 2010 | Changes | | 2010 | 2010 | Cha |
| | | (As Adjusted) | | | | (As Adjusted) | |
| Condensed Consolidated Statement of Operations | | | | | | | |
| Net Sales | $ (5,008,276) | $ (2,313,843) | $ 2,694,433 | $ | (7,192,114) | $ (4,096,702) | $ 3,0 |
| Cost of Sales | 3,571,453 | 1,011,742 | (2,559,711) | | 5,100,165 | 2,159,175 | (2,9 |
| Royalty Expense | 624,676 | 579,784 | (44,892) | | 1,156,124 | 1,105,167 | |
| Selling, General and administrative | 622,285 | 1,260,982 | 638,697 | | 1,412,893 | 2,432,869 | 1,0 |
| Interest Expense | 286,484 | 323,052 | 36,568 | | 535,084 | 588,624 | |
| Interest Income | (151,578) | - | 151,578 | | (180,763) | - | |
| Condensed Consolidated Statement of Cash Flows | | | | | | | |
| Cash flows from operating activities | | | | | | | |
| Net income (loss) | $ 196,563 | $ (721,952) | $ (918,515) | $ | (727,576) | $ (2,085,320) | $ (1,3 |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | | | | | |
| Prepaid expenses and other current assets | | | | | 113,720 | (1,243,159) | (1,3 |
| Related party receivable | | | | | (2,159,155) | - | 2,1 |
| Accrued liabilities | | | | | 782,545 | 1,344,013 | 5 |

8

Taxes - At June 30, 2011, management had recorded a full valuation allowance against the net deferred tax assets related to temporary differences and operating losses in the current period because there is significant uncertainty as to the realizability of the deferred tax assets. Based on a number of factors, the currently available, objective evidence indicates that it is more-likely-than-not that the net deferred tax assets will not be realized.

## Recent Accounting Pronouncements

In January 2009, the Securities and Exchange Commission ("SEC") issued Release No. 33-9002, "Interactive Data to Improve Financial Reporting." The final rule requires companies to provide their financial statements and financial statement schedules to the SEC and on their corporate websites in interactive data format using the eXtensible Business Reporting Language ("XBRL"). The rule was adopted by the SEC to improve the ability of financial statement users to access and analyze financial data. The SEC adopted a phase-in schedule indicating when registrants must furnish interactive data. Under this schedule, the Company is required to submit filings with financial statement information using XBRL commencing with the quarterly period ended June 30, 2011, reported on Form 10-Q. The Company has implemented this new pronouncement effective as of that date.

In April 2010, the FASB issued guidance to clarify classification of an employee stock-based payment award when the exercise price is denominated in the currency of a market in which the underlying equity security trades. The guidance is effective for fiscal years and interim periods beginning after December 15, 2010, with early adoption permitted. The Company's adoption of the new standard, on January 1, 2011, did not have a material impact on its consolidated statements.

## NOTE 2 - REALIZATION OF ASSETS

The accompanying condensed consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America, which contemplate continuation of the Company as a going concern. The Company had a net loss of $3,905,783 and of $2,085,320 for the six months ended June 30, 2011 and 2010, respectively. As of June 30, 2011, the Company had an accumulated deficit of $44,740,760. In addition, the Company used cash in its operations in the amount of $525,045 and $35,943 during the six months ended June 30, 2011 and 2010, respectively. The Company had borrowed funds in the form of short-term advances, notes, and convertible debentures. The Company had a negative working capital balance of $24,937,959 as of June 30, 2011, and $21,140,941 as of December 31, 2010. Additionally, in light of the occurrence of one or more Events of Termination pursuant to the Amended and Restated Forbearance Agreement (See Note 6), YA Global Investments has declared that its agreement to forbear enforcement of its rights under the Convertible Debentures has terminated, and accordingly, YA Global Investments has all rights of a secured creditor. Play Beverages, LLC, ("PlayBev"), a consolidated entity of the Company, filed petitions under Chapter 11 of the federal bankruptcy laws in the United States Bankruptcy Court for the District of Utah. Under Chapter 11, certain claims, including a motion to terminate the Product License Agreement between Playboy and PlayBev, against PlayBev in existence before the filing of the petitions for relief under the federal bankruptcy laws are stayed while PlayBev continues business operations as Debtor-in-possession. (See also Note 16). These conditions raise substantial doubt about our ability to continue as a going concern.

In view of the matters described in the preceding paragraph, recoverability of a major portion of the recorded asset amounts shown in the accompanying consolidated balance sheets is dependent upon continued operations of the Company, which in turn is dependent upon the Company's ability to meet its financing requirements on a continuing basis, to maintain or replace present financing, to acquire additional capital from investors, and to succeed in its future operations. The financial statements do not include any adjustments relating to the recoverability and classification of recorded asset amounts and classification of liabilities that might be necessary should the Company be unable to continue as a going concern. The Company feels that its beverage business has the potential to have a substantial impact on its business. The Company plans to focus on the beverage business and the contract manufacturing business. For the beverage business, the Company plans to sell existing products and develop new products under the license agreement with Playboy to a globally expanding market. With regard to contract manufacturing, the Company goal is to provide customers with manufacturing solutions for both new and more mature products, as well as across product generations.

9

The Company currently provides product marketing services to the direct response and retail markets for both proprietary and non-proprietary products. This segment provides campaign management and marketing services for both the Direct-response, Retail and Beverage Distribution markets. The Company intends to continue to provide marketing and media services to support its own product efforts, and offer to customers marketing service in channels involving television, radio, print media, and the internet.

With respect to electronics assembly and manufacturing, the Company intends to continue to serve these industries, although it anticipates that its focus will shift more to providing services on a sub-contract basis.

## NOTE 3 - INVENTORY

Inventory consisted of the following:

|  | June 30, 2011 | December 31, 2010 |
|---|---|---|
| Raw Materials | $ 1,704,320 | $ 1,730,086 |
| Work in Process | 426,250 | 139,947 |
| Finished Goods | 727,381 | 737,881 |
| Allowance / Reserve | (2,065,558) | (2,065,558) |
| Totals | $ 792,393 | $ 542,356 |

## NOTE 4 - INTELLECTUAL PROPERTY

Intellectual property and estimated service lives consisted of the following:

|  | June 30, 2011 | December 31, 2010 | Estimated Service Lives in Years |
|---|---|---|---|
| Infomercial development costs | $ 54,946 | $ 54,946 | 7 |
| Patents | 38,056 | 38,256 | 7 |
| Website Development Costs | 150,000 | 150,000 | 5 |
| Total intellectual property | $ 243,002 | $ 243,202 |  |
| Less accumulated amortization | (86,813) | (73,543) |  |
| Intellectual property, net | $ 156,189 | $ 169,659 |  |

The estimated amortization expenses for the next five years are as follows:

Year Ending December 31,

| 2011 | $ 24,583 |
|---|---|
| 2012 | 34,352 |
| 2013 | 32,418 |
| 2014 | 32,418 |
| 2015 | 32,418 |
| Total | $ 156,189 |

## NOTE 5 - RELATED PARTY TRANSACTIONS

### Global Marketing Alliance

The Company entered into an agreement with Global Marketing Alliance ("GMA"), and hired GMA's owner as the Vice President of CirTran Online ("CTO")', one of the Company's subsidiaries. Under the terms of the agreement, the Company outsources to GMA the online marketing and sales activities associated with the Company's CTO products. In return, the Company provides bookkeeping and management consulting services to GMA, and pays GMA a fee equal to five percent of CTO's online net sales. In addition, GMA assigned to the Company all of its web-hosting and training contracts effective as of January 1, 2007, along with the revenue earned thereon, and the Company also assumed the related contractual performance obligations. The Company recognizes the revenue collected under the GMA contracts, and remits back to GMA a management fee approximating their actual costs. The Company recognized revenues from GMA related products and services in the amount of $0 and $278,477 for the three months ended June 30, 2011 and 2010, respectively, and $0 and $768,522 for the six months ended June 30, 2011 and 2010, respectively.

10

The GMA agreement remained in place as of June 30, 2011, but there was no activity under the agreement for the period ending June 30, 2011.

Transactions involving Officers, Directors, and Stockholders

In 2007, the Company appointed Fadi Nora to its Board of Directors. In addition to compensation the Company normally pays to non-employee members of the Board, Mr. Nora is entitled to a quarterly bonus equal to 0.5 percent of any gross sales earned by the Company directly through Mr. Nora's efforts. As of June 30, 2011 the Company owed $48,788 under this arrangement. During the six months ended June 30, 2011, Mr. Nora loaned the company $605,200 and received cash payments totaling $100,000. As of June 30, 2011, the Company still owed Mr. Nora $1,302,159 in the form of unsecured advances. These advances and short term bridge loans were approved by the Board of Directors under a 5% borrowing fee. The borrowing fees were waived by Mr. Nora on these loans. In addition, the Company owed Mr. Nora $1,534,506 in accrued liabilities as of June 30, 2011, for selling, general and administrative expenses that were paid for by Mr. Nora on a personal credit card.

The Company has agreed to issue 2,400,000 options to Mr. Nora as compensation for services provided as a director of the company. The terms of the director agreement requires the Company to grant to Mr. Nora options to purchase 2,400,000 shares of the Company's stock each year, with the exercise price of the options being the market price of the Company's common stock as of the grant date. During the six months ended June 30, 2011, the Company accrued for 2,400,000 stock options relating to the director agreement with Mr. Nora. The fair market value of the options was $4,747, using the following assumptions: 5 year term, estimated volatility of 167.47 and a discount rate of 2.02 percent (see also Note 12).

In addition, on July 14, 2009, the Company entered into a Stock Purchase Agreement with Mr. Nora to sell to Mr. Nora 75,000,000 shares of common stock of the Company at a purchase price of $.003 per share, for a total of $225,000, payable through the conversion of outstanding loans made by the director to the Company. Mr. Nora and the Company acknowledged in the purchase agreement that the Company did not have sufficient shares to satisfy the issuances, and agreed that the shares would be issued once the Company has sufficient shares to do so. As of June 30, 2011, the Company showed the balance of $225,000 as part of his short term advances payable on the balance sheet.

In 2007, the Company issued a 10 percent promissory note to a family member of the Company president in exchange for $300,000. The note was due on demand after May 2008. During the six months ended June 30, 2011 and 2010, the Company repaid principal and interest totaling $7,609 and $28,212, respectively. At June 30, 2011, the principal amount owing on the note was $151,833. On March 31, 2008, the Company issued to this same family member, along with four other Company shareholders, promissory notes totaling $315,000. The family member's note was for $105,000. Under the terms of all the notes, the Company received total proceeds of $300,000, and agreed to repay the amount received plus a five percent borrowing fee. The notes were due April 30, 2008, after which they were due on demand, with interest accruing at 12 percent per annum. During the six months ended June 30, 2011, the Company made no payments towards the outstanding notes. The principal balance owing on the promissory notes as of June 30, 2011, totaled $51,916.

On April 2, 2009, the Company President and a Director of the Company borrowed from a third party a total of $890,000 in the form of four short-term promissory notes. The Company President and a Director of the Company signed personally for the notes. Because the loans were used to pay obligations of the Company, the Company has assumed full responsibility for the notes. Two of the notes were for a term of 60 days, with a 60 day grace period; a third note was for a term of 90 days, and a fourth note was for 24 days. Loan fees totaling $315,000. Loan fees totaling $103,418 were incurred with the issuance of the notes and are payable upon maturity of the notes. At June 30, 2011, the Company showed the balance of $745,162 as part of short term advances payable on the balance sheet. As of June 30, 2011, all four notes were in default and are accruing interest at the default rate of 36 percent per year.

11

As of June 30, 2011, the Company owed the Company president a total of $229,102 in short term advances payable, and $148,695 in accrued options. These advances and short term bridge loans were approved by the Board of Directors under a 5% borrowing fee. The borrowing fees were waived by the Company's president on these loans.

On July 14, 2009, the Company entered into a Stock Purchase Agreement with Iehab Hawatmah, the president of the Company, to sell to him 50,000,000 shares of common stock of the Company at a purchase price of $.003 per share, for a total amount of $150,000, payable through the conversion of outstanding loans made by Mr. Hawatmah to the Company. Mr. Hawatmah and the Company acknowledged in the purchase agreement that the Company did not have sufficient shares to satisfy the issuances, and agreed that the shares would be issued once the Company has sufficient shares to do so. As of June 30, 2011, the Company showed the balance of $150,000 as a part of the short term advances payable on the balance sheet.

On March 5, 2010, the Company entered into a Separation Agreement ("Agreement") with Shaher Hawatmeh. As of the date of the Agreement, Shaher Hawatmeh's employment with the Company was terminated and he no longer had any further employment obligations with the Company. In consideration of his execution of the Agreement, the Company agreed to pay Shaher Hawatmeh's "Separation Pay" of $210,000 in twenty-six bi-weekly payments. The company recorded $40,385 and $56,539 of compensation expense for the six months ended June 30, 2011 and 2010, under the terms of the agreement, respectively. On April 2, 2010, the Company made the first payment to Shaher Hawatmeh. Additional terms of the separation agreement included the issuance and delivery to Shaher Hawatmeh of ten million (10,000,000) shares of the Company's common stock within a reasonable time following authorization by the Company's shareholders of sufficient shares to cover such issuance. The grant date fair value of the shares aggregated to $50,000 as of March 5, 2010, based on the $.005 per share value as of the effective date of the separation agreement, and has been included in accrued liabilities as of June 30, 2011.

**Sublease**

In an effort to operate more efficiently and focus resources on higher margin areas of the Company's business, on March 5, 2010, the Company and Katana Electronics, LLC, a Utah limited liability company ("Katana") entered into certain agreements (collectively, the "Agreements") to reduce the Company's costs. The Agreements include an Assignment and Assumption Agreement, an Equipment Lease, and a Sublease Agreement relating to the Company's property. Pursuant to the terms of the Sublease, the Company agreed to sublease a certain portion of the Company's Premises to Katana, consisting of the warehouse and office space used as of the close of business on March 4, 2010. The term of the Sublease is for two (2) months with automatic renewal periods of one month each. The base rent under the Sublease is $8,500 per month. The Sublease contains normal and customary use restrictions, indemnification rights and obligations, default provisions and termination rights. Under Agreements signed, the Company continues to have rights to operate as a contract manufacturer in the future in the US and offshore. The income from the sublease to Katana for the six months ended June 30, 2011, was $57,000 and was recognized as other income. As of July 1, 2011, Katana has assumed the full lease payment and the Company has agreed to pay Katana $5,000 per month for the use of office space and utilities.

**NOTE 6 - COMMITMENTS AND CONTINGENCIES**

Litigation and Claims - Various vendors and service providers have notified the Company that they believe they have claims against the Company totaling approximately $2,100,000. The Company has determined the probability of realizing any loss on these claims is remote. The Company has made no accrual for these claims and is currently in the process of negotiating the dismissal of these claims.

Petition for Relief under Chapter 11 - On, August 12, 2011, Play Beverages, LLC, ("PlayBev"), a consolidated entity of the Company, filed petitions under Chapter 11 of the federal bankruptcy laws in the United States Bankruptcy Court for the District of Utah. Under Chapter 11, certain claims against PlayBev in existence before the filing of the petitions for relief under the federal bankruptcy laws are stayed while PlayBev continues business operations as Debtor-in-possession. (See also Note 16). These claims are included in the June 30, 2011, balance sheet and are considered liabilities subject to compromise. Additional claims (liabilities subject to compromise) may arise after the filing date resulting from rejection of executory contracts, and from the determination by the court (or agreed to by parties in interest) of allowed claims for contingencies and other disputed amounts. Claims against PlayBev (secured claims) are stayed, although the holders of such claims have the right to move the court for relief from the stay. As of the date of filing, PlayBev was in the process of filing the required court documents and had not made significant progress in the process of proposing and confirming a plan of reorganization.

12

In connection with the prior Chapter 7 case, Playboy Enterprises International, Inc. ("Playboy"), filed a motion to terminate the automatic stay to permit it to terminate the Product License Agreement between Playboy and PlayBev. PlayBev contests the motion, and a hearing on the motion was currently scheduled for August 23, 2011. However, in light of the conversion to Chapter 11, PlayBev filed a motion to continue the hearing on Playboy's motion. At an August 16, 2011, hearing on PlayBev's motion, the Court continued the hearing on Playboy's motion to terminate the automatic stay until September 2, 2011, when such motion will be heard.

Registration rights agreements - In connection with the Company's issuance of convertible debentures to YA Global Investments, L.P., formerly known as Cornell Capital Partners, L.P. ("YA Global"), the Company granted to YA Global certain registration rights, pursuant to which the Company agreed to file, a registration statements to register the resale of shares of the Company's common stock issuable upon conversion of the debentures. The Company agreed to keep the registration statement effective until all of the shares issuable upon conversion of the debenture have been sold. The Company has not accrued a liability for potential losses.

Previously, YA Global has agreed to extensions of the filing deadlines inherent in the terms of the convertible debentures mentioned above. On January 24, 2011, the Company and YA Global entered into a forbearance agreement related to the convertible debentures issued by the Company to YA or its predecessor entities.

Forbearance agreements - In previous periods the Company has defaulted on certain obligations under its convertible debentures and related agreements. The Company has entered into several forbearance agreements with YA Global in an attempt to restructure the agreement. As of December 31, 2010, the Company had defaulted under the terms of the previous forbearance agreement. On January 24, 2011, the Company, and YA Global Investments finalized an amended and restated forbearance agreement and related agreements ("A&R Forbearance Agreement"). The A&R Forbearance Agreement was dated as of January 7, 2011, but the final conditions for closing were met on January 24, 2011.

The Company and certain of its subsidiaries, which also guaranteed the Company's obligations (the "Guarantors" and collectively with the Company, the "Obligors"), agreed to waive any claims against YA, and released any such claims the Obligors may have had. The Obligors also ratified their respective obligations under the Financing Documents, and agreed to the satisfaction of certain conditions precedent, including the following: payment of certain funds to YA at the time of execution of the A&R Forbearance Agreement; the entry by Iehab Hawatmeh, President of the Company, into a Guaranty Agreement and a Pledge Agreement (both discussed below); the entry into a Ratification and Joinder Agreement by the Obligors (discussed below); the execution of a confession of judgment in a litigation matter between YA, the Company, and Katana Electronics, LLC ("Katana"); and the delivery of a new warrant (the "Warrant") to YA (discussed below).

Additionally, the Obligors agreed to seek to obtain waivers from their respective landlords at their properties in Utah and Arkansas; agreed to seek to obtain deposit account control agreements from the Company's banks and depository institutions; and to repay the Company's obligations under the Debentures on the following schedule:

i. $225,000, on or before the date of the A&R Forbearance Agreement to be applied as follows (x) $75,000 in reimbursement of the legal fees and expenses incurred by the Lender, and (y) $150,000 applied first to accrued but unpaid interest and then to the principal balance of the Obligations;

ii. $75,000 on February 1, 2011;

iii. $75,000 on March 1, 2011;

iv. $75,000 on April 1, 2011;

13

v. $200,000 on May 1, 2011;

vi. $200,000 on June 1, 2011;

vii. $200,000 on July 1, 2011;

viii. $200,000 on August 1, 2011;

ix. $200,000 on September 1, 2011;

x. $200,000 on October 1, 2011;

xi. $200,000 on November 1, 2011;

xii. $200,000 on December 1, 2011; and

xiii. the remaining balance of the Obligations shall be paid in full in good and collected funds by federal funds wire transfer on or before the earlier of (i) the occurrence of a Termination Event (as defined in the A&R Forbearance Agreement), or (ii) 3:00 P.M. (prevailing Eastern time) on December 31, 2011 (the "Termination Date").

During the six months ended June 30, 2011, the Company paid $430,000 towards the required payments under the schedule above. As of the date of this filing it had not made the required payments for the months of May through August, 2011.

Pursuant to the A&R Forbearance Agreement, the parties agreed that the Company, subject to the consent of YA, may choose to pay all or any portion of the payments listed above in common stock, with the conversion price to be used to determine the number of shares of common stock being equal to 85% of the lowest closing bid price of the Company's common stock during the ten trading days prior to the payment date.

In exchange for the satisfaction of such conditions and agreements from the Obligors, YA agreed to forbear from enforcing its rights and remedies as a result of the existing defaults until the earlier of (i) the occurrence of a Termination Event (as defined in the A&R Forbearance Agreement), or (ii) the Termination Date, which is given as December 31, 2011. Notwithstanding the foregoing, nothing contained in the A&R Forbearance Agreement or the other Forbearance Documents will be deemed to constitute a waiver by YA of any default or event of default, whether now existing or hereafter arising (including, without limitation, the existing defaults listed in the A&R Forbearance Agreement), and/or its right to convert the Debentures into shares of the Company's common stock.

In connection with the A&R Forbearance Agreement, Mr. Hawatmeh entered into a Guaranty Agreement and a Pledge Agreement. Pursuant to the Guaranty Agreement, Mr. Hawatmeh agreed to guarantee to YA the full payment and prompt performance of all of the obligations in the A&R Forbearance Agreement. Pursuant to the Pledge Agreement, Mr. Hawatmeh agreed to pledge a first priority security interest in 7,000 class A membership units in Play Beverages, LLC ("PlayBev") to secure the payment of the obligations under the A&R Forbearance Agreement and the Guaranty Agreement.

The Company, the Company's Utah-based subsidiary (also name of CirTran Corporation) ("CirTranSub"), and the other Obligors also entered into a Ratification and Joinder to Collateral Agreements, pursuant to which CirTranSub agreed to be bound by the terms and conditions of, and to be a party to, the Global Security Agreement (entered into in connection with a Prior Forbearance Agreement) and the Global Guaranty Agreement (entered into in connection with a Prior Forbearance Agreement). (The terms of the Global Guaranty Agreement and the Global Security Agreement were described in, and attached as exhibits to, the Company's Current Report on Form 8-K, filed with the SEC on August 17, 2009. For a more complete description of these agreements, please see that filing.) In conjunction with the Forbearance Agreement, the Company issued five-year warrants to purchase up to 25,000,000 shares of common stock at an exercise price of $0.02 per share. (See note 12).

In light of the Company's default in payments described above, YA indicated that it has elected to exercise its rights as a secured creditor. On July 22, 2011, YA filed a motion in the ABS lawsuit (discussed below under "Legal Proceedings"), seeking an order clarifying its position with respect to ABS and staying enforcement of that court's order that CirTran pay approximately $35,000 in legal fees to ABS. In its motion, YA gave notice that it intended to conduct a secured party's public

auction of all of CirTran's assets. Also on July 22, 2011, in a letter written to the Company and filed with YA's motion (the "Instruction Letter"), YA informed the Company that one or more "Events of Termination (as defined in the A&R Forbearance Agreement) had occurred, and that as a result, YA had declared that all of the Company's obligations under the A&R Forbearance Agreement and the Debentures had been accelerated and was due and owing. Further, YA stated that it intended to commence action to collect on the obligations of the Company. YA instructed the Company to assemble the assets.

14

At a hearing held on August 3, 2011, on YA's motion to stay enforcement, YA noted that the date of the proposed secured party's public auction was August 30, 2011. Additionally, on August 3, 2011, YA tendered to the Company Notifications of Disposition of Collateral (the "UCC Notifications"), giving notice of the date of the proposed sale of assets on August 30, 2011.

At the hearing, the court denied YA's motion to stay the payment of attorneys' fees by the Company.

Subsequently, YA, the Company, and the Company's subsidiaries that were parties to the A&R Forbearance Agreement (the "Subsidiaries") entered into an agreement (the "Letter Agreement") whereby YA agreed to rescind the Instruction Letter and the UCC Notifications. The Company and YA further agreed that YA's agreement to forbear enforcement under the A&R Forbearance Agreement was terminated, and that the rescission of the UCC Notifications and the Instruction Letter did not constitute a waiver of any of YA's rights, and that Company and the Subsidiaries remain responsible for all obligations under the A&R Forbearance Agreement.

Employment Agreements - The Company has entered into an employment agreement with Mr. Hawatmeh, our President. The terms of the employment agreement requires the Company to grant to Mr. Hawatmeh options to purchase a minimum of 6,000,000 shares of the Company's stock each year, with the exercise price of the options being the market price of the Company's common stock as of the grant date. The employment agreement also includes additional incentive compensation as follows:
a quarterly bonus equal to 5 percent of the Company's earnings before interest, taxes, depreciation and amortization for the applicable quarter; bonus(es) equal to 1.0 percent of the net purchase price of any acquisitions completed by the Company that are directly generated and arranged by Mr. Hawatmeh; and an annual bonus (payable quarterly) equal to 1 percent of the gross sales, net of returns and allowances of all beverage products of the Company and its affiliates for the most recent fiscal year. For the six months ended June 30, 2011 and 2010 the Company incurred $11,868 and $42,581, respectively, of non-cash compensation expense related to accrual for employee stock options to be awarded per the employment contract for compensation related to the bonuses under the Employment Agreements.

Pursuant to the employment agreement, Mr. Hawatmeh's employment may be terminated for cause, or upon death or disability, in which event the Company is required to pay Mr. Hawatmeh any unpaid base salary and unpaid earned bonuses. In the event that Mr. Hawatmeh is terminated without cause, the Company is required to pay to Mr. Hawatmeh (i) within thirty (30) days following such termination, any benefit, incentive or equity plan, program or practice (the "Accrued Obligations") paid when the bonus would have been paid Employee if employed; (ii) within thirty (30) days following such termination (or on the earliest later date as may be required by Internal Revenue Code Section 409A to the extent applicable), a lump sum equal to thirty (30) month's annual base salary, (iii) bonus(es) owing under the employment agreement for the two year period after the date of termination (net of an bonus amounts paid as Accrued Obligations) based on actual results for the applicable quarters and fiscal years; and (iv) within twelve (12) months following such termination (or on the earliest later date as may be required by Internal Revenue Code Section 409A to the extent applicable), a lump sum equal to thirty (30) month's Annual Base Salary; provided that if Employee is terminated without cause in contemplation of, or within one (1) year, after a change in control, then two (2) times such annual base salary and bonus payment amounts.

On May 1, 2009, PlayBev, a consolidated entity of CirTran, entered into compensation agreements with its managers, Mr. Hawatmeh and Mr. Nora. The agreed compensation consists of a monthly fee of $10,000 for each manager, reimbursement of reasonable expenses on behalf of the Company, a car allowance for Mr. Nora of $1,000 per month to cover the cost of use, fuel and repairs. The Company recorded expenses of $126,000 and $126,000 relating to the compensation agreements for the six months ended June 30, 2011 and 2010, respectively. As of June 30, 2011 and December 31, 2010, the Company had $546,000 and $420,000, respectively, accrued as related party payables for management compensation associated with PlayBev.

15

The company has active employment contracts with several of its employees that require annual payment of non-cash compensation in a fixed number of shares. During the six months ended June 30, 2011, the Company did not grant options to purchase shares of common stock to employees due to the unavailability of issuable stock. The Company accrued an expense of $46,053 and $43,577 for the six months ended June 30, 2011 and 2010, respectively, for employee options relating to the employment contracts of these employees.

## NOTE 7 - NOTES PAYABLE

Notes payable consisted of the following at June 30, 2011, and December 31, 2010:

|  | June 30, 2011 | December 31, 2010 |
|---|---|---|
| Settlement note, ten monthly payments, no interest. | 59,350 | 59,769 |
| Promissory note to a stockholder, 10% stated interest rate, unsecured, interest due quarterly, due on demand to related party. | 151,832 | 159,442 |
| Promissory note to an investor, 10% stated interest rate, face value discounted and to be accreted over the life of the note.  Due on demand. | 700,000 | 663,935 |
| Promissory note to a member of AfterBev, 10% stated interest, interest payable quarterly. Due on demand. | 75,000 | 75,000 |
| Promissory notes to 3 investors, 12% stated interest, 5% borrowing fee, due on demand to related party. | 51,916 | 51,916 |
| Promissory note to a member of PlayBev, 10% stated interest, interest payable quarterly, unsecured. Due on demand. | 250,000 | 250,000 |
|  | 1,288,098 | 1,260,062 |
| Less current maturities | (1,288,098) | (1,260,062) |
| Long-term portion of notes payable | $        – | $        – |

16

The accounting policies of the segments are consistent with those described in the summary of significant accounting policies. The Company evaluates performance of each segment based on earnings or loss from operations. Selected segment information is as follows:

| | Electronics Assembly | Contract Manufacturing | Marketing and Media | Beverage Distribution | Tot |
|---|---|---|---|---|---|
| **Three Months Ended June 30, 2011** | | | | | |
| Sales to external customers | $ - | $ 23,407 | $ - | $ 662,218 | $ 66 |
| Segment income (loss) | 5,674,748 | (24,996) | (92,772) | (852,971) | 4,70 |
| Segment assets | 1,756,790 | 836,559 | 96,518 | 1,480,919 | 4,17 |
| Depreciation and amortization | 6,258 | 43,448 | 2,631 | - | 9 |
| **Three Months Ended June 30, 2010** | | | | | |
| Sales to external customers | $ 28,500 | $ 26,509 | $ 278,085 | $ 1,980,749 | $ 2,31 |
| Segment income (loss) | (127,853) | (52,734) | (35,278) | (506,087) | (72 |
| Segment assets | 2,896,647 | 1,114,310 | 661,189 | 3,222,196 | 7,89 |
| Depreciation and amortization | 93,410 | 64,447 | 5,841 | - | 16 |
| **Six Months Ended June 30, 2011** | | | | | |
| Sales to external customers | $ - | $ 77,348 | $ - | $ 2,003,477 | $ 2,08 |
| Segment income (loss) | (2,557,968) | (25,518) | (98,560) | (1,223,737) | (3,90 |
| Segment assets | 1,756,790 | 836,559 | 96,518 | 1,480,919 | 4,17 |
| Depreciation and amortization | 14,993 | 85,626 | 8,146 | - | 10 |
| **Six Months Ended June 30, 2010** | | | | | |
| Sales to external customers | $ 198,944 | $ 27,554 | $ 768,521 | $ 3,101,683 | $ 4,09 |
| Segment income (loss) | (546,698) | (117,681) | (72,413) | (1,348,528) | (2,08 |
| Segment assets | 2,896,647 | 1,114,310 | 661,189 | 3,222,196 | 7,89 |
| Depreciation and amortization | 187,143 | 128,894 | 11,682 | - | 32 |

## NOTE 14 - GEOGRAPHIC INFORMATION

The Company currently maintains $160,684 of capitalized tooling costs in China. All other revenue-producing assets are located in the United States of America. Revenues are attributed to the geographic areas based on the location of the customers purchasing the products.

## NOTE 15 - VARIABLE INTEREST ENTITY

Consolidation of PlayBev - During the year ended December 31, 2007, the Company, through AfterBev, a 51% voting and 4% economic interest consolidated subsidiary, purchased a 50% ownership in PlayBev for $750,000. As condition of the purchase, AfterBev was to develop an acceptable operating plan for PlayBev, procure a credit facility with a third party at prevailing market rates sufficient to fund PlayBev's working capital needs, and provide a third party vendor to develop, manufacture, and distribute the energy drink product. Upon satisfactory completion of these events, AfterBev was granted an additional 1% ownership interest in PlayBev, bringing its total investment to 51%. Certain participating rights held by the minority interest holders of PlayBev prevented it being consolidated with the Company under the majority ownership accounting guidance. The Company was selected to develop, manufacture, and distribute the energy drinks as well as provide the credit facility to support the working capital needs of PlayBev.

20

Effective January 1, 2010, the Company adopted the new provisions under Generally Accepted Accounting Principles ("GAAP"), ASC 810-10, "Consolidation of Variable Interest Entities," caused the Company to re-evaluate its involvement with PlayBev. At year end, the Company determined that it was the primary beneficiary of PlayBev, and that the assets, liabilities and operations of PlayBev should be consolidated into its financial statements beginning January 1, 2010.

Included in the accompanying financial statements are the following assets and liabilities of PlayBev as of June 30, 2011, and December 31, 2010:

| | June 30, 2011 | December 31, 2010 |
|---|---|---|
| Other Assets | $ 361 | $ 361 |
| Prepaid Royalty | - | 500,000 |
| Total Assets | $ 361 | $ 500,361 |
| Accrued Interest | $ 344,762 (a) | $ 266,129 |
| Royalty Payable | 582,278 (a) | 552,150 |
| Notes Payable to Shareholders | 250,000 (a) | 250,000 |
| Total Liabilities | $ 1,177,040 | $ 1,068,279 |

(a) The following liabilities are considered liabilities subject to compromise (See Notes 6 and 16).

The assets included above primarily relate to prepayments under the Playboy license agreement that expires in March 2012. The parties have the option to extend the license agreement at the end of the term. These assets can not be used to settle PlayBev's liabilities. The liabilities above include royalties payable under a license agreement with LIB-MP on beverage sales.

## NOTE 16 - SUBSEQUENT EVENTS

YA Global - On July 22, 2011, YA filed a motion in the ABS lawsuit (discussed below under "Legal Proceedings"), seeking an order clarifying its position with respect to ABS and staying enforcement of that court's order that CirTran pay approximately $35,000 in legal fees to ABS. In its motion, YA gave notice that it intended to conduct a secured party's public auction of all of CirTran's assets. Also on July 22, 2011, in a letter written to the Company and filed with YA's motion (the "Instruction Letter"), YA informed the Company that one or more "Events of Termination (as defined in the A&R Forbearance Agreement) had occurred, and that as a result, YA had declared that all of the Company's obligations under the A&R Forbearance Agreement and the Debentures had been accelerated and was due and owing. Further, YA stated that it intended to commence action to collect on the obligations of the Company. YA instructed the Company to assemble the assets.

At a hearing held on August 3, 2011, on YA's motion to stay enforcement, YA noted that the date of the proposed secured party's public auction was August 30, 2011. Additionally, on August 3, 2011, YA tendered to the Company Notifications of Disposition of Collateral (the "UCC Notifications"), giving notice of the date of the proposed sale of assets on August 30, 2011.

At the hearing, the court denied YA's motion to stay the payment of attorneys' fees by the Company.

Subsequently, YA, the Company, and the Company's subsidiaries that were parties to the A&R Forbearance Agreement (the "Subsidiaries") entered into an agreement (the "Letter Agreement") whereby YA agreed to rescind the Instruction Letter and the UCC Notifications. The Company and YA further agreed that YA's agreement to forbear enforcement under the A&R Forbearance Agreement was terminated, and that the rescission of the UCC Notifications and the Instruction Letter did not constitute a waive of any of YA's rights, and that Company and the Subsidiaries remain responsible for all obligations under the A&R Forbearance Agreement.

21

PlayBev Bankruptcy - The management of Play Beverages, LLC ("PlayBev"), a consolidated entity of the Company, decided that reorganizing PlayBev as a debtor-in-possession under Chapter 11, of Title 11, of the United States Bankruptcy Code, was in the best interests of PlayBev, its creditors and its equity holders. Accordingly, on August 12, 2011, PlayBev consented to the entry of an order for relief in the pending involuntary bankruptcy case that was filed against it, and immediately exercised its right under section 706(a) of the Bankruptcy Code to convert the case to a voluntary Chapter 11 case. That same day, the court entered an Order for Relief under Chapter 11 based on PlayBev's elections. PlayBev is now a debtor-in-possession and intends to propose and confirm a plan of reorganization in the case.

In connection with the prior Chapter 7 case, Playboy Enterprises International, Inc. ("Playboy"), filed a motion to terminate the automatic stay to permit it to terminate the Product License Agreement between Playboy and PlayBev. PlayBev contests the motion, and a hearing on the motion was currently scheduled for August 23, 2011. However, in light of the conversion to Chapter 11, PlayBev filed a motion to continue the hearing on Playboy's motion. At an August 16, 2011, hearing on PlayBev's motion, the Court continued the hearing on Playboy's motion to terminate the automatic stay until September 2, 2011, when such motion will be heard.

22

## ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

This discussion should be read in conjunction with Management's Discussion and Analysis of Financial Condition and Results of Operations included in our Annual Report on Form 10-K for the year ended December 31, 2010.

### Overview

In our U.S. operations, we provide a mix of high and medium size volume turnkey manufacturing services and products using various high-tech applications for leading electronics OEMs in the communications, networking, peripherals, gaming, law enforcement, consumer products, telecommunications, automotive, medical, and semiconductor industries. Our services include pre-manufacturing, manufacturing and post-manufacturing services. Our goal is to offer customers the significant competitive advantages that can be obtained from manufacture outsourcing. We also market an energy drink under the Playboy brand pursuant to a license agreement with Playboy Enterprises, Inc. ("Playboy").

We conduct business through our subsidiaries and divisions: CirTran Beverage, CirTran USA, CirTran Asia, CirTran Products, CirTran Media Group, and CirTran Online. CirTran Beverage manufactures, markets, and distributes Playboy-licensed energy drinks in accordance with an agreement we entered into with PlayBev, a consolidated variable interest entity, who holds the Playboy license. Revenues from CirTran Beverages during the three months ended June 30, 2011 and 2010, amounted to 97 percent and 86 percent of total sales, respectively, and during the six months ended June 30, 2011 and 2010, amounted to 96 percent and 75 percent of total sales, respectively.

CirTran USA accounted for zero percent and 1 percent of our total revenues during the three months ended June 30, 2011 and 2010, respectively, and zero percent and 5 percent of our total revenues during the six months ended June 30, 2011 and 2010, respectively. Revenues were generated by low-volume electronics assembly activities consisting primarily of the placement and attachment of electronic and mechanical components on printed circuit boards and flexible (i.e., bendable) cables.

Through CirTran Asia we manufacture and distribute electronics, consumer products and general merchandise to companies selling in international markets. Royalty revenue was 3 percent and 1 percent of our total revenues during the three months ended June 30, 2011 and 2010, respectively and 4 percent and 1 percent of our total revenues during the six months ended June 30, 2011 and 2010, respectively.

CirTran Products pursues contract-manufacturing relationships in the U.S. consumer products markets, including licensed merchandise sold in the sports and entertainment markets. Sales comprised zero percent of total sales for the three and six months ended June 30, 2011 and 2010, respectively.

CirTran Media provides end-to-end services to the direct response and entertainment industries. The company had no revenues relating to this subsidiary for the three and six months ended June 30, 2011 and 2010.

CirTran Online sells products via the Internet, and provides services and support to Internet retailers. In conjunction with our partner GMA, revenues from this division were zero percent and 12 percent of total revenues for the three months ended June 30, 2011 and 2010, respectively, and zero and 19 percent of total revenues for the six months ended June 30, 2011 and 2010, respectively.

### Forward-Looking Statements and Certain Risks

The statements contained in this report that are not purely historical are considered to be "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995 and Section 21E of the Securities Exchange Act. These statements represent our expectations, hopes, beliefs, anticipations, commitments, intentions, and strategies regarding the future. They may be identified by the use of words or phrases such as "believes," "expects," "anticipates," "should," "plans," "estimates," and "potential," among others. Forward-looking statements include, but are not limited to, statements contained in Management's Discussion and Analysis of Financial Condition and Results of Operations regarding our financial performance, revenue, and expense levels in the future and the sufficiency of our existing assets to fund future operations and capital spending needs. Readers are cautioned that actual results could differ materially from the anticipated results or other expectations that are expressed in these forward-looking statements. The fact that some of these risk factors may be the same or similar to our past reports filed with the SEC means only that the risks are present in multiple periods. We believe that many of the risks are part of doing business in the industry in which we operate and compete and will likely be present in all

periods reported. The fact that certain risks are common in the industry does not lessen their significance. The forward-looking Statements contained in this report, are made as of the date of this report and we assume no obligation to update them or to update the reasons why our actual results could differ from those that we have projected in such forward-looking Statements. We expressly disclaim any obligation or intention to update any forward-looking statement.

23

**Results of Operations**

Comparison of the three months ended June 30, 2011 and 2010 and six months ended June 30, 2011 and 2010.

**Sales and Cost of Sales**

Net sales decreased to $685,625 for the three months ended June 30, 2011, as compared to $2,313,843 for the three months ended June 30, 2010. Net sales decreased to $2,080,825 for the six months ended June 30, 2011, as compared to $4,096,702 for the six months ended June 30, 2010. Sales were significantly higher during the second quarter of 2010 due to several large start-up orders from overseas distributor. During the second quarter of 2011 we did not experience the same volume of new business.

Cost of sales, including royalty expense, as a percentage of sales, increased to 97 percent from 69 percent for the three months ended June 30, 2011, as compared to the three months ended June 30, 2010, respectively, and decreased to 68 percent from 80 percent for the six months ended June 30, 2011, as compared to the six months ended June 30, 2010, respectively. Consequently, the gross profit margin decreased to 3 percent from 31 percent, for the three months ended June 30, 2011 and 2010, respectively and increased to 32 percent from 20 percent, for the six months ended June 30, 2011 and 2010, respectively. The increase in gross profit margin were attributable to the significant shift in the sales mix of products and services experienced during 2011 as compared to 2010 and increases in product royalty expenses, which are included in the cost of sales. The company shifted its focus to the manufacture and distribution of beverages. In addition, CirTran Beverage records products sales and costs on sales made directly to distributors and end customer, which sales provide a more favorable gross profit margin. We anticipate that gross profit margins for CirTran Beverage will increase in the future as we increase our distribution of the Playboy energy drink beverages to both domestic and international markets.

The following charts present comparisons of sales, cost of sales and gross profits generated by our four operating segments, i.e., Contract Manufacturing, Electronics Assembly, Marketing and Media and Beverage Distribution during the three and six months ended June 30, 2011 and 2010.

24

Three Months Ended June 30:

| Segment | Year | Sales | Cost of Sales | Royalty Expense | Gross Loss / |
|---|---|---|---|---|---|
| Electronics Assembly | 2011 | $ - | $ - | $ - | $ |
| | 2010 | 28,500 | - | - | |
| Contract Manufacturing | 2011 | 23,407 | 403 | - | |
| | 2010 | 26,509 | 427 | 25,200 | |
| Marketing / Media | 2011 | - | - | - | |
| | 2010 | 278,085 | 264,182 | - | |
| Beverage Distribution | 2011 | 662,218 | 132,727 | 534,296 | |
| | 2010 | 1,980,749 | 747,133 | 554,584 | 6 |

Six Months Ended June 30:

| Segment | Year | Sales | Cost of Sales | Royalty Expense | Gross Loss / |
|---|---|---|---|---|---|
| Electronics Assembly | 2011 | $ - | $ - | $ - | $ |
| | 2010 | 198,944 | 198,340 | - | |
| Contract Manufacturing | 2011 | 77,348 | 734 | - | |
| | 2010 | 27,554 | (11,181) | 25,200 | 1 |
| Marketing / Media | 2011 | - | - | - | |
| | 2010 | 768,521 | 727,328 | - | |
| Beverage Distribution | 2011 | 2,003,477 | 327,683 | 1,078,361 | 59 |
| | 2010 | 3,101,683 | 1,244,688 | 1,079,967 | 77 |

## Selling, General and Administrative Expenses

During the three months ended June 30, 2011, selling, general and administrative expenses decreased $85,376 and decreased $185,115 for the six months ended June 30, 2011, as compared to the same periods during 2010. The decrease was the result of the shift from assembly and Media and Marketing to Beverage Distribution that reduced payroll and administrative costs. We continue to reposition our business structure to take advantage of our core strengths.

Non-cash compensation expense

Compensation expense in connection with accounting for options owed or granted to employees to purchase common stock was $5,703 for the three months ended June 30, 2011, as compared to $0 for the three months ended June 30, 2010, respectively, and $104,462 for the six months ended June 30, 2011, as compared to $43,577 for the six months ended June 30, 2010, respectively, as a result of the employee stock options accrued for per the respective employment agreements.

Other income and expense

Interest expense recorded in the Condensed Consolidated Statements of Operations combines both accretion expense and interest expense. The combined interest expense for three months ended June 30, 2011, was $232,722 as compared to $323,052 for the three months ended June 30, 2010, a decrease of 28 percent and the combined interest expense for six months ended June 30, 2011, was $504,512 as compared to $588,624 for the six months ended June 30, 2010, a decrease of 14 percent. The decrease in the combined interest expense was driven by the reduction in accretion, expense recorded for the three and six months ended June 30, 2011.

We recorded a gain of $6,005,885 on our derivative valuation for the three months ending June 30, 2011, as compared to a gain of $120,652 recorded for the three months ended June 30, 2010. We recorded a loss of $1,865,826 on our derivative valuation for the six months ended June 30, 2011, as compared to a gain of $368,009 recorded for the six months ended June 30, 2010. The swing in the derivative valuation is primarily the result of factors relating to the differing debt levels of the underlying convertible securities, together with the varying market values of our common stock.

25

As a result of these factors, our overall net income increased to $4,704,009 for the three months ended June 30, 2011, as compared to a net loss of $721,952 for the three months ended June 30, 2010. The net income attributable to the Company was $5,263,106 for the three months ended June 30, 2011, and a net loss of $559,097 was attributable to a non-controlling equity interest in PlayBev. Net loss increased to $3,905,783 for the six months ended June 30, 2011, as compared to a net loss of $2,085,320 for the six months ended June 30, 2010. The net loss attributable to the Company was $2,770,850 for the six months ended June 30, 2011, and a net loss of $1,134,933 was attributable to a non-controlling equity interest in PlayBev.

### Liquidity and Capital Resources

We have had a history of losses from operations, as our expenses have been greater than our revenues. Our accumulated deficit was $44,740,760 at June 30, 2011, and $41,969,908 at December 31, 2010. Net loss for the six months ended June 30, 2011, was $3,905,783 as compared to $2,085,320 for the six months ended June 30, 2010. Our current liabilities exceeded our current assets by $24,937,959 as of June 30, 2011, and by $21,140,941 as of December 31, 2010. For the six months ended June 30, 2011 and 2010, we experienced negative cash flows from operating activities of $525,045 and $35,943, respectively.

### Cash

The amount of cash used in operating activities during the six months ended June 30, 2011 decreased by $525,045, driven primarily by increasing payables and deferred revenue balances.

### Accounts Receivable

Trade accounts receivable, net of allowance for doubtful accounts, increased $364,470 during the six months ended June 30, 2011. We continue to monitor individual customer accounts and are working to improve collections on trade accounts receivable. The company eliminates the receivables associated with PlayBev as part of consolidation in accordance with GAAP treatment as a Variable Interest Entity ("VIE").

Accounts payable and accrued liabilities

During the six months ended June 30, 2011, accounts payable, accrued liabilities and short-term debt increased $1,230,370 to a combined balance of $15,704,426. The increase was driven primarily by an increase of $589,005 of short-term advances and an increase of $670,199 in accrued liabilities. At June 30, 2011, we owed $546,000 to the President of the Company and a board member for manager fees relating to PlayBev.

Liquidity and financing arrangements

We have a history of substantial losses from operations, as well of history of using rather than providing cash in operations. We had an accumulated deficit of $44,740,760 along with a total stockholders' deficit of $23,017,582, at June 30, 2011. In addition, we have used, rather than provided, cash in our operations for the six months ended June 30, 2011 and 2010, of $525,045 and $35,943, respectively. During the six months ended June 30, 2011, our monthly operating costs and interest expense averaged approximately $238,000 per month.

In conjunction with our efforts to improve our results of operations we are also actively seeking infusions of capital from investors, and are seeking sources to repay our existing convertible debentures. In our current financial condition, it is unlikely that we will be able to obtain additional debt financing. Even if we did acquire additional debt, we would be required to devote additional cash flow to servicing the debt and securing the debt with assets. Accordingly, we are looking to obtain equity financing to meet our anticipated capital needs. There can be no assurances that we will be successful in obtaining such capital. If we issue additional shares for debt and/or equity, this will dilute the value of our common stock and existing shareholders' positions.

There can be no assurance that we will be successful in obtaining more debt and/or equity financing in the future or that our results of operations will materially improve in either the short or the long term. If we fail to obtain such financing and improve our results of operations, we will be unable to meet our obligations as they become due. Additionally, in light of the occurrence of one or more Events of Termination pursuant to the Amended and Restated Forbearance Agreement (discussed below), YA Global Investments has declared that its agreement to forbear enforcement of its rights under the Convertible Debentures has terminated, and accordingly, YA Global Investments has all rights of a secured creditor. These conditions

raise substantial doubt about our ability to continue as a going concern.

26

**Convertible Debentures**

Highgate House Funds, Ltd. - In May 2005, the Company entered into an agreement with Highgate, to issue a $3,750,000, 5 percent Secured Convertible Debenture (the "Debenture"). The Debenture was originally due December 2007, and is secured by all of the Company's assets. Highgate extended the maturity date of the Debenture to December 31, 2008. As of January 1, 2008 the interest rate increased to 12 percent. On August 11, 2009, the Company and YA Global, an assignee of Highgate, entered into a forbearance agreement and related agreements. The Company agreed to repay the Company's obligations under the Debentures per an agreed schedule. Subsequently, the Company defaulted on its payment obligation. However, in January 2011, the Company and YA Global entered into an amended and restated forbearance agreement, described below.

Accrued interest was originally payable at the time of maturity or conversion. Per the Forbearance Agreement, the scheduled payments are to be applied first to outstanding accrued interest. The Company may, at its option, elect to pay accrued interest in cash or shares of our common stock, with the conversion price to be used to determine the number of shares of common stock being equal to 85 percent of the lowest closing bid price of the Company's common stock during the ten trading days prior to the payment day. Accrued interest of $50,000 was paid during the six months ended June 30, 2011. Interest accrued during the six months ended June 30, 2011, totaled $36,902. The balance of accrued interest owed at June 30, 2011, was $66,301.

On January 24, 2011, the Company, and YA Global Investments finalized an amended and restated forbearance agreement (the "A&R Forbearance Agreement") and related agreements, which related to certain financing arrangements and agreements between the Company and YA and its predecessors. The A&R Forbearance Agreement was dated as of January 7, 2011, but the final conditions for closing were met on January 24, 2011.

The Company and certain of its subsidiaries, which also guaranteed the Company's obligations (the "Guarantors" and collectively with the Company, the ("Obligors") agreed to waive any claims against YA, and released any such claims the Obligors may have had. The Obligors also ratified their respective obligations under the Financing Documents, and agreed to the satisfaction of certain conditions precedent, including the following: payment of certain funds to YA at the time of execution of the A&R Forbearance Agreement; the entry by Iehab Hawatmeh, President of the Company, into a Guaranty Agreement and a Pledge Agreement (both discussed in Note 6); the entry into a Ratification and Joinder Agreement by the Obligors (discussed below); the execution of a confession of judgment in a litigation matter between YA, the Company, and Katana Electronics, LLC ("Katana"); and the delivery of a new warrant (the "Warrant") to YA (see Note 6).

The Company determined that certain conversion features of the Debenture fell under derivative accounting treatment. Since May 2005, the carrying value has been accreted over the life of the debenture until December 31, 2007, the original maturity date. As of that date, the carrying value of the Debenture was $970,136, which was the remaining face value of the debenture.

In connection with the issuance of the Debenture, $2,265,000 of the proceeds was used to repay earlier promissory notes. Fees of $256,433, withheld from the proceeds, were capitalized and were amortized over the life of the note.

During 2006, Highgate converted $1,000,000 of Debenture principal and accrued interest into a total of 37,373,283 shares of common stock. During 2007, Highgate converted $1,979,864 of Debenture principal and accrued interest into a total of 264,518,952 shares of common stock. During the year ended December 31, 2008 Highgate converted $350,000 of debenture principle into a total of 36,085,960 shares of common stock. The carrying value of the Debenture as of June 30, 2011 remained $620,136. The fair value of the derivative liability stemming from the debenture's conversion feature was determined to be $567,681 as of June 30, 2011.

YA Global December, 2005 Debenture - In December 2005, the Company entered into an agreement with YA Global to issue a $1,500,000, 5 percent Secured Convertible Debenture (the "December Debenture"). The December Debenture was originally due July 30, 2008, and has a security interest in all the Company's assets, subordinate to the Highgate security interest. YA Global also agreed to extend the maturity date of the December Debenture to December 31, 2008. As of January 1, 2008 the interest rate was increased to 12 percent. The Company agreed to repay the Company's obligations under the Debentures per an agreed schedule.

27

Accrued interest was originally payable at the time of maturity or conversion. Per the Forbearance Agreement, the scheduled payments are to be applied first to outstanding accrued interest. The Company may, at its option, elect to pay accrued interest in cash or shares of our common stock, with the conversion price to be used to determine the number of shares of common stock being equal to 85 percent of the lowest closing bid price of the Company's common stock during the ten trading days prior to the payment day. Accrued interest of $380,000 was paid during the six months ended June 30, 2011. Interest accrued during the six months ended June 30, 2011, totaled $55,114. The balance of accrued interest owed at June 30, 2011, was $89,260.

As noted above, on January 24, 2011, the Company, and YA Global Investments entered into the A&R Forebearance Agreement, discussed above.

The December Debenture was issued with 10,000,000 warrants, with an exercise price of $0.09 per share. The warrants vested immediately and had a three-year life. As a result of the May 2007 1.2-for1 forward stock split, the effective number of vested warrants increased to 12,000,000. On December 31, 2008, all 12,000,000 warrants expired.

The Company also granted YA Global registration rights related to the shares of the Company's common stock issuable upon the conversion of the December Debenture and the exercise of the warrants. As of the date of this Report, no registration statement had been filed.

The Company determined that the conversion features on the December Debenture and the associated warrants fell under derivative accounting treatment. The carrying value was accreted over the life of the December Debenture until August 31, 2008, a former maturity date, at which time the value of the December Debenture reached $1,500,000.

In connection with the issuance of the December Debenture, fees of $130,000, withheld from the proceeds, were capitalized and are being amortized over the life of the December Debenture.

As of June 30, 2011, YA Global had not converted any of the December Debenture into shares of the Company's common stock. As a result, the carrying value of the debenture as of June 30, 2011, remains $1,500,000. The fair value of the derivative liability stemming from the December Debenture's conversion feature as of June 30, 2011, was determined to be $1,286,074.

YA Global August, 2006 Debenture - In August 2006, the Company entered into another agreement with YA Global relating to the issuance by the Company of another 5 percent Secured Convertible Debenture, due in April 2009, in the principal amount of $1,500,000 (the "August Debenture").

Accrued interest was originally payable at the time of maturity or conversion. Per the Forbearance Agreement, the scheduled payments are to be applied first to outstanding accrued interest. The Company may, at its option, elect to pay accrued interest in cash or shares of our common stock, with the conversion price to be used to determine the number of shares of common stock being equal to 85 percent of the lowest closing bid price of the Company's common stock during the ten trading days prior to the payment day. Interest accrued during the six months ended June 30, 2011, totaled $61,959. The balance of accrued interest owed at June 30, 2011, was $595,165.

As noted above, on January 24, 2011, the Company, and YA Global Investments entered into the A&R Forebearance Agreement, discussed above.

In connection with the August Debenture, the Company also agreed to grant to YA Global warrants (the "Warrants") to purchase up to an additional 15,000,000 shares of our common stock. The Warrants had an exercise price of $0.06 per share, and originally were to expire three years from the date of issuance. The Warrants also provide for cashless exercise if at the time of exercise there is not an effective registration statement or if an event of default has occurred. As a result of the May 2007 1.2-for 1 forward stock split, the effective number of outstanding warrants increased to 18,000,000. In connection with the Forbearance Agreement, the term of the warrants was extended to August 23, 2010 and have since expired.

28

In connection with the issuance of the August Debenture, the Company also granted YA Global registration rights related to the common stock issuable upon conversion of the August Debenture and the exercise of the Warrants. As of the date of this report, no registration statement had been filed.

The Company determined that the conversion features on the August Debenture and the associated warrants fell under derivative accounting treatment. The carrying value was accreted each quarter over the life of the August Debenture until the carrying value equaled the face value of $1,500,000. During the year ended December 31, 2008, YA Global chose to convert $341,160 of the convertible debenture into 139,136,360 shares of common stock.

YA Global chose to convert $117,622 of the convertible debenture into 72,710,337 shares of common stock during the year ended December 31, 2009. As of June 30, 2011, the carrying value of the August Debenture was $1,041,218. The fair value of the derivative liability arising from the August Debenture's conversion feature was $1,353,284 as of June 30, 2011.

In connection with the issuance of the August Debenture, fees of $135,000, withheld from the proceeds, were capitalized and are being amortized over the life of the August Debenture.

**Events of Termination under A&R Forbearance Agreement**

On July 22, 2011, YA Global filed a motion in the ABS lawsuit (discussed below under "Legal Proceedings"), seeking an order clarifying its position with respect to ABS and staying enforcement of that court's order that CirTran pay approximately $35,000 in legal fees to ABS. In its motion, YA Global gave notice that it intended to conduct a secured party's public auction of all of CirTran's assets. Also on July 22, 2011, in a letter written to the Company and filed with YA Global's motion (the "Instruction Letter"), YA Global informed the Company that one or more "Events of Termination (as defined in the A&R Forbearance Agreement) had occurred, and that as a result, YA Global had declared that all of the Company's obligations under the A&R Forbearance Agreement and the Debentures had been accelerated and was due and owing. Further, YA Global stated that it intended to commence action to collect on the obligations of the Company. YA Global instructed the Company to assemble the assets.

At a hearing held on August 3, 2011, on YA Global's motion to stay enforcement, YA Global noted that the date of the proposed secured party's public auction was August 30, 2011. Additionally, on August 3, 2011, YA Global tendered to the Company Notifications of Disposition of Collateral (the "UCC Notifications"), giving notice of the date of the proposed sale of assets on August 30, 2011.

At the hearing, the court denied YA Global's motion to stay the payment of attorneys' fees by the Company.

Subsequently, YA Global, the Company, and the Company's subsidiaries that were parties to the A&R Forbearance Agreement (the "Subsidiaries") entered into an agreement (the "Letter Agreement") whereby YA Global agreed to rescind the Instruction Letter and the UCC Notifications, The Company and YA Global further agreed that YA Global's agreement to forbear enforcement under the A&R Forbearance Agreement was terminated, and that the rescission of the UCC Notifications and the Instruction Letter did not constitute a waive of any of YA Global's rights, and that Company and the Subsidiaries remain responsible for all obligations under the A&R Forbearance Agreement.

Critical accounting estimates

Revenue Recognition - Revenue is recognized when products are shipped. Title passes to the customer or independent sales representative at the time of shipment. Returns for defective items are repaired and sent back to the customer. Historically, expenses associated with returns have not been significant and have been recognized as incurred.

Shipping and handling fees are included as part of net sales. The related freight costs and supplies directly associated with shipping products to customers are included as a component of cost of goods sold.

We signed an Assignment and Exclusive Services Agreement with GMA, a related party, whereby revenues and all associated performance obligations under GMA's web-hosting and training contracts were assigned to us. Accordingly, this revenue is recognized in our financial statements when it is collected, along with our revenue of CirTran Online Corporation.

29

We sold our Salt Lake City, Utah, building in a sale/leaseback transaction, and reported the gain on the sale as deferred revenue to be recognized over the term of lease pursuant to ASC 840-10, Accounting for Leases.

We have entered into a Manufacturing, Marketing and Distribution Agreement with PlayBev, a related party, whereby we are the vendor of record in providing initial development, promotional, marketing, and distribution services marketing and distribution services. Accordingly, all amounts billed to PlayBev in connection with the development and marketing of its new energy drink have been included in revenue.

Impairment of Long-Lived Assets - We review our long-lived assets, including intangibles, for impairment when events or changes in circumstances indicate that the carrying value of an asset may not be recoverable. At each balance sheet date, we evaluate whether events and circumstances have occurred that indicate possible impairment. We use an estimate of future undiscounted net cash flows from the related asset or group of assets over their remaining life in measuring whether the assets are recoverable. Long-lived asset costs are amortized over the estimated useful life of the asset, which is typically 5 to 7 years. Amortization expense was $6,636 and $111,113 for the three months ended June 30, 2011 and 2010, respectively, and was $13,271 and $222,227 for the six months ended June 30, 2011 and 2010, respectively.

Financial Instruments with Derivative Features - We do not hold or issue derivative instruments for trading purposes. However, we have financial instruments that are considered derivatives, or contain embedded features subject to derivative accounting. Embedded derivatives are valued separate from the host instrument and are recognized as derivative liabilities in our balance sheet. We measure these instruments at their estimated fair value, and recognize changes in their estimated fair value in results of operations during the period of change. We have estimated the fair value of these embedded derivatives using the Black-Scholes model. The fair value of the derivative instruments are measured each quarter.

Registration Payment Arrangements - On January 1, 2007, we adopted ASC 815-40 Accounting for Registration Payment Arrangements. Under ASC 815-40, and ASC 450-10, Accounting for Contingencies, a registration payment arrangement is an arrangement where (a) we have agreed to file a registration statement for certain securities with the SEC and have the registration statement declared effective within a certain time period; and/or (b) we will endeavor to keep a registration statement effective for a specified period of time; and (c) transfer of consideration is required if we fail to meet those requirements. When we issues an instrument coupled with these registration payment requirements, we estimate the amount of consideration likely to be paid under the agreement, and offsets such amount against the proceeds of the instrument issued. The estimate is then reevaluated at the end of each reporting period, and any changes recognized as a registration penalty in the results of operations. As further described in Note 6 to the consolidated financial statements, we have instruments that contain registration payment arrangements. The effect of implementing this has not had a material effect on the financial statements because we consider probability of payment under the terms of the agreements to be remote.

30

**ITEM 3. Quantitative and Qualitative Disclosures About Market Risk**

Not required

**ITEM 4. CONTROLS AND PROCEDURES**

**Disclosure Controls and Procedures**

The Company carried out an evaluation, under the supervision and with the participation of management, including our Chief Executive Officer / Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of June 30, 2011. Based on our evaluation, our Chief Executive Officer / Chief Financial Officer has concluded that the Company's disclosure controls and procedures were not effective at June 30, 2011, due to the fact that the material weaknesses in the Company's internal control over financial reporting described in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2010, had not been remediated as of June 30, 2011.

These weaknesses are continuing. Management and the Board of Directors are aware of these weaknesses that result because of limited resources and staff. Efforts to design and implement controls and processes have been put on hold due to limited resources, but we anticipate a renewed focus on this effort in the near future. Due to our limited financial and managerial resources, we cannot assure when we will be able to implement effective internal controls over financial reporting.

**Changes in Internal Control over Financial Reporting**

There was no change in our internal control over financial reporting that occurred in the second quarter of 2011 that has materially affected, or is reasonably likely to materially affect our internal control over financial reporting.

31

## PART II - OTHER INFORMATION

**Item 1. Legal Proceedings**

*Advanced Beauty Solutions, LLC. v. CirTran Corporation*, Case No.1:08-ap-01363-GM. In connection with prior litigation between Advanced Beauty Solutions ("ABS") and the Company, ABS claimed non-performance by the Company and filed an adversary proceeding in ABS's bankruptcy case proceeding in the United States Bankruptcy Court, Central District of California, and San Fernando Valley Division. On March 17, 2009, the Bankruptcy Court entered judgment in favor of ABS and against the Company in the amount of $1,811,667 plus interest. On September 11, 2009, the Bankruptcy Court denied the Company's motion to set aside the judgment. As of the date of this report, ABS is pursuing collection efforts on this judgment.

On September 8, 2010, the Company executed an Assignment of Copyrights, thereby assigning the Company's Copyright Registration No. TX-6-064-955, Copyright Registration No. TX-6-064-956, and Copyright to the True Ceramic Pro - Live Ops (TCPS) infomercial and related master tapes (collectively the "Copyrights") to ABS. The Company assigned and transferred the Copyrights without reservation or exclusion, making ABS the owner of the Copyrights. On February 23, 2011, the Company filed a Motion to Declare Judgment Fully Satisfied or Alternatively to Recoup Mutual Debts, requesting that the Court determine that the Company's assignment of the Copyrights resulted in full satisfaction of the ABS judgment. On March 3, 2011, ABS brought a Motion for Order to Show Cause re Civil Contempt by the Company and CirTran Beverage Corp., CirTran Products Corp., CirTran Media Corp., and Iehab Hawatmeh, alleging that the Company had failed to make payments on ABS's judgment in violation of the Court's orders.

On April 6, 2011, the Court held a hearing on (1) the Company's Motion to Declare Judgment Fully Satisfied or Alternatively to Recoup Mutual Debts; and
(2) ABS's Motion for an Order to Show Cause re Civil Contempt. The Court denied the Company's Motion to declare the judgment fully satisfied, and granted ABS's motion but did not hold the Company in civil contempt. The Court set a hearing on the motion for the Order to Show Cause for July 8, 2011, regarding the Company's compliance with collection orders, which the parties stipulated should be postponed until August 3, 2011. The parties attended a mediation of the case on July 11, 2011, but no formal settlement resulted. The court found that a basis exists to hold the Company, some of its subsidiaries, and Mr. Hawatmeh in contempt and set an evidentiary hearing for October 6, 2011, to determine whether to issue a contempt citation. As of the date of this Report, the Company had appealed the denial of the motion to declare the judgment satisfied, and was reviewing its options with respect to how to proceed.

*Apex Maritime Co. (LAX), Inc. v. CirTran Corporation, CirTran Asia, Inc., et al.*, California Superior Court, Los Angeles County, SC098148. Plaintiff Apex Maritime Co. (LAX), Inc. ("Apex") filed a complaint on May 8, 2008, against the Company and CirTran Asia, the Company's subsidiary, claiming breach of contract, nonpayment on open book account, nonpayment of an account stated, and non-payment for services, seeking approximately $62,000 against the Company and $121,000 against CirTran Asia. The Company and CirTran Asia answered on June 9, 2008. The parties subsequently entered into a Release and Settlement Agreement pursuant to which the Company and CirTran Asia agreed to pay an aggregate of $195,000 in monthly payments. In the event of default under the Release and Settlement Agreement, the Plaintiffs could file a Stipulation for Entry of Judgment in the amount of $195,000, minus any amounts paid under the Release and Settlement Agreement. On February 26, 2009, the Stipulation of Judgment was filed, granting the California court jurisdiction to enforce the Release and Settlement Agreement. On March 3, 2009, the court entered its judgment pursuant to the Release and Settlement Agreement. On April 23, 2009, a Judgment Enforcing Settlement was entered against CirTran Corporation and CirTran Asia, Inc., jointly and severally in the principal amount of $173,000, plus fees of $1,800 and costs of $40. On October 28, 2009, the Third Judicial District Court, District of Utah, West Jordan Department, entered an Order in Supplemental Proceedings, with which the Company complied. The parties have previously engaged in settlement negotiations. These amounts have been accrued in full as a liability.

*Global Freight Forwarders v. CirTran Asia*, Civil No. 080925731, Third Judicial District Court, Salt Lake County, State of Utah. On December 18, 2008, the plaintiff filed a complaint against CirTran Asia, claiming breach of contract, breach of the duty of good faith and fair dealing, and unjust enrichment, seeking approximately $260,000. The Complaint was served on CirTran Asia on January 5, 2009. On February 12, 2009, CirTran Asia filed its answer. The Parties engaged in settlement negotiations, reached an agreement, and a final written settlement agreement has been executed.

32

Dr. Najib Bouz v. CirTran Beverage Corp, Iehab Hawatmeh and Does 1-20, Superior Court for the State of California, County of Los Angeles, Civil No. KC053818. On September 12, 2008, the plaintiff filed a complaint, seeking a judgment for $52,500 plus attorneys' fees and certain costs, against CirTran Beverage, Iehab Hawatmeh and unnamed others, claiming breach of contract and fraud in connection with a certain promissory note. CirTran Beverage and Mr. Hawatmeh answered, denying liability. On August 11, 2009, the parties entered into a settlement agreement whereby the claims against Mr. Hawatmeh were dismissed with prejudice, and the Company agreed to pay Dr. Bouz $63,000 over a twelve month period. The Company has made 9 monthly payments but is in default of the $5,250 monthly payments that were due on May 28, 2010, June 28, 2010, and July 28, 2010. The judgment has been domesticated in Utah, and Dr. Bouz has begun pursuing collection efforts. These amounts have been accrued in full as a liability.

Dr. Paul Bouz v. CirTran Beverage Corp, Iehab Hawatmeh and Does 1-20, Superior Court for the State of California, County of Los Angeles, Civil No. KC053819. On September 12, 2008, the plaintiff filed a complaint, seeking a judgment for $52,500 plus attorneys' fees and certain costs, against CirTran Beverage, Iehab Hawatmeh and unnamed others, claiming breach of contract and fraud in connection with a certain promissory note. CirTran Beverage and Mr. Hawatmeh answered, denying liability. On August 11, 2009, the parties entered into a settlement agreement whereby the claims against Mr. Hawatmeh were dismissed with prejudice, and the Company agreed to pay Dr. Bouz $63,000 over a twelve month period. The Company has made 10 monthly payments but is in default of the $5,250 monthly payments that were due on June 28, 2010, and July 28, 2010. The judgment has been domesticated in Utah, and Dr. Bouz has begun pursuing collection efforts. These amounts have been accrued in full as a liability.

NA CL&D Graphics v. CirTran Beverage Corp., Case No. 09V01154, Circuit Ct, Waukesha County, Wisconsin. On or about March 23, 2009, CL&D filed an action in the above court, alleging claims for breach of contract, unjust enrichment, promissory estoppel, and seeking damages of at least $25,488 along with attorneys' fees and costs. CirTran Beverage Corp is reviewing the matter and intends to defend vigorously against the allegations in the complaint. These amounts have been accrued in full as a liability.

Old Dominion Freight Line v. CirTran Corporation, Civil No. 090426290, Third Judicial District Court, Salt Lake County, State of Utah. On May 5, 2010, the Court entered an Order in Supplemental Proceedings in connection with a judgment in favor of Old Dominion and against CirTran in the amount of $33,187. The parties agreed to resolve this matter under terms requiring CirTran to pay $20,000 over time. To date, the required payments have not been made. These amounts have been accrued in full as a liability.

YA Global Investments, LP v. CirTran Corporation, Third Judicial District Court of Salt Lake County, State of Utah, case no. 100911400. On January 24, 2011, the Company entered into a Forbearance Agreement with YA Global Investments, LP ("YA"), including a confession of judgment in favor of YA. On February 23, 2011, the court entered judgment based on the confession of judgment against the Company in the amount of $3,161,354 in principal, plus $825,858 in interest.

On July 22, 2011, YA Global filed a motion in the ABS lawsuit (discussed above), seeking an order clarifying its position with respect to ABS and staying enforcement of that court's order that CirTran pay approximately $35,000 in legal fees to ABS. In its motion, YA Global gave notice that it intended to conduct a secured party's public auction of all of CirTran's assets. Also on July 22, 2011, in a letter written to the Company and filed with YA Global's motion (the "Instruction Letter"), YA Global informed the Company that one or more "Events of Termination (as defined in the A&R Forbearance Agreement) had occurred, and that as a result, YA Global had declared that all of the Company's obligations under the A&R Forbearance Agreement and the Debentures had been accelerated and was due and owing. Further, YA Global stated that it intended to commence action to collect on the obligations of the Company. YA Global instructed the Company to assemble the assets.

At a hearing held on August 3, 2011, on YA Global's motion to stay enforcement, YA Global noted that the date of the proposed secured party's public auction was August 30, 2011. Additionally, on August 3, 2011, YA Global tendered to the Company Notifications of Disposition of Collateral (the "UCC Notifications"), giving notice of the date of the proposed sale of assets on August 30, 2011.

At the hearing, the court denied YA Global's motion to stay the payment of attorneys' fees by the Company.

33

Subsequently, YA Global, the Company, and the Company's subsidiaries that were parties to the A&R Forbearance Agreement (the "Subsidiaries") entered into an agreement (the "Letter Agreement") whereby YA Global agreed to rescind the Instruction Letter and the UCC Notifications. The Company and YA Global further agreed that YA Global's agreement to forbear enforcement under the A&R Forbearance Agreement was terminated, and that the rescission of the UCC Notifications and the Instruction Letter did not constitute a waive of any of YA Global's rights, and that Company and the Subsidiaries remain responsible for all obligations under the A&R Forbearance Agreement.

LIB-MP Beverage, LLC v. PlayBeverages, LLC, CirTran Beverage Corporation, CirTran Corporation, Iehab Hawatmeh, and Fadi Nora, United States District Court, Central District of California, Case No. CV10-2814. On March 25, 2010, LIB-MP Beverages, LLC, filed a complaint asserting claims for fraud, specific performance, breach of contract, breach of the implied covenant of good faith and fair dealing, declaratory relief and accounting (the "California Litigation"). The amount of damages claimed in the California Litigation was not specified. On April 29, 2010, the Company filed claims against LIB-MP Beverage, LLC, American Sales & Merchandising, LLC, Warner Depuy, Michael Liberty and Jeffrey Pollack in the Third Judicial District Court, Salt Lake County, State of Utah, seeking a declaratory judgment on the claims asserted in the California litigation, and further asserting claims for tortious interference with contractual relations, breaches of fiduciary duties, fraud and negligent misrepresentations. On June 21, 2010, the complaint filed in the California Litigation was dismissed without prejudice for lack of jurisdiction.

Jimmy Esebag v. CirTran Corporation and Fadi Nora, Superior Court of the State of California, Los Angeles County, Case No. BC296162. On July 15, 2010, the court entered judgment against the Company in the amount of $68,270 based upon the Company's failure to make payments when due under a settlement with Mr. Esebag. Mr. Esebag has engaged in some actions to collect on the judgment. These amounts have been accrued in full as a liability.

Desiree Liston v. CirTran Media Corp. d/b/a Diverse Media Group Corp., Circuit Court of Benton County, Arkansas, Case No. CV2010-2448-6. On July 28, 2010, Desiree Liston filed a complaint seeking an unspecified amount in excess of $75,000 based on allegations of breach of an Employment Agreement. The Company has filed its answer, and subsequently filed a motion for summary judgment, which was pending as of the date of this Report. The Company believes that this claim has no merit and intends to defend it vigorously.

Gordon Jensen, d/b/a Gordon Jensen Trucking v. CirTran Corp., Third Judicial District Court of Salt Lake County, State of Utah, case no.108900934. On May 28, 2010, plaintiff brought an action seeking $7,145 for nonpayment of services. Judgment was entered against CirTran on October 7, 2010, for $6,703. These amounts have been accrued in full as a liability.

General Distributors, Inc., v. Iehab Hawatmeh and CirTran Beverage Corp., dba Play Beverages LLC dba Playboy Beverages, in the Circuit Court of the State of Oregon, for the County of Clackamas, Case No. CV 10110087. On November 8, 2010, General Distributors, Inc., filed a complaint asserting claims for breach of contract, liability under the Uniform Commercial Code, quasi contract - unjust enrichment, goods sold and delivered, account state, and attorneys fees. The complaint seeks judgment in the amount of $49,999 plus interest and attorneys fees. The Company and the other defendants have answered the complaint and deny liability. Because of the effect of the automatic stay in connection with the In Re Play Beverages LLC bankruptcy matter (discussed below), the litigation in this matter has been stayed.

Playtime Distributing of Oklahoma LLC v. CirTran Corporation, CirTran Beverage Corporation, and PlayBeverages LLC, in the District Court of Oklahoma County, State of Oklahoma, Case No. CJ-2010-1058. On December 30, 2010, Playtime Distributing of Oklahoma LLC filed suit asserting claims for breach of a distribution agreement, bad faith breach of a distribution agreement, rescission of the distribution agreement, accounting, breach of an independent sales agreement, bad faith breach of an independent sales agreement, and punitive damages. The petition seeks judgment in an unspecified amount in excess of $75,000, plus interest and attorneys fees. The Company and the other defendants have answered and deny liability. Because of the effect of the automatic stay in connection with the In Re Play Beverages LLC bankruptcy matter (discussed below), the litigation in this matter has been stayed.

34

USS Cal Builders, Inc. v. CirTran Beverage Corp., Iehab Hawatmeh, and Fadi Nora, in the Superior Court of the State of California, County of Orange, Case No. 00425093. On November 16, 2010, USS Cal Builders, Inc., filed a complaint asserting various claims which were challenged by the Company. On February 8, 2011, USS Cal Builders, Inc., replaced its original complaint with an amended complaint, in which it asserts claims for breach of promissory note, breach of oral contract, common count money had and received, and common count money lent. The amended complaint seeks damages in the sum of at least $100,000 plus interest, costs, and attorneys fees. The Company and the individual defendants have answered the amended complaint, deny liability, and intend to defend the claims.

RDS Touring and Promotions, Inc. v. CirTran Beverage Corp., CirTran Corp., and CirTran Media Corp., in the Superior Court of the State of California, County of Los Angeles, Case No. BC454112. On January 31, 2011, RDS Touring and Promotions, Inc., filed a complaint asserting claims for breach of settlement agreement, fraud in the inducement, and fraud and deceit (false promise). The Company filed a motion to dismiss the fraud claims and the contract claim against all defendants other than the Company. The Plaintiffs filed an amended complaint which included only the contract claim. The Company has answered the amended complaint. Although the Company does not deny that it is currently in breach of the settlement agreement, there is a dispute as to whether CirTran Beverage Corporation and CirTran Media Corporation are obligated under the settlement agreement.

American Express Travel Related Services Company, Inc., v. CirTran Corporation, dba Diverse Media Group and Iehab Hawatmeh, in the Third District Court, State of Utah, Salt Lake County. In this action, American Express asserts a claim for $108,029 in principal and $24,269 in interest due on a credit card account. On May 18, 2011, the defendants were served with a First Amended Complaint. The Company has answered the first amended complaint, denies liability, and intends to defend the claims.

Ayad Jaber, Ramzy Fakhoury, Haya Enterprises, LLC. V. CirTran Beverage Corporation, Play Beverages LLC, Iehab Hawatmeh, and Fadi Nora, in the Superior Court of the State of California, County of Orange, Case No. 0443807. On January 24, 2011, these plaintiffs filed a complaint asserting claims based on alleged breaches of various written and oral promises, seeking damages of $700,000 in principal from the Company, plus $1,219,520 in principal from all defendants, plus $200,000 from Fadi Nora, plus other unspecified amounts. On April 20, 2011, the court entered default judgments against Fadi Nora, the Company, and Play Beverages, LLC. On May 18, 2011, each of these defendants filed a motion to set aside the default judgments and seeking an order permitting the defendants to file their responsive pleadings. These motions were granted, and the default judgments were set aside pursuant to a stipulation. On June 30, 2011, the court granted leave for the defendants to file an answer, cross complaint, and a motion to recuse opposing counsel. The plaintiffs have opposed the cross complaint.

In re Play Beverages, LLC, involuntary Chapter 7 petition, United States Bankruptcy Court for the District of Utah, Case No. 11-26046. Three alleged creditors, LIB-MP Beverage, LLC, George Denney, and Warner K. Depuy, filed an involuntary Chapter 7 petition against Play Beverages, LLC, on April 26, 2011. The petition and a summons were served on Play Beverages, LLC on May 18, 2011. Play Beverages, LLC, has filed a motion to dismiss the involuntary petition. This motion is scheduled to be heard on August 25, 2011. Play Beverages, LLC denies the allegations in the involuntary petition.

In re Play Beverages, LLC, voluntary Chapter 11 petition, United States Bankruptcy Court for the District of Utah, Case No. 11-26046-JTM. The management of Play Beverages, LLC ("PlayBev"), a consolidated entity of the Company, decided that reorganizing PlayBev as a debtor-in-possession under Chapter 11, of Title 11, of the United States Bankruptcy Code, was in the best interests of PlayBev, its creditors and its equity holders. Accordingly, on August 12, 2011, PlayBev consented to the entry of an order for relief in the pending involuntary bankruptcy case that was filed against it, and immediately exercised its right under section 706(a) of the Bankruptcy Code to convert the case to a voluntary Chapter 11 case. That same day, the court entered an Order for Relief under Chapter 11 based on PlayBev's elections. PlayBev is now a debtor-in-possession and intends to propose and confirm a plan of reorganization in the case.

In re Play Beverages, LLC, Motion of Playboy Enterprises International, Inc. to Terminate the Automatic Stay, United States Bankruptcy Court for the District of Utah, Case No. 11-26046. Playboy Enterprises International, Inc. has filed a motion to terminate the automatic stay to permit it to terminate a Product License Agreement between it and Play Beverages, LLC. Play Beverages, LLC contests the motion, and a hearing on the motion was scheduled for August 23, 2011. However, in light of the conversion to Chapter 11 discussed above, PlayBev filed a motion to continue the hearing on Playboy's motion. At an August 16, 2011, hearing on PlayBev's motion, the Court continued the hearing on Playboy's motion to terminate the automatic stay until September 2, 2011, when such motion will be heard.

35

Globe Express Services, v. CirTran Beverage Corp., Third District Court, Salt Lake County, Case No. 110914239. Plaintiff seeks approximately $58,000 for services rendered. The Company was served with the Complaint on June 10, 2011. The Company had not filed a responsive pleading as of the date of this Report, but had undertaken settlement discussions.

Alix Technologies v. CirTran dba CirTran Beverage Corp, Third District Court, West Jordan, Case No. 110407015. Plaintiff filed suit claiming that CirTran Beverage had failed to pay for goods, services, or merchandise provided by Plaintiff. Defendant filed its answer. As of the date of this Report, CirTran Beverage was reviewing the pleadings and its options, and intends to defend against the claims brought.

United Medical Devices, LLC, v. PlaySafe, LLC, Iehab Hawatmeh, and Fadi Nora, Superior Court of the State of California, in and for the County of Los Angeles, West District, Case No. SC113081 ("UMD #1"), and PlaySafe, LLC and PlayBeverages, LLC, v. United Medical Devices, LLC, United Licensing Group, Jimmy Esebag, Patrick Bertranou, and Does 1 through 50, inclusive, Superior Court of the State of California, in and for the County of Los Angeles, West District, Case No. SC113149 ("UMD #2"). In May 2011, Plaintiffs PlaySafe, LLC ("PlaySafe") and PlayBeverages, LLC ("PlayBev"), brought suit against United Medical Devices ("UMD"), United Licensing Group ("ULG"), Jimmy Esebag, and Patrick Bertranou in Utah, alleging breach of contract, breach of the covenant of good faith and fair dealing, tortious interference with contract, fraud, negligent misrepresentation, and seeking damages and punitive damages. That case was dismissed for lack of personal jurisdiction over the defendants. Subsequently, on June 17, 2011, UMD brought suit against PlaySafe, PlayBev, Iehab Hawatmeh, and Fadi Nora, alleging breach of contract, fraudulent misrepresentation, promissory fraud, and fraudulent concealment. On June 23, PlaySafe and PlayBev brought suit against UMD, ULG, Esebag, and Bertranou alleging breach of contract, breach of the covenant of good faith and fair dealing, tortious interference with contract, tortious interference with prospective business relationship, fraud/deceit, negligent misrepresentation, misappropriation of trade secrets.

In UMD #1, defendants PlaySafe, PlayBev, and Messrs. Hawatmeh and Nora filed demurrers on all claims but the breach of contract claims. That motion was pending as of the date of this Report.

In UMD #2, Plaintiffs PlaySafe and PlayBev filed a motion seeking a temporary restraining order, requiring defendants to provide products and to cease contacting the plaintiffs' distributor contacts. The Court in UMD #2 denied the motion for temporary restraining order.

Plaintiffs PlaySafe and PlayBev also filed a motion to consolidate UMD #2 into UMD #1, which motion was pending as of the date of this Report.

Redi FZE v. CirTran Beverage Corp, in the Third District Court, Salt Lake County, State of Utah, Civil No. 110915101. Redi has asserted claims for breach of contract, fraud and negligent misrepresentations. CirTran Beverage Corporation has filed a counterclaim for breach of contract, breach of the covenant of good faith and fair dealing, and a third-party claim for tortious interference against Paul Levin. The company believes that Redi's claims are without merit and intends to defend them vigorously.

## Item 2. Unregistered Sales of Equity Securities and Use of Proceeds

None

## Item 3. DEFAULTS UPON SENIOR SECURITIES

In light of the occurrence of one or more Events of Termination pursuant to the Amended and Restated Forbearance Agreement (See Note 6), YA Global Investments has declared that its agreement to forbear enforcement of its rights under the Convertible Debentures has terminated, and accordingly, YA Global Investments has all rights of a secured creditor.

## Item 4. (Removed and Reserved)

None